SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
JOHN A. MOE, II (Bar No. 066893)
john.moe@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:  (213) 623-9300
Facsimile:   (213) 623-9924

Attorneys for Debtor,
GARDENS REGIONAL HOSPITAL
AND MEDICAL CENTER, INC.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC., dba GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER,<br><br>Debtor. | Case No. 2:16-bk-17463-ER<br><br>Chapter 11<br><br>[Voluntary Petition Filed: June 6, 2016]<br><br>**DECLARATION OF ERIC WEISSMAN IN SUPPORT OF FIRST DAY MOTIONS**<br><br>Hearing:<br><br>Date:  June 9, 2016<br>Time:  10:00 a.m.<br>Place:  Courtroom 1568<br>U.S. Bankruptcy Court<br>255 East Temple Street<br>Los Angeles, CA 90012<br><br>Judge:  Hon. Ernest M. Robles |

94478033\V-3

# DECLARATION OF ERIC WEISSMAN

I, Eric Weissman, declare:

1. I am President of Wilshire Pacific Capital Advisors, LLC ("WPCA"), located at 8447 Wilshire Boulevard, Suite 202, Beverly Hills, California 90211. WPCA was formerly known as London & Pacific Capital Advisors, and it has been in operation since May 2006. In this capacity I have advised numerous hospitals, health plans, healthcare IT companies, physician groups, medical service organizations, surgery centers, skilled nursing facilities, clinics and other entities in the healthcare industry on financing, raising capital, and restructuring debts. Previously, I served as a Senior Associate for Mergers & Acquisitions for Huntington Securities LLC, as a Partner for Mergers & Acquisitions for Phoenix Group LLP, and an Associate for Tax Mergers and Acquisitions for PricewaterhouseCoopers. All together, I have been advising healthcare entities on issues broadly related to mergers and acquisitions and financing for more than 17 years. I have a J.D. from William and Mary School of Law (1999), and an A.B. from the Department of Economics at Princeton University (1996). I have FINRA Series 7, Series 24, Series 63, Series 79 licenses, and I am an associate member of the Virginia State Bar.

2. My firm was retained by the Debtor on October 7, 2013 to serve as its investment banker with regards to efforts to sell Gardens Regional Hospital and Medical Center (the "Hospital" or the "Debtor") as a going concern and/or to raise capital. We marketed the Hospital to hospital buyers and operators throughout California, as well as various out-of-state operators. We negotiated a management agreement and financing commitment from a skilled nursing facility operator in Southern California called Rollins Nelson, which decided to partner with one of the Hospital's previous managers to form a new management company called Sycamore Health Care. Sycamore managed the Hospital from July 14, 2014, to May 31, 2015, at which time the Hospital's board terminated the agreement due to compliance issues and a failure by Sycamore to deliver $2 million in senior debt financing to which it had committed.

3. My firm was re-engaged at that time to find a replacement manager or buyer for the Hospital. Again, we marketed the Hospital widely to operators both inside and outside of California. After soliciting written indications of interest from all prospective bidders, we

arranged for presentations to the board of directors by the top two candidates, Paladin Healthcare, headquartered in Los Angeles, California, and ER Hospitals, LLC, headquartered in Sandy, Utah. The board selected Paladin Healthcare. My firm negotiated a management services agreement and a mezzanine credit facility with an affiliated entity called Harbor-Gardens Healthcare, with the expectation that Paladin would purchase the Hospital in the near future.

4. On June 1, 2016 (the "Petition Date"), the Debtor will file its voluntary petition for relief under Chapter 11 of the Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court").

5. To enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 Case on its business, particularly with regard to patient care, the Debtor has requested various types of relief in a number of applications and motions (each a "First Day Motion" and collectively the "First Day Motions"). The First Day Motions seek relief intended to maintain the Debtor's business operations to preserve value for the Debtor, maintain the quality of patient care, and maximize the return for creditors. Each First Day Motion is crucial to the Debtor's reorganization efforts.

6. I make this declaration in support of the First Day Motions. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion. I have personal knowledge of all the facts stated herein. If called as a witness, I could and would competently testify to the facts set forth herein.

## BACKGROUND

**Chapter 11 Initiatives**

7. The management of the Debtor, after a thorough and deliberative process, has authorized the Debtor to commence this bankruptcy case for the purpose of preserving and maximizing the value of the Debtor's assets for the benefit of the Debtor's creditors and parties in interest and to ensure proper care of patients.

/ / /

/ / /

94478033\V-3

**Secured Creditors**

8. The Debtor has not undertaken an exhaustive review to ascertain whether there is any defect in the security interest granted or the perfection of that security interest. For the purposes herein, I, on behalf of the Debtor, will assume that the security interests were in fact duly perfected, reserving all rights with regard to this issue.

9. I am informed and believe that the following parties have security interests in the Debtors assets: (a) RollinsNelson Grp (*sic*), LLC, a California limited liability company ("RNG"), (b) Sycamore Healthcare Services, LLC ("Sycamore"), (c) Roxbury Healthcare Services, LLC ("Roxbury") and (d) Harbor-Gardens Capital 1, LLC ("Harbor").

10. Pursuant to a Claims Settlement Agreement And Release Agreement, executed in April 2016 ("April Settlement Agreement"), RNG has a $500,000 secured claim, plus interest.

11. Pursuant to that same April Settlement Agreement, Sycamore has a $250,000 secured claim, plus interest.

12. Pursuant to that same April Settlement Agreement, RNG has a $575,000 secured claim, plus interest.

13. Pursuant to a previous settlement agreement, Roxbury has a secured claim for $675,000, plus interest.

14. Under the terms of the April Settlement Agreement, the Debtor consented to treat all four claims described above on a *pari-passu* basis as senior secured claims in a total amount of $2.0 million.

15. Finally, I believe that Harbor loaned the Debtor $2.5 million during the period of October 2015 through February 2016.

16. Thus, I believe that the Debtor's total senior and junior secured claims are equal to $4.5 million, plus interest.

**Capitalized Leases**

17. The Debtor has capitalized leases for medical equipment, the remaining balances due on which total approximately $203,230.

///

94478033\V-3

**The Debtor's Unsecured Debt**

18. The Debtor has approximately $25,825,435 in total unsecured debt, including a significant amount of disputed, unliquidated or contingent claims, which are comprised of claims made by vendors of goods and services, cost report payables, management fees, and incurred but not reported third party claims.

**Plan of Reorganization**

19. The Debtor anticipates that this Chapter 11 Case will involve a Chapter 11 Plan of Reorganization.

20. On behalf of the Debtor, I have secured Debtor In Possession Financing for the Debtor, so that the Debtor can successfully reorganize.

**[PARAGRAPHS 21-24 INTENTIONALLY LEFT BLANK]**

21. ///

///

///

///

///

///

22. ///

///

///

///

///

///

23. ///

///

///

///

///

- 5 -

94478033\V-3

1     24.

2  ///

3  ///

### FIRST DAY MOTIONS AND APPLICATIONS

25. Concurrently with the filing of its Chapter 11 petition, the Debtor is filing certain applications, motions and proposed orders. The Debtor requests that the relief described below be granted, as each request constitutes a critical element in achieving the successful restructuring of the Debtor for the benefit of its patients, creditors and the community it serves.

26. The First Day Motions request various forms of relief. Generally, the First Day Motions have been designed to meet the Debtor's goals of: (a) no disruption in patient care, (b) continuing its operations in Chapter 11 with as little disruption and impact on patient care, (c) maintaining the confidence and support of its employees, vendors, suppliers and service providers during the Debtor's reorganization process, (d) establishing procedures for the smooth and efficient administration of this Chapter 11 Case, and (e) obtaining the necessary financing through cash collateral usage and a debtor in possession loan to finance the Debtor's operations during this Chapter 11 Case.

27. I have reviewed and discussed with Debtor's counsel each of the First Day Motions described below (including the exhibits and supporting memoranda). It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve the goals of this Chapter 11 Case.

///

28. It is my further belief that, with respect to those First Day Motions requesting a sale process that proceeds quickly and employee wages and benefits, the relief requested is essential to the Debtor's chapter 11 effort and necessary to avoid immediate and irreparable harm to the Debtor. Any diminution in the Debtor's ability to maintain its operations in the ordinary course will have an immediate and irreparable harmful effect on the going concern value of the Debtor's estate to the detriment of the Debtor's creditors.

- 6 -

94478033\V-3

**The Motion to Pay Employee Wages and Obligations**

29. The Debtor's goals in this chapter 11 case are to facilitate an orderly administration of its bankruptcy case and to maintain efficient and seamless operations for the benefit of patients in order to maximize the value of its assets for the benefit of all stakeholders. Accordingly, it is imperative to the accomplishment of the Debtor's goals in this case that the Debtor minimizes any adverse impact of the chapter 11 filing on the Debtor's workforce, on the patients in its hospital, on the operations of the hospital, and on the orderly administration of this Case. Any disruption to payment of the payroll in the ordinary course, or to the continued implementation of employee programs in the Debtor's discretion, would adversely affect the Debtor's goals in this case because such events are likely to cause some employees to terminate their employment with the Debtor, will cause employees to be distracted from their duties to care for the patients and the operations of the hospital, and will hurt employee morale at a particularly sensitive time for all employees. Failure to honor payroll and employee benefits obligations could have severe repercussions on the Debtor's ability to preserve its assets and administer its estate, to the detriment of all constituencies.

**Prepetition Wages, Salaries and Associated Benefits**

30. As of the Petition Date, the Debtor employed approximately 332 employees (the "Employees"), of which 222 are full-time, 22 are part-time and 88 are per diem employees.

31. The Employees are paid their wages and salaries (the "Wages") bi-weekly, in arrears, every other Friday for the two-week period ending the previous Saturday through ADP by way of direct deposit or by check.

/ / /

32. The Debtor's average bi-weekly gross payroll is approximately $600,000, which includes approximately $62,000 for executive payroll and withholding obligations. The date on which the hourly employees and executives were last paid was June 2, 2016 (the "June 2nd Payroll"), for the two week period ending May 28, 2016.

33. More specifically, on May 31, 2016, the Hospital funded to ADP $359,075 for Wages for hourly employees for the June 2nd Payroll, and on June 2, 2016, the Hospital funded $44,632.34 for the Debtor's 20 executives.

34. The Debtor's next routine payroll is scheduled for June 16, 2016 (the "June 16th Payroll"), which covers Wages earned from May 29, 2016, through June 11, 2016. Part of the June 16th Payroll will include amounts for a prepetition period. The total amount of the June 16th Payroll is expected to be approximately $600,000. The June 16th Payroll will include approximately $409,453 for Wages for hourly and executive employees for the period of May 28, 2016 through June 11, 2016.

35. In the ordinary course of its business, the Debtor routinely withholds from the Wages certain amounts that the Debtor is required to transmit to third parties for purposes such as Social Security and Medicare, federal and state or local income taxes, contributions to the Debtor's benefit plans, 403(b) contributions, garnishment, child support or similar obligations pursuant to court order or law (collectively, the "Withholding Obligations"). On June 1, 2016, the Hospital funded to ADP $141,128 for Withholding Obligations for hourly employees for the June 2nd Payroll, not paying approximately $17,000 for Withholding Obligations for executives, which still need to be paid.

36. As of the Petition Date, the Debtor's payments for the June 16th Payroll Wages and Withholding Obligations -- including payments for tax obligations (the "Employer Tax Obligations"), such as Social Security -- have been accruing commencing as of May 29, 2016.

37. The Debtor seeks authority to continue with its payroll schedule in the ordinary course of its business and to pay all prepetition Wages, which includes the Withholding Obligations, and the Employer Tax Obligations, as planned on the dates indicated above. No Employee will be paid on account of prepetition accrued Wages more than $12,475, the allowable $12,475 priority amount of such prepetition Wages under section 507(a)(4) of the Bankruptcy Code. In addition, the Debtor requests authority to forward the prepetition Withholding Obligations including, but not limited to, all payroll taxes associated with the prepetition Wages, to the appropriate parties and to pay the prepetition Employer Tax Obligations as they come due.

- 8 -

94478033\V-3

38.     The costs associated with paying priority employee Wage claims, which includes the Withholding Obligations, and Employer Tax Obligations are relatively minimal compared with the damage that would result to the Debtor's estate and have funds to satisfy, at least in part, its debt if the Debtor fails to meet its payroll obligations.

39.     The Debtor's payroll is disbursed by ADP, a supplier of human resources and document services that provides the Debtor with payroll management and administrative services. The Debtor normally funds its payroll to ADP by 5:00 p.m. on the Tuesday prior to the Pay Date. Employees receive their direct deposits or checks, as the case may be on the applicable payroll date.

40.     As of the Petition Date, the Debtor will owe ADP approximately $1,316 with respect to its processing of the Debtor's payroll and related payroll administration matters (the "Administration Fees"). The Debtor requests authority to pay ADP the prepetition amount of $1,316 and to continue to pay the post-petition ADP Administration Fees in the ordinary course of the Debtor's business.

**Business Expense Reimbursements**

41.     The Debtor customarily reimburses Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtor. Such expenses typically include, but are not limited to, mileage, department expenses, travel expenses, safety incentive programs, and phone expenses (the "Reimbursement Obligations"). Expense reports detailing the Reimbursement Obligations are submitted for reimbursement by the Employees and generally must be supported by copies of receipts.

42.     It is difficult for the Debtor to determine the exact amount of Reimbursement Obligations that is due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtor throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing. Based on historical experience, the Debtor anticipates that, as of the Petition Date, the Debtor owed an estimated $600 in Reimbursement Obligations to its Employees. Accordingly, the Debtor seeks authority to pay $600 in prepetition Reimbursement

94478033\V-3

Obligations. The Debtor will continue to pay Reimbursement Obligations incurred postpetition in the ordinary course of the Debtor's business.

**Paid Time Off**

43. The Debtor provides its full and part-time Employees with paid time off (the "PTO"). Per Diem Employees are not eligible for PTO. PTO is time off due to vacation, holiday or personal time, which includes sick time. Eligible full-time employees can accrue up to 184 hours annually for years 1 through 5, 224 hours annually for years 6 through 10 and 264 hours annually thereafter. Eligible part-time employees can accrue up to a maximum of 184 hours annually for years 1 through 5, 224 hours annually for years 6 through 10 and 264 hours annually thereafter. PTO accrues only on hours worked and benefit hours paid.

44. Employees can accrue up to 270 hours of PTO. When this cap is reached, no further PTO will accrue until the Employee uses some of the accrued PTO or some of the accrued time is cashed out by the Employee. As of the Petition Date, the Debtor is carrying approximately $606,411 on its books for accrued and unused PTO.

45. The Debtor seeks authority to honor its existing PTO policies to extent it would permit continuing Employees to use their prepetition accrued leave in the ordinary course of business and, going forward. The Debtor is not, by this Motion, seeking permission to cash out any accrued and unused PTO of continuing Employees but does seek the authority, in the Debtor's discretion, to pay the Employees for unused vacation time that accrued within the 180 days prior to the Petition Date when their services with the Debtor are terminated so long as the total of the payments already then-made for prepetition Employee Obligations and the PTO does not exceed $12,475.

///

///

**Employee Benefits**

46. To keep the morale of the Employees positive for the benefit of the Debtor's business, the Debtor has established a variety of benefit plans and programs (the "Employee

- 10 -

94478033\V-3

Benefits") designed to assist its Employees and the Employees' eligible dependents in meeting certain financial burdens, including those that can arise from illness, injury or death.

### *Medical, Vision and Dental Insurance*

47.     The Debtor offers all full-time Employees medical and vision insurance (the "Medical/Vision Benefits") through a policy with UnitedHealthcare, a third party. The Debtor pays approximately $83,518 in monthly premiums for the Medical/Vision Benefits and the Employees pay approximately $27,287 per month. As of the Petition Date, the Debtor owed UnitedHealthcare on May 1, 2016, approximately $100,675 for accrued and unpaid prepetition premiums for May.

48.     The Debtor also offers Employees dental insurance (the "Dental Benefits"). The dental benefits are insured by Sun Life Financial and United Concordia. The Debtor pays approximately $3,227 in monthly premiums and Employees pay approximately $6,845 per month. As of the Petition Date, the Debtor owed Sun Life Financial and United Concordia on May 1, 2016, approximately $10,072 for accrued and unpaid prepetition premiums for May.

49.     The Debtor seeks authority to pay the Debtor's portion of the premiums that accrued and remain unpaid as of the Petition Date for the Medical/Vision Benefits and the Dental Benefits and to turn over to UnitedHealthcare, United Concordia and Sun Life Financial any amounts sufficient to satisfy the portion of the accrued and unpaid prepetition premiums to be paid by the Employees in connection with the payment of the Wages and Withholding Obligations. The Debtor intends to pay in the ordinary course of the Debtor's business, the premiums for the Medical Benefits/Vision and the Dental Benefits incurred post-petition.

50.     Furthermore, and for similar reasons, the Debtor seeks to continue to perform any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") (*see* 26 U.S.C. § 4980B) in respect to former employees. The Debtor believes that any prepetition costs related to COBRA coverage benefits are *de minimus*, but nonetheless, to maintain employee morale and ensure the orderly administration of the Estate, the Debtor requests authority to pay in its discretion any such prepetition costs.

94478033\V-3

*Employee Life, Disability and Workers' Compensation*

51.　The Debtor also offers Employees premium-based group life insurance and accidental death and disability insurance through Sun Life (the "Life Insurance"). The premiums and other related charges for this insurance coverage are paid 100% by the Debtor and total approximately $866 monthly. The Debtor also provides workers' compensation insurance through Torus National Insurance, a fully insured program (the "Workers Compensation Insurance"). The Debtor has purchased a fully insured workers' compensation policy. The amount of the annual payment is approximately $670,300 which is paid monthly in the amount of approximately $55,900; however, the monthly payments have been adjusted downward to approximately $30,000 in order to reflect the Debtor's current headcount. The Debtor owes $31,000 for the month of May. The Debtor seeks authority, in its discretion, to pay any accrued and unpaid prepetition premiums and related charges for the Life Insurance and the Workers' Compensation Insurance and to continue the above benefits post-petition and to deliver the Employees portion of any accrued and unpaid prepetition premiums to Sun Life in connection with the payment of the Wages and Withholding Obligations.

*401(k) Plan*

52.　The Debtor also offers eligible Employees the opportunity to participate in a 403(b) Savings and Retirement Plan ("403(b) Plan") that is administered by Oppenheimer Funds. Employees participating in this program may contribute up to the federal statutory cap per year. The Debtor deducts the 403(b) Plan contributions from Employee paychecks. The Debtor does not contribute to the plan. Employee contributions are remitted immediately following each pay date. Failure to timely forward the Employees' 403(b) Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended, resulting in potential personal liability for the Debtor's officers for such deducted amounts. The Debtor believes that maintaining the 403(b) Plan is critical to maintaining Employee morale. The Debtor seeks authority to delivery to Oppenheimer Funds the Employee contributions in connection with the payment of Wages and Withholding Obligations described above. Administration's fees for the Plan are paid by the employee participants.

*Miscellaneous Employee Benefit Plans*

53.   The Debtor also offers its eligible Employees the opportunity to participate in an IRS Section 125 Cafeteria Plan, a Flexible Spending Account/Dependent Care Account, voluntary health, life, and disability insurance. All of these programs are 100% funded by the Employees and are paid for through payroll deductions**.** The Debtor requests authority to continue to honor these programs, in its discretion, and to continue distributing to third-parties the payments for these programs in connection with the payment of Wages and Withholding Obligations a described above, including the distributions of payments that are for prepetition amounts due.

**Insider Compensation**

54.   The Debtor is a non-profit 501(c)(3) corporation so there are no shareholders to whom compensation is owed. The Debtor does have one officer (David Herskovitz)who receives compensation and who will be filing the appropriate insider compensation forms with the Court. The Debtor requests authority through this Motion to pay the prepetition amount (for the period commencing May 29, 2016 to the Petition Date) due this officer which for the entire two-week period is less than the priority cap of $12,475. No other amounts will be paid the officer until the Debtor is allowed to do so under Local Bankruptcy Rule 2014-1 regarding insider compensation.

**Temporary Staffing**

55.   In addition to their full-time Employees, the Debtor also currently utilizes Staffing and Contract Agencies ("Agencies") for security services, registry nursing, infection control services and Respiratory Care services. Agencies provide services when the Debtor is unable to staff with its regular staff or when services can be provided in a more cost effective manner through outside sources.

56.   The Debtor's business would be harmed if the Debtor is not allowed to pay Agencies the amount that is owed it for the prepetition work of these services and Agency, as a result, will remove these registry/contract Employees. While the Debtor does not directly compensate the Employees employed through Agencies, the Debtor's failure to pay for their prepetition services could severely hamper the Debtor's ability to conduct the necessary services

provided the temporary Employees. The Debtor requests authority to pay -- in its discretion and only to the extent it can pay -- any prepetition amounts owed to these Agencies which the Debtor currently estimates are approximately $264,766.

**Motion Regarding Use of Existing Bank Accounts**

57. The Debtor is requesting authority to maintain and utilize ten existing bank accounts (the "Accounts"). If the Debtor is required to close certain of the accounts it needs for the smooth and uninterrupted operation of its business and open new ones, the deposit of the payments it receives from approximately 500 sources would be disrupted while the depositors (many of which are governmental agencies) change their internal records regarding the new deposit instructions, which can be a very lengthy period. Any interruption in the Debtor's cash flow could result in a potentially harmful interruption of the Debtor's business. The Debtor's accounting staff, which will also be working on supplying all of the information needed to meet the Debtor's chapter 11 reporting requirements as well as performing their regular tasks, would be further distracted by a needless, time-consuming exercise of closing accounts, opening new ones, advising and explaining the same to interested parties, dealing with the logistical issues of getting the depositors to utilize the new accounts and getting check printed for the new disbursement account. Accordingly, it is critical that the Debtor be allowed to maintain the existing Accounts and its cash management procedures as described in the Motion.

58. The Debtor maintains seven bank accounts with Bank of America: (1) the Government-old Account (Account No. 05947-14482) (the "Old Government Account"); (2) the Government-new account (Account No. 09458-73238) (the "New Government Account"); (3) the Non-Government Account (Account No. 09455-40890) (the "Non-Government Account"), (4) the Payroll Account (Account No. 05945-14483) (the "Payroll Account"), (5) the Flexible Spending Account (Account No. 3250-0048-3098) (the "FSA Account"); (6) the Maximizer Account which is a savings account (Account No. 05949-10525) (the "Maximizer Account:" and (7) the new checking Account (001453032488 (the "New Checking Account").

59. The Debtor maintains one account with Wells Fargo Bank: the Credit Card Account (Account No. 2832723536).

- 14 -

94478033\V-3

60. The Debtor maintains two bank accounts with U.S. Bank (1) the Checking Account (Account No.1-534-6492-4015), and (2) the Savings Account (Account No.1-534-9323-6845) (collectively the "Banks and the "Accounts").

61. The Debtor receives payment for its services, in the form of checks, cash, and credit card payments from patients and non-patients and from checks and electronic funds transfers from various insurance companies and other sources including a monthly capitation payment from Blue Cross. The primary source of these payments is the Federal Government under the Medicare program and, to a lesser extent, under the Medicaid program. The Medicare and Medicaid payments are deposited into the Old Government Account at Bank of America. To a much lesser extent, the Debtor receives payments from private insurance companies, attorneys and self-pay individual patients. Medicare, Medi-Cal and a few insurance companies have the Debtor's bank routing and account information in their payment systems and they direct the payments, with a few exceptions as discussed below, into the Old Government Account. As such, all non-credit card collections are deposited in the Old Government Account. If the Debtor is required to close the Old Government Account and open a new depository account, each of these payers will have to update its payment system with the new information, a process over which the Debtor has no control.

62. The debtor pays its vendors from its New Government Account and the Non-Government Account. Additionally, ADP, a supplier of human resources and document services, provides the Debtor with payroll management and administrative services and they draw funds from the 05945-14483 Account to cover payroll.

63. The FSA Account is used to pay medical bills for the employees from tax deferred amounts that are deducted from employee pay checks. United Healthcare is an insurance company who handles this account. The Debtor deposited $5,000 into this fund on 9/1/14 when the plan started.

///

64.   The Wells Fargo Account is used for credit card payments only. Money is kept in the Wells Fargo Account until it is needed to transfer to the New Government Account at Bank of America.

65.   The US Bank Account (the "IPA Account") is used for the fees arising from third party claims in connection with the Independent Practice Association (the "IPA") which is an independent group of physicians and other health-care providers that are under contract to provide services to members of different HMOs, as well as other insurance plans, usually at a fixed fee per patient. Payments made for the claims of the IPA are paid from this IPA Account. Signal Hills Solution, Inc., ("Signal Hill") is a management company with a partnership with the hospital. Signal Hills processes all third party claims arising from parties connected with the IPA, issues the checks and directs them to the Debtor for review and signature.

66.   Bank of America accounts are on automatic zero balance transfer except for the Maximizer account. All accounts are zero balance at midnight and will be transferred to the main Account Government-New Account on a daily basis. The funds remain in this Account until they are needed for the payment of the Debtor's business expenses, including payroll, at which time they are transferred into the Payroll Account. Disbursements are made via paper check and by electronic funds transfers. The amount needed to cover the payroll is transferred from the Government-New Account into the Payroll Account every other Wednesday and Thursday. Signal Hill Solutions, Inc. pays the IPA accounts every other Friday. The Debtor authorizes such payments. As in the case with the payers noted above, these vendors have the Debtor's bank routing and account information in their systems. From time to time, the Debtor will transfer money to Bank of America Accounts as needed. If the Debtor is required to close the Bank of America Accounts and open a new account or accounts, each of these vendors, including Signal Hill Solutions, Inc., will have to update its system.

67.   As of the Petition Date, the aggregate balance in the Accounts was approximately $134,034.00. I am informed and believe that Bank of America, Wells Fargo and US Bank are approved depositories for funds of debtors in possession by the Office of the United States

///

- 16 -

94478033\V-3

68. Trustee for Region 16 so the funds in these Accounts are protected as required by section 345 of the Bankruptcy Code.

69. I believe that the relief requested in the First Day Motions described above are in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this Chapter 11 Case, and is critical to the Debtor's reorganization efforts.  Accordingly, on behalf of the Debtor, I respectfully submit that the First Day Motions described above should be granted.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 6th day of June, 2016, at Beverly Hills, California.

/s/ Eric Weissman
ERIC WEISSMAN

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

94478033\V-3