1   SAMUEL R. MAIZEL (Bar No. 189301)
    samuel.maizel@dentons.com
2   JOHN A. MOE, II (Bar No. 066893)
    john.moe@dentons.com
3   DENTONS US LLP
4   601 South Figueroa Street, Suite 2500
    Los Angeles, California 90017-5704
5   Telephone:    (213) 623-9300
    Facsimile:    (213) 623-9924
6
7   Attorneys for Debtor,
    GARDENS REGIONAL HOSPITAL
8   AND MEDICAL CENTER, INC.

9

10              UNITED STATES BANKRUPTCY COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                  LOS ANGELES DIVISION

13

| 14 | In re: | Case No. 2:16-17463-ER |
|---|---|---|
| 15 | GARDENS REGIONAL HOSPITAL AND | Chapter 11 |
| 16 | MEDICAL CENTER, INC., dba GARDENS REGIONAL HOSPITAL AND MEDICAL | DECLARATION OF DAVID HERSKOVITZ IN SUPPORT OF FIRST |
| 17 | CENTER, | DAY MOTIONS |
| 18 | Debtor. | Hearing: |
| 19 | | Date:      June 9, 2016 |
| 20 | | Time:      10:00 a.m. Courtroom: 1568 |
| 21 | | Place:     U.S. Bankruptcy Court 255 Spring Street |
| 22 | | Los Angeles, CA |
| 23 | | Judge      Hon. Ernest M. Robles |

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## DECLARATION OF DAVID HERSKOVITZ

I, David Herskovitz, declare:

1.    I am a Member of, and the Secretary of the Board of Directors (the "Board"), of Gardens Regional Hospital and Medical Center, Inc. (the "Debtor"), a California non-profit, public benefit corporation doing business as Gardens Regional Hospital and Medical Center and formerly doing business as Tri-City Regional Medical Center.  Currently, I also serve as its In-House Counsel and Compliance Officer.  In addition, I chair the Board's Community Benefits Committee and serve on its Legal Committee.  I am responsible for coordinating legal matters for the Debtor, as well as certain contract, privacy, compliance and other matters.  I have been providing some combination of services to the Debtor, either directly or under contract with the Debtor's management company, for about ten years.

2.    I am an attorney licensed in California with 35 years of legal experience and with over 15 years of those years spent advising, managing and/or providing other assistance to businesses in the healthcare industry.  Before commencing work for the Debtor, I served as President and General Counsel (including responsibility for legal affairs, contracting and compliance) of a healthcare services company where I assisted in the management of approximately fifty persons providing healthcare clinical and educational services at 7 acute care hospitals and outpatient clinics.  I also served as Executive Vice President and General Counsel (including responsibility for legal affairs, contracting and compliance) of a Bio-Medical company, assisting in the management of dozens of employees responsible for designing, overseeing and monitoring clinical trials involving new medical devices at over 25 medical centers and clinics nationwide.  Prior to that, I provided various types of management, consulting business development, legal and other assistance to companies and individuals, including some involving healthcare related products and services.  Previously, I was a partner at Mitchell, Silberberg & Knupp, and at Gold, Marks, Ring and Pepper, where I practiced law in the fields of business, litigation and corporate restructuring.  I have a J.D. from Whittier College School of Law, where I was Editor in Chief of the Law Review and recipient of the school's Most

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Outstanding Student Award. I have an undergraduate degree from UCLA, where I graduated cum laude.

3.      On the date hereof (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California. To enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 Case on its operations, in particular with regard to patient care, the Debtor has requested various types of relief in a number of applications and motions (each a "First Day Motion", and collectively the "First Day Motions"). The First Day Motions seek relief intended to maintain the Debtor's business operations to preserve value for the Debtor and its creditors. Each First Day Motion is crucial to the Debtor's reorganization efforts.

4.      I make this Declaration in support of the First Day Motions. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion. I am generally familiar with the day-to-day operations and business affairs of the Debtor, and have personal knowledge of all the facts stated herein, except where the information is expressly stated as being based on my information and belief. If called as a witness, I could and would competently testify to the facts set forth herein.

## I.

## BACKGROUND

**A.      General Background**

5.      The Debtor leases a 137 bed, acute care hospital doing business at 21530 South Pioneer Boulevard, Hawaiian Gardens, Los Angeles, California. The Debtor is currently staffed to operate approximately 30-35 beds on a normal day, although it has access to visiting nurse registries, which allow it to quickly increase its staff to meet patient needs.

6.      The Debtor features an Intensive Care Unit, a Cardiac Care Unit, and an 8-bed, Emergency Department ("ED") staffed with a team of qualified ED physicians, nurses, and other professional personnel. The ED is a paramedic-receiving emergency room that works

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

hand-in-hand with Los Angeles County and Orange County Emergency Medical Services to provide emergency services 24-hours each day, seven days each week. The Debtor provides a full range of inpatient and outpatient services, including, but not limited to, medical acute care, general surgical services, bariatric surgery services (for weight loss), spine surgery services, orthopedic and sports medicine and joint replacement services, wound care and pain management services, physical therapy, respiratory therapy, outpatient ambulatory services, diagnostic services, radiology and inpatient/outpatient imaging services, laboratory and pathology services, geriatric services, and community wellness and education programs.

7.    More than 8,500 patients visited the Debtor's emergency room last year, and the Debtor had a total of more than 2,850 admissions. Its physicians performed nearly 1,400 inpatient and 2,250 outpatient surgeries. The Debtor has invested millions of dollars over approximately the past five years for updated furniture, fixtures, equipment and technology as well as long-overdue improvements to the facility.

8.    The Debtor was recognized in 2012 by Consumer Reports Magazine as one of the top five safest hospitals in the Los Angeles Metropolitan area. In addition, in 2012 the Debtor was ranked number two in the U.S. for the lowest 30-day mortality rate for patients with pneumonia by Becker's Hospital Review Magazine based on data from the federal agency Centers for Medicaid and Medicare Services ("CMS"), an agency of the U.S. Department of Health and Human Services ("HHS"), according to data from CMS' Hospital Compare database. In addition to other recognition for patient care, the Debtor received Five Star quality ratings from HealthGrades, Inc., in multiple years between 2005 and 2013 for treatment of the following medical conditions: heart failure, hip fracture, pulmonary care including Pneumonia and Chronic Obstructive Pulmonary Disease, esophageal/stomach surgeries, sepsis, and gynecologic surgery.

9.    The Debtor is accredited by Det Norske Veritas Healthcare, Inc. ("DNV"). Additionally, the Debtor is regularly surveyed by the Western Division of Survey and Certification, CMS, HHS, of CMS and the California Department of Public Health ("CDPH"). Hospitals accredited by DNV are "deemed" to meet Medicare Conditions of Participation

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

("COPs"). However, if a sample validation survey results in a finding that a hospital is out of

compliance with one or more of the COPs, that Debtor will no longer be deemed to meet any

COPs. The last completed survey by DNV was conducted in December 2014, whereby the Debtor

was deemed in compliance with CMS regulations and determined to have fully met the Medicare

COPs for a provider of Debtor services. DNV conducted its reaccreditation survey for CMS on

January 20, 2016. On February 15, 2016, Debtor submitted its corrective action plan for areas

identified by DNV as being in need of improvement. DNV conducted a follow up survey on

March 21, 2016 regarding a condition level finding pertaining to Life Safety (a condition level

finding requires an unannounced survey to verify that the corrective action has been addressed).

Pursuant to a Certificate of Accreditation issued by DNV, with an initial date of March 18, 2016

and an expiration date of March 18, 2019, and an accompanying cover letter from DNV dated

April 12, 2016, pursuant to the authority granted to DNV by HHS and CMS (and subject to all

conditions and qualifications stated in that Certificate of Accreditation and cover letter), the plan

of correction for the noted condition level finding was found to have been implemented

satisfactorily and the Debtor was deemed in compliance with the Medicare COPs for hospitals.

On March 3, 2016, CDPH conducted a CMS Debtor-wide compliance survey to validate the

survey that recently had been conducted by DNV. On March 23, 2016, the Debtor received an

extensive Statement of Deficiencies from CMS outlining deficiencies identified during the

validation survey with the COPs related to governing body, patient rights, quality assessment and

performance improvement program, food and dietetic services, and infection control. The Debtor

has timely met its deadline to submit responsive documentation evidencing satisfactory correction

of the cited deficiencies by April 22, 2016. Pending CMS' receipt and review of such response,

CMS has removed Debtor's "deemed" status and placed the Debtor under CDPH survey

jurisdiction until full compliance with the COPs has been demonstrated. Once the plan of

correction is deemed acceptable to CMS, it will schedule a follow up resurvey. If that follow up

survey confirms that the Debtor is in compliance with the COPs, the Debtor's "deemed" status

will be reinstated. If the Debtor fails to satisfy all such requirements in a timely manner, CMS

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

will take steps to terminate the Debtor's provider agreement effective June 23, 2016. In the event of termination, the Debtor will cease receiving payment for inpatient services rendered to Medicare beneficiaries admitted on or after the effective date of termination. The Debtor's Laboratory is accredited and regularly inspected by The Joint Commission; that accreditation currently is in good standing.

**B.      The Debtor's Management and Employees**

10.      The Debtor's Board currently is comprised of four members: Brian Walton, Esq., Chair (attorney, consultant and adjunct professor of law at UCLA); Hassney Hamood, M.D. (former Chief of Staff of the Debtor and practicing physician); Jonathan Pastor, Esq. (attorney and arbitrator); and myself.

11.      From 1997, when the Debtor opened, to November, 2010, the Debtor's President and Chief Executive Officer ("CEO") was Arthur Gerrick. From December 1999, until June 1, 2015, the Debtor had contracted, pursuant to written management agreements, with a series of third party management companies to provide a qualified professional senior management team for the Debtor that assisted the Board in implementing measures necessary for operational management of the Debtor. Effective June 1, 2015, the Debtor terminated the last management services agreement and hired James Sherman as Chief Executive Officer ("CEO") (he had been CEO but employed by the management company previously, rather than being employed by the Debtor directly). On August 17, 2015, the Board replaced Mr. Sherman with Kenneth Strople as Interim CEO and engaged Edmund King as Interim Chief Financial Officer ("CFO"). Mr. Strople served until October 11, 2015.

12.      On October 12, 2015, the Debtor entered into a long-term management services agreement ("MSA") with Paladin-Gardens Management, LLC ("Paladin"), whereby Paladin assumed exclusive responsibility to provide management and financial advisory services on behalf of Debtor, and to oversee the entirety of the hospital operations of Debtor, subject to the ultimate authority of the Board. The Paladin MSA required Paladin to engage and to pay for the services of the Chief Executive Officer, the Chief Financial Officer, and the Chief Nursing

- 5 -

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

Officer, and, in addition, an average of 250 hours per month of Paladin's principals, advisors and other personnel. For its management services, the Debtor was required to pay Paladin $325,000 per month.

13.    In addition to the Paladin MSA, Paladin was required to assist Debtor to obtain necessary and available financing. As a result, Paladin secured a Bridge Loan Agreement between its affiliate, Harbor-Gardens Capital I, LLC ("Harbor") and the Debtor, whereby Harbor agreed to loan to Debtor $2,500,000, at an interest rate of 14% per annum. Amounts loaned and due under the Harbor Bridge Loan Agreement are set forth in the Declaration of Eric Weissman filed concurrently herewith.

14.    Paladin (the Debtor's Management Company), by virtue of its letter dated April 4, 2016, notified the Debtor of its intent to terminate the MSA effective April 11, 2016. Paladin unilaterally withdrew all of its personnel as of midnight on April 11th. The Debtor disputes Paladin's alleged bases for terminating the Agreement and unilaterally withdrawing the Debtor's entire executive management team on short notice – especially at a time when the Debtor was particularly vulnerable and only eleven days before the Debtor's deadline to submit and start implementing a critical Plan of Correction to CMS -- and asserts that Paladin, through its various acts and omissions, has materially breached and failed to meet its obligations under the MSA, and that both Paladin and Harbor, separately and acting in concert, have materially harmed and damaged the Debtor as a result thereof.

15.    Pursuant to an Interim Management Services Agreement "(IMSA") entered into between the Debtor and Genesis Healthcare Management, LLC ("Genesis") on April 11, 2016, commencing as of April 12, 2016, at 12:01 am, Genesis assumed exclusive responsibility to provide interim management and financial advisory services on behalf of Debtor, and to oversee the entirety of the hospital operations of Debtor, subject to the ultimate authority of the Board. The Genesis IMSA required Genesis to engage and to pay for the services of the Interim Chief Executive Officer, the Interim Chief Financial Officer, the Interim Chief Operations Officer and the Interim Chief Nursing Officer, to oversee the Debtor's day-to-day management, on an interim

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 6 -

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

basis. The Genesis Interim CEO and CFO completed their services under the IMSA on April 22, 2016 and the Genesis Interim CNO ceased providing his temporary Interim CNO coverage as of midnight on April 20, 2016.

16.    The Debtor has promoted Aileen Tamares, RN, BSN, CEN, an existing employee and member of the Debtor's nursing leadership team, to assume the position of Interim CNO, effective as of 12:01 am on the morning of April 21st. Ms. Tamares is familiar with the Debtor Hospital, and a seasoned Registered Nurse with about 25 years of nursing experience, of which at least 12 years have consisted of responsibilities and services involving nursing administration and leadership, including, but not limited to, 5 years in nursing administration and leadership as ER Clinical Manager and ER Interim Director at Lakewood Regional Hospital in Lakewood; 6 years in nursing administration and leadership as Clinical Nurse Supervisor/Staff RN in the Emergency Department at Orange Coast Memorial Medical Center in Fountain Valley; and 1.5 years in nursing administration and leadership as Nurse Manager of ICU and Telemetry Departments, and Administrative House Supervisor at Kindred Health Care in Westminster. Ms. Tamares is a Certified Emergency Nurse. She received her BSN degree in 2009 from Grand Canyon University, an Associate degree in Nursing from Rancho Santiago College, and currently has 1 year left to complete her MSN.

17.    On April 6, 2016, the Debtor appointed Eric Weissman, President of Wilshire Pacific Capital Advisors, LLC, as its Financial Advisor. Mr. Weissman has been advising hospitals and other business entities in the healthcare industry on mergers and acquisitions, financial matters, financing, raising capital, and restructuring debts for more than 17 years. A detailed description of his extensive experience and expertise is set forth in Mr. Weissman's Declaration, which is filed concurrently herewith.

18.    The Debtor's Board of Directors has added to the Debtor's executive management team several more seasoned healthcare professionals who previously have served in key executive positions (including CEO and CFO) at other area hospitals, as described below.

19.    The Debtor has engaged Stan Otake, as its Interim CEO/President, to help manage

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 7 -    DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

the Debtor, effective as of April 22, 2016.  Mr. Otake is a seasoned health care executive, with over 30 years of hospital leadership experience, and a successful record of helping to manage difficult hospital turnarounds and improved patient care and profitability.  Having served as an executive at several hospitals in the area, Mr. Otake is well known by many key physicians on the Debtor's medical staff.  In addition to services as a health care consultant, he served as: Senior VP, Development, of Prospect Medical Systems from October 2009 to January 2015; CEO of Brotman Medical Center from October 2007 to October 2009 (he joined the hospital as a distressed hospital, one day before it filed a Chapter 11 Bankruptcy case and led it trough a successful reorganization); Principal / Health Care Consultant of Trent Healthcare Consulting, Inc. from August 2002 to October 2008 (in which capacity he provided strategic and business services involving several hospitals, and served as Interim CEO at Bellwood General Hospital, while it prepared for an organized closure); CEO of West Coast Surgery Centers from June 2001 to July 2002 (where he oversaw operations of an 8 facility surgery center business); a member of the management team of Pacific Health Corporation from May 1993 to June 2001, including CEO of its Bellflower Medical Center facility (where his responsibilities included direct accountability for the hospital's operational and financial performance); VP Business Development of Pacific Health Corporation from September 1991 to May 1993; and Director of Marketing of NME - Lakewood Regional Medical Center from August 1989 to September 1991. He has a Bachelor of Science – Kinesiology Degree from UCLA.

20.     The Debtor has engaged Charles Natcher, CPA, as its Interim CFO, to help support the operations and financial management of the Debtor, effective as of April 22, 2016. Mr. Natcher is a seasoned CFO and health care executive, with over 25 years of hospital leadership experience, in both for-profit and not-for-profit healthcare entities. His work experience includes: CFO for Tenet Health Care's Placentia-Linda Hospital (including daily management of all revenue cycle departments and case management); CFO for Kindred Health Care (and also served for 10 months as Interim CEO and for 11 months as Physician Practice Administrator of several Kindred hospital facilities); Interim CFO for Brotman Medical Center

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

from 2008- 2009; Regional CFO for Promise Healthcare Corp.'s California Hospitals; Vanguard Health Systems, as CFO of La Palma Intercommunity Hospital from 2003 to 2006; Assistant Administrator, Finance, of Kaiser Permanente Inc.'s Valley Regional Office; Regional Director of Finance (and CFO) of Catholic Healthcare West's Golden Coast Division in 1997 - 1998; and CFO of Hospital Corp. of America's West Hills Regional Medical Center. Mr. Natcher was awarded a Bachelor in Business Administration from Middle Tennessee State University, and has been a Certified Public Accountant since 1984.

21.    In addition, the Debtor's existing personnel, along with Mr. Weissman, outside consultants and members of the Board of Directors are providing day-to-day assistance, as needed.

22.    The Debtor's Board of Directors has authorized Eric Weissman – the Hospital's Financial Advisor; Gregg Yost – the Hospital's Chief Human Resources Officer; and Reva Swadener – the Hospital's Administrative Executive Assistant; to make and implement banking decisions, including, but not limited to, opening and closing bank accounts, signing checks, and authorizing wire instructions or cashier's checks for disbursement of funds, as they may be directed to do and subject to them receiving approval from, the Chairman of the Board of Directors of Debtor, and as may be appropriate and necessary to assist the Debtor to effectively conduct its business operations, preserve its financial viability, and safeguard its funds.

23.    Approximately 300 doctors have medical staff privileges at the Hospital.  The Medical Staff of Gardens Regional Hospital and Medical Center ("Medical Staff") is an unincorporated association that was formed on July 24, 2015 by, is governed by, and operates for the benefit of, the physicians who are members of the Debtor's medical staff.  The Medical Staff is responsible for governing the medical staff, subject to all applicable laws, rules and regulations. The Medical Staff is wholly separate and apart from the Debtor, including separate bylaws, bank accounts, IRS Employer Identification Number, officers and directors.  The Medical Staff is not filing bankruptcy.

24.    The Debtor currently employs approximately 322 people (222 full-time, 22 part-time, and 88 per diem).  Of this, 107 are nurses, who are represented by Service

- 9 -

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

Employees International Union ("SEIU") Local 121RN.  The remainder include, but are not limited to, management/supervision, professional/clinician, office, technician/technologist, plant operations, I.T. staff, human resources, Quality Assurance and dietary staff.  Debtor is the second largest employer in the City of Hawaiian Gardens.

**C.    The Debtor's Market**

25.    I am informed by the Debtor's 2013 Community Health Needs Assessment, and the 2014 California State Community Benefits Report, and believe as follows (as set forth in paragraphs 16 – 19):  the Debtor provides emergency and acute hospital services to the largely low-income population of Hawaiian Gardens, which is the smallest city in Los Angeles County, with a total area of 0.9 square miles, and a population of only approximately 15,000.

26.    The Debtor provides a wide-range of healthcare services to under-served and indigent communities in Hawaiian Gardens, Artesia, Bellflower, Cerritos, Lakewood, Long Beach, Norwalk and Paramount (the "Service Area"), as well as patients from other cities, states and counties including Orange, San Bernardino and San Diego Counties.  The Debtor provides annually in excess of $11 million of charitable care, community services and health professions education.  The Debtor is a vital part of Los Angeles County's health care safety net, serving some of Southern California's most medically vulnerable residents.

27.    The Debtor serves a high volume of medically under-served and indigent patients and has been designed a Disproportionate Share Hospital ("DSH") by HHS in connection with the Medicaid program.  As a result of the high volume of indigent patients, millions of dollars worth of Debtor's services have been historically expended on Charity Care, and the amount of uncompensated care provided by Debtor is expected to continue.

28.    Among the residents in the Service Area, 14.7% are at or below 100% of the federal poverty level ("FPL") and 39.1% are at 200% of FPL or below.  Hawaiian Gardens has the highest levels of poverty among children (34%) in the service area.  The communities in the Service Area have median household incomes that are lower than the county median household income.  The median household income in the area ranges from $42,770 in Hawaiian Gardens to

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 10 -

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

$87,522 in Cerritos.

**D.    The Debtors Assets**

29.    The Debtor is the lessee of a fully licensed and accredited 137-bed acute care general hospital.

30.    Prior to January 1, 2016, 30 acute care licensed beds contained within the Debtor's hospital facility were licensed to Kindred Healthcare, Inc. ("Kindred"), which operated a Long Term Acute Care ("LTAC") hospital, under a license (a) for which Kindred paid approximately $101,296 per month (for use of the beds and the Debtor also providing certain ancillary and other services, some of which Kindred was obligated to pay separately), and (b) which expired on December 31, 2015.

31.    The Debtor also leases clinic space in a Medical Office Building ("MOB") at 21520 South Pioneer Boulevard, Hawaiian Gardens (directly across the parking lot from its acute care facility), which the Debtor currently sub-leases to physicians for their private use.  In addition, the Debtor leases a nearby office building located at 22101 Norwalk Boulevard in Hawaiian Gardens (the "Norwalk Property"), for its Business Office operations. The Debtor has not paid the rent that was due for the MOB and Norwalk Property on April 1, 2016, which amounts, along with any applicable late charges, remain delinquent.

32.    The main hospital facility and MOB are leased from Cerritos Gardens General Hospital Company ("CGGHCO"). The Debtor's hospital premises have been leased from CGGHCO continuously since February 1, 1997.  Effective January 1, 2001, the lease with CGGHCO was renegotiated, and the Debtor and CGGHCO entered into an Amended and Restated Lease dated January 1, 2001 (the "Hospital Lease"), as further amended in 2013, under which the Debtor has exercised the right to continue to lease the hospital premises until December 31, 2025.  The Hospital Lease provides for a $64,692 per month rental payment, with annual CPI increases, and the Norwalk property has a base rent of $3,149 per month, also with annual CPI increases.  Under the terms of the Hospital Lease, rent is due on the first calendar day of each month. If any installment of rent under the Hospital Lease is not received by CGGHCO within

- 11 -

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

fifteen days after such amount is due, such rent payment is deemed late, and an additional late charge equal to five percent of the delinquent amount shall be due forthwith. The Debtor has not paid the rent that was due on April 1, 2016 and May 1, 2016, which amounts, along with any applicable late charges, remain delinquent. CGGHCO has demanded payment for the delinquent rent along with late charges, and has reserved all of CGGHCO's rights and remedies under the Hospital Lease, including the right to serve a three-day notice to pay rent or quit. As of this date, CGGHCO has not served Debtor with a three-day notice to pay rent or quit.

**E.      Events Leading to the Filing of This Chapter 11 Case**

33.      The current fiscal crisis for the Debtor is the result of the confluence of many factors. However, a significant contributor is reduction in DSH payments described above. As an underlying constant goal and challenge, the Debtor provides over a million dollars per year in care to indigent patients, for which it is not fully compensated. The percentage of the Debtor's resources expended on indigent care is significant because the Debtor serves a depressed community. The Debtor has been able to recoup only about 20% of the DSH payment reduction due to the large amount of charity care provided by the Debtor.

34.      Additional factors that contributed to the Debtor's financial difficulties include inconsistent patient census, insufficient reimbursements for individual patient cases because of denials of coverage or partial denials based on extended lengths of stay, unanticipated operational costs, a lower case mix, a decline in bariatric and other surgeries, difficulties in implementing the required change to electronic medical records, managing the length of stay of patients, and difficulties in collections and billings, among other things.

35.      Moreover, as a small stand-alone hospital, the Debtor has been unsuccessful in its efforts to negotiate significant increases in reimbursement rates from various governmental and commercial payors that would be comparable to rates of reimbursement received by many other hospitals.

36.      Once the ACA took effect, there was a marginal increase in some of the Debtor's patients who had obtained health insurance coverage, but this was grossly overshadowed by the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 12 -

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

annual loss of DSH payments that had previously enabled the Debtor to treat the local low-income population. To the extent previously uninsured patients now have some health insurance coverage, this population continues to be chronically underinsured, or have insurance with high deductibles, which they cannot afford to pay. This results in insufficient health insurance benefits payments to the Debtor as well as to other health care providers. Further, Medi-Cal and Medicare reduced their payment rates in the range of 2.9% to 10% in or after 2010, which slowly whittled down reimbursements and revenues. These changes have caused a decline in the Debtor's revenues without a corresponding reduction in the Debtor's obligations to provide patient care, and annual CPI increases in costs of the Debtor's supplies and overhead costs.

37.    In addition to these continual struggles with changes in government programs and benefits available to help public benefit charity care hospitals that are common to most DSH providers, and negative operational cash flow, the Debtor, in approximately 2010, discovered large-scale mismanagement of its operations, resulting in turnover of certain key personnel.

38.    There are approximately 10 to 15 litigation or arbitration matters for which insurance coverage does not exist, which the Debtor has been required to defend or has chosen to prosecute, including:  (a) actions by vendors and other creditors seeking to collect monies they allege to be owed from the Debtor (generally for products or services); at least two of those cases also have complex cross-claims filed by the Debtor; and (b) an action filed by the Los Angeles City Attorney seeking both civil damages and injunctive relief against the Debtor.

39.    In addition, the Debtor has been named as a defendant or cross-defendant in approximately 25 to 30 lawsuits and arbitration proceedings for which insurance coverage does exist (after payment of retentions or deductibles), including:  (a) approximately 15 straight medical malpractice suits, plus 9 related Personal Injury cases involving allegations related to spine surgeries performed at the Debtor hospital – and a minimum of 23 more former hospital patients who the Debtor anticipates will be added as plaintiffs in the future; (b) a Personal Injury case that was filed by a homeless patient (related to the City Attorney action identified above); (c) defense of a Cross-Complaint filed by the Debtor's former CEO (this case was recently settled

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 13 -

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

and is being dismissed); and (d) two complex Qui Tam (whistle blower) lawsuits.

40.     After incurring substantial legal fees for its defense, the Debtor was successful in obtaining dismissal of other legal proceedings that had been commenced against it.

41.     The Debtor currently is a plaintiff in approximately 3 litigation matters.

42.     The cost, resources, distraction and potential liability arising from all of the foregoing disputes is substantial, and has taken – and continues to take – a meaningful toll on the Debtor.

43.     Over the past 12 months, the Debtor needed to generate approximately $119,474 per day to cover its costs. No appreciable cost savings are recognized by the Debtor when the patient census drops below 50 beds a day, as the fixed costs remain fairly constant. The Debtor has been generating only approximately $91,830 per day in cash collections. Thus, the Debtor loses money every month it operates, and would soon be unable to pay its employees for the next pay period or to pay the necessary COD advance payments to obtain critical medical supplies for patient care. The Debtor's many efforts to identify and implement a better solution have been unsuccessful. The termination by Paladin of the MSA and its unilateral withdrawal of its entire executive management team as of April 12, 2016, along with the Debtor's dire need to line up and maintain a stable and consistent executive management team and source of adequate funding for the Debtor's Hospital operations, and to focus key resources for the preparation, submission to CMS by April 22, 2016 and immediate implementation of a Plan of Correction (which, among other necessities, requires the Debtor to promptly address certain costly deferred maintenance), has created further challenges for the Debtor. The Debtor did not take this decision lightly. However, in light of these dire circumstances and the severe ongoing cash flow shortage, the Debtor was forced to file this chapter 11 case.

## II.

## FIRST DAY MOTIONS AND APPLICATIONS

44.     Concurrently with the filing of its Chapter 11 petition, the Debtor is filing certain applications, motions and proposed orders. The Debtor requests that the relief described below

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

1    be granted, as each request constitutes a critical element in achieving the successful restructuring

2    of the Debtor for the benefit of its patients and creditors.

3        45.    The First Day Motions have been designed to meet the Debtor's goals of: (a) no

4    disruption in patient care, (b) continuing its operations in Chapter 11 with as little disruption and

5    loss of productivity as possible, (c) maintaining the confidence and support of its employees,

6    vendors, suppliers and service providers during the Chapter 11 Case, and (d) establishing

7    procedures for the smooth and efficient administration of this Chapter 11 Case.

8    **A.    Motion Re Filing Confidential Information Under Seal**

9        46.    I am informed and believe that to fulfill its obligations under the Bankruptcy Code

10   without violating applicable non-bankruptcy laws protecting confidential patient information, the

11   Debtor needs authorization to file confidential patient information under seal.  For example, I am

12   informed and believe that the Debtor is required to serve notice of the filing of its case, a bar date

13   notice, and other critical case related documents on parties with an interest in the case or who

14   may have a claim against the Debtor, and that to show proper notice has been provided, the

15   Debtor is required to file service lists showing the names and addresses of those who have been

16   served.  Former patients are usually among the parties entitled to such notice.

17       47.    The Privacy Rule of the Health Insurance Portability and Accountability Act of

18   1996 (commonly referred to as "HIPAA") protects all individually indentifiable health

19   information, which includes information such as the names or addresses of current or former

20   patients.  Thus, the Privacy Rule's requirements to protect the privacy and security of protected

21   health information require that the names and addresses of current and former patients not be

22   publicly disclosed.  The Debtor is a covered entity under HIPAA and must comply with HIPAA's

23   requirements to protect the privacy of health information.  However, the Privacy Rule permits the

24   use and disclosure of protected health information, without an individual's authorization or

25   permission, as part of a judicial proceeding, if the information is disclosed pursuant to a court

26   order.

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

**B.    The Motion to Limit Notice**

48.    Through the Motion to Limit Notice, the Debtor proposes that notices regarding the Limited Notice Matters (as defined in the Motion to Limit Notice) that will be heard on regular notice be served by first class mail upon only: (a) the Office of the United States Trustee, (b) the creditors appearing on the list filed in accordance with Bankruptcy Rule 1007(d) by the Debtor unless and until a Committee is appointed and it retains counsel, then in such event, to counsel for the Committee, (c) the United States of America, by service to the Attorney General of the United States and the United States Attorney for the Central District of California, and any department or agency of the United States of America that is affected by the Limited Notice Matter, including but not limited to the U.S. Department of Health and Human Services ("HHS") and its Centers for Medicare & Medicaid Services ("CMS") until counsel for the United States makes an appearance on behalf of that department or agency, and, thereafter on that counsel, (d) the State of California, by service to the Attorney General of California, and any department or agency of the State that is affected by the Limited Notice Matter until counsel for the State makes an appearance on behalf of that department or agency, and thereafter on that counsel, (e) parties that file with the Court and serve upon the Debtor requests for notice of all matters in accordance with Bankruptcy Rule 2002(i), and (f) any party with a pecuniary interest in the subject matter of the particular Limited Notice Matter or its counsel (collectively, the "Limited Service List").

49.    The above proposed limited notice procedures are necessary and appropriate given that the creditor body is large and many of the creditors (including former patients and employees who, if the Wage Motion is approved, will receive payment in full of their prepetition claims) would not be interested in receiving copies of all the Limited Notice Matters, but would find service of all these motions and other documents wasteful.  Requiring notice to, and service upon, so many parties, therefore, would substantially augment the cost and administrative burden on the Debtor, without conferring any meaningful benefit to the Debtor's estate, and thus would diminish the assets ultimately available for the operations of the Debtor and distributions to creditors.  Further, allowing service of an emergency motion by overnight delivery in the

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES, CALIFORNIA  90017-5704
(213) 623-9300

- 16 -

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

instances outlined above provides parties on the Limited Service List with adequate notice and preserves the Debtor's ability to bring such matters on a timely and efficient basis. The Debtor submits that such notice constitutes due and sufficient notice of the Limited Notice Matters.

C.    **Motion Re Ordinary Course Professionals (the "OCP Motion")**

50.    The Debtor customarily retains the services of various attorneys, accountants, and other professionals in matters arising in the ordinary course of business that are unrelated to the underlying chapter 11 case (each an "OCP" and collectively, the "OCPs"). Prior to the filing of the Chapter 11, the Debtor retained the OCPs listed on Exhibit A to the OCP Motion to render services in connection with various corporate and business matters and specific litigation pending in various courts.

51.    The Debtor requires the services of the OCPs listed on the Exhibit to the OCP Motion and any additional OCPs whose services may be required during this Case in order to continue to operate its business as a debtor in possession. The work of the OCPs, albeit ordinary course, is directly related to the preservation of the value of the Debtor's estate.

52.    The operation of the Debtor's business would be severely hindered if the OCPs were delayed in performing their work on behalf of the Debtor while the Debtor (i) submitted to this Court an application, affidavit, and proposed retention order for each OCP; (ii) waited until such order was approved before such OCP continued to render services; and (iii) withheld payment of the normal fees and expenses of the OCPs until they complied with the compensation procedures applicable to professionals hired pursuant to section 327(a) or (e). In addition, some of the OCPs do not generally work for debtors in bankruptcy cases and may be unfamiliar with the required employment and compensation procedures. Therefore, the Debtor would expend significant amounts of money and time educating the OCPs as to these procedures and assisting them with their compliance with the procedures.

53.    Further, some OCPs might be unwilling or unable to assume the administrative and cost burden of such employment and fee procedures and may therefore be unwilling to work with the Debtor if these requirements are imposed, forcing the Debtor to incur additional and

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 17 -

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

unnecessary expenses to retain other professionals who would not have the background and expertise of the OCPs or the same familiarity with the Debtor, and at potentially higher rates. The uninterrupted services of the OCPs are important to the Debtor's continuing operations and its ability to move toward a successful conclusion of the Case.

54.    Moreover, a requirement that the OCPs each file retention pleadings and follow the usual fee application process required of the Chapter 11 Professionals would burden the Clerk's office, this Court, and the U.S. Trustee's office with unnecessary fee applications while significantly adding to the administrative costs of the Case without any corresponding benefit to the Debtor's estate. This Motion proposes a procedure to alleviate such a burden.

55.    Although the OCPs set forth on Exhibit A to the OCP Motion and additional OCPs whose services may be required during the Case may hold unsecured claims against the Debtor in respect of prepetition services rendered, the Debtor does not believe that the OCPs have an interest materially adverse to the Debtor, its estate, its creditors, or other parties in interest, and thus none will be retained who do not meet, if applicable, the special counsel retention requirement of section 327(e) of the Bankruptcy Code. By the OCP Motion, the Debtor is not requesting authority to pay prepetition amounts owed to OCPs.

**D.    Motion Re Security Deposits For Utility Services**

56.    The Debtor receives essential utility services from many companies. A list of the utility companies (each, a "Utility Company" and collectively, the "Utility Companies") and the Debtor's account number with each Utility Company is attached hereto as Exhibit "A." The Debtor receives essential water, gas, electric, telephone and other services from the Utility Companies. On any given business day, patients are undergoing surgical procedures and are receiving medical treatments for which sophisticated, life-sustaining, utility-powered equipment is absolutely essential. While any interruption in utility services would certainly be very detrimental to any debtor's business, in this Case, any utility interruption, no matter how brief, could be extremely harmful to the patients at the Debtor's facility and may violate applicable laws, rules, regulations and standards with which the Debtor is obligated to comply. The

601 SOUTH FIGUEROA STREET, SUITE 2500
DENTONS US LLP
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 18 -

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Debtor's ability to operate the Hospital depends on maintaining the confidence of the doctors who perform surgical and other medical procedures at the Hospital and the patients who are treated there. Both constituencies must be absolutely assured that there will be no interruption of utility services.

57.    I believe that the relief requested in the First Day Motions described above is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this Chapter 11 Case, and is critical to the Debtor's reorganization efforts. Accordingly, on behalf of the Debtor, I respectfully submit that the First Day Motions should be granted.

///
///
///
///
///
///
///
///
///
///
///

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES, CALIFORNIA  90017-5704
(213) 623-9300

1       I declare under penalty of perjury under the laws of the United States that the foregoing is

2   true and correct to the best of my knowledge, information and belief.

3       Executed this 23rd day of May, 2016, at Los Angeles, California.

4

5

6   _____

7                  DAVID HERSKOVITZ

8

9

10  84865288\V-6(CLEAN-Rev DH 5-23-16)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DAVID HERSKOVITZ
IN SUPPORT OF FIRST DAY MOTIONS

# EXHIBIT "A"

Gardens Regional Hospital & Regional Center
Utilities Motion

| Vendor ID | Vendor Name- Utilities Company | Vendor Address | Account # | Type of Service | Average Monthly Billings | Security or Additional Deposits |
|---|---|---|---|---|---|---|
| 50070 | Southern California Edison | PO Box 300 Rosemead CA 91772 | 3-017-1759-69 | Electricity | 16.500 | No |
| 50070 | Southern California Edison | PO Box 300 Rosemead CA 91772 | 3-018-4532-33 | Electricity | 2,900 | No |
| 50070 | Southern California Edison | PO Box 300 Rosemead CA 91772 | 3-022-5473-60 | Electricity | 1,300 | No |
| 50248 | Southern California Gas | PO Box C Monterey Park, CA 91756 | 133 106 6841 6 | Gas | 2,200 | No |
| 50039 | Golden State Water Company | PO Box 9016 San Dimas CA 91773 | 12309100001 | Water | 2.600 | No |
| 50039 | Golden State Water Company | PO Box 9016 San Dimas CA 91773 | 81309100006 | Water | 31 | No |
| 50039 | Golden State Water Company | PO Box 9016 San Dimas CA 91773 | 87809200006 | Water | 130 | No |
| 50125 | Republic Services | PO Box 78829 Phoenix AZ 85062 | 3-0902-1202153 | Trash | 2,248 | No |
| 50125 | Republic Services | PO Box 78829 Phoenix AZ 85062 | 3-0902-1222541 | Trash | 150 | No |
| 50228 | Sparkletts Water of America | PO Box 660579 Dallas TX 75266 | 23801114104 972 | Drinking Water | 1,140 | No |
| 56670 | WM Healthcare Solutions | PO Box 660345 Dallas TX 75266 | 831-0000556-2831-2 | Surgical Waste | 5,040 | No |
| 50068 | Verizon California | PO Box 920041 Dallas TX 75392 | 01 2803 1250346363 08 | Phone | 2,500 | No |
| 50543 | AT&T Mobility | PO Box 6463 Carol Stream IL 90197 | 835613964 | Cell Phone | 2,700 | No |
| 52896 | MPower Communication | PO Box 60767 Los Angeles CA 90060 | 378323 | Phone | 1,750 | No |
| 54612 | Paetec Communications INC | PO Box 9001013 Louisville KY 40290 | 2432898 | Phone | 2,750 | No |
| 51587 | Time Warner Cable | PO Box 60074 City of Industry Ca 91716 | 8448 30055 0136326 | Cable | 436 | No |
| 51587 | Time Warner Cable | PO Box 60074 City of Industry Ca 91716 | 8448 30064 0391667 | Cable | 88 | No |
| 51587 | Time Warner Cable | PO Box 60074 City of Industry Ca 91716 | 8448 30064 0442486 | Cable | 1,000 | No |
| 53758 | DirecTV | PO Box 60036 Los Angeles CA 90060 | 063739856 | Cable | 224 | No |
| 53758 | DirecTV | PO Box 60036 Los Angeles CA 90060 | 025672723 | Cable | 70 | No |
| 53758 | DirecTV | PO Box 60036 Los Angeles CA 90060 | 014724016 | Cable | 106 | No |
| 50151 | Matheson Tri Gas | PO Box 845502 Dallas TX 75284 | 00345 | Oxygen | 2,740 | No |

Prepared by Chinda Bhanaraksa
Reviewed by Karen Nimniyom
Date  March 3, 2016