# EXHIBIT B

## ASSET PURCHASE AGREEMENT

between

## GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC.,
**Debtor and Debtor-in-Possession**

and

## PROMISE HOSPITAL OF EAST LOS ANGELES, L.P.

**July 1, 2016**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ................................................................................................1

ARTICLE 2 PURCHASE AND SALE OF ASSETS ........................................................5

    2.1    Purchased Assets ................................................................................................5
    2.2    Excluded Assets .................................................................................................6
    2.3    No Liens, Claims or Encumbrances ..................................................................7
    2.4    Assumption of Liabilities ..................................................................................7
    2.5    Excluded Liabilities ...........................................................................................7
    2.6    Prorations ...........................................................................................................8

ARTICLE 3 PURCHASE PRICE AND CLOSING ..........................................................8

    3.1    Purchase Price ....................................................................................................8
    3.2    Allocation of Purchase Price .............................................................................8
    3.3    Closing ...............................................................................................................8
    3.4    Termination ........................................................................................................9

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER ..........................9

    4.1    Organization .......................................................................................................9
    4.2    Authorization .....................................................................................................9
    4.3    Title to Assets ....................................................................................................9
    4.4    No Other Brokers ...............................................................................................9

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ..........................9

    5.1    Organization .......................................................................................................9
    5.2    Authorization ...................................................................................................10
    5.3    Financing ..........................................................................................................10

ARTICLE 6 COVENANTS .............................................................................................10

    6.1    Bankruptcy Court Authorization .....................................................................10
    6.2    Additional Assumed Contracts ........................................................................11
    6.3    Access to Information .......................................................................................11
    6.4    Conduct of Business ........................................................................................12
    6.5    Maintenance of Premises .................................................................................12
    6.6    Employees ........................................................................................................12
    6.7    Attorney General Consent ...............................................................................12
    6.8    Regulatory Approvals ......................................................................................13
    6.9    Duty To Confer ................................................................................................13

ARTICLE 7 CONDITIONS TO OBLIGATIONS OF BUYER .......................................13

    7.1    Representations and Warranties True ...............................................................13
    7.2    Performance .....................................................................................................13
    7.3    Bankruptcy Court Order ..................................................................................13
    7.4    Attorney General Consent ...............................................................................14
    7.5    Regulatory Approvals ......................................................................................14
    7.6    No Proceedings .................................................................................................14

BN 21000003v7

7.7    Licenses and Permits in Effect ........................................................14
7.8    Casualty Loss ...................................................................................14
7.9    Instruments of Transfer ...................................................................14
ARTICLE 8 CONDITIONS TO OBLIGATIONS OF SELLER ...............................14
8.1    Representations and Warranties True ...............................................14
8.2    Performance ....................................................................................14
8.3    Bankruptcy Court Order ..................................................................14
8.4    Attorney General Consent ...............................................................15
8.5    No Proceedings ...............................................................................15
8.6    Delivery of Consideration ...............................................................15
ARTICLE 9 POST-CLOSING COVENANTS ..........................................................15
9.1    Further Assurances and Cooperation ...............................................15
9.2    Post-Closing Access by Seller .........................................................15
9.3    Collection of Healthcare Accounts ..................................................15
9.4    Emergency Services .........................................................................15
9.5    Site Neutral Beds .............................................................................15
ARTICLE 10 MISCELLANEOUS ............................................................................16
10.1    Notices ...........................................................................................16
10.2    Expenses ........................................................................................17
10.3    Entire Agreement ...........................................................................17
10.4    Amendment ....................................................................................17
10.5    Waiver ............................................................................................17
10.6    Severability ....................................................................................17
10.7    Successors and Assigns ..................................................................17
10.8    Headings .........................................................................................18
10.9    Governing Law ...............................................................................18
10.10    Jurisdiction ...................................................................................18
10.11    Counterparts; Facsimile Signatures .............................................18

## SCHEDULES

Schedule 2.1(c)   -   Licenses and Permits
Schedule 2.1(e)   -   Motor Vehicles
Schedule 2.1(f)   -   Assumed Contracts
Schedule 2.1(j)   -   Other Purchased Assets
Schedule 2.2(q)   -   Other Excluded Assets

## EXHIBITS

Exhibit 6.1(a)    -    Bidding Procedures

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made and entered into as of July 1, 2016, by and between PROMISE HOSPITAL OF EAST LOS ANGELES, L.P., a California limited partnership ("**Buyer**"), and GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC., a California nonprofit public benefit corporation ("**Seller**").

WHEREAS, on June 6, 2016 (the "**Petition Date**"), Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Bankruptcy Court**"), commencing Case No. 2:16-bk-17463-ER (the "**Chapter 11 Case**");

WHEREAS, Seller is continuing to operate its businesses and manage its properties as a debtor-in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, Buyer wishes to buy, and Seller wishes to sell, certain assets of Seller on the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings set forth in this Article 1.

"**Additional Contracts**" has the meaning set forth in Section 6.2 of this Agreement.

"**Affiliate**" of a specified Person means a Person who directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified.

"**Assumed Contracts**" has the meaning set forth in Section 2.1(f) of this Agreement.

"**Assumed Liabilities**" has the meaning set forth in Section 2.4 of this Agreement.

"**Attorney General**" means the Attorney General of the State of California.

"**Attorney General Consent**" has the meaning set forth in Section 6.7 of this Agreement.

"**Authorized Assumed Contracts**" has the meaning set forth in Section 2.4(a) of this Agreement.

"**Authorizing Order**" has the meaning set forth in Section 6.1(b) of this Agreement.

"**Buyer**" has the meaning set forth in the introduction to this Agreement.

1

"**Bankruptcy Code**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals of this Agreement.

"**Bidding Procedures**" has the meaning set forth in Section 6.1(a) of this Agreement.

"**Business Day**" means a day that is not a Saturday, Sunday or holiday in the State of California.

"**Chapter 11 Case**" has the meaning set forth in the recitals of this Agreement.

"**Chosen Courts**" has the meaning set forth in Section 10.10 of this Agreement.

"**Closing**" has the meaning set forth in Section 3.3 of this Agreement.

"**Closing Date**" has the meaning set forth in Section 3.3 of this Agreement.

"**Cure Amounts**" has the meaning set forth in Section 6.1(b)(iii) of this Agreement.

"**Effective Time**" has the meaning set forth in Section 3.3 of this Agreement.

"**Excluded Assets**" has the meaning set forth in Section 2.2 of this Agreement.

"**Excluded Liabilities**" has the meaning set forth in Section 2.5 of this Agreement.

"**Governmental Authority**" means any nation, province, state or other political subdivision thereof, and any agency, natural person or other entity exercising executive, legislative, regulatory or administrative functions of or pertaining to government, including without limitation, the California State Board of Equalization, the California Board of Pharmacy, the California Bureau of Security and Investigative Services, the California Department of Industrial Relations, the California Department of Managed Health Care, the California Department of Public Health, the California Employment Development Department, the California Franchise Tax Board, the California Office of Statewide Health Planning and Development, the Centers for Medicare & Medicaid Services, the City of Hawaiian Gardens, the Internal Revenue Service, the Los Angeles County Fire Department, the Los Angeles County Treasurer and Tax Collector, Medi-Cal, TRICARE, the United States Department of Health and Human Services, the United States Drug Enforcement Agency, and the United States Food and Drug Administration.

"**Healthcare Accounts**" means all accounts, accounts receivable, rights to payment, health care insurance receivables, general intangibles, payment intangibles, instruments, promissory notes, chattel paper, supporting obligations, and letter of credit rights arising out of the delivery of medical, surgical, diagnostic or other healthcare related goods or services, including without limitation, all rights and claims to payment under Medicare (including Medicare cost report settlements), Medi-Cal, TRICARE, the Children's Health Insurance Program, the Disproportionate Share Hospital Program, and the Hospital Quality Assurance Fee Program.

2

"**Hospital**" means Gardens Regional Hospital and Medical Center, formerly Tri-City Regional Medical Center, a 137-bed acute care hospital owned and operated by Seller and located at 21530 South Pioneer Blvd., Hawaiian Gardens, California 90716, including the hospital pharmacy, laboratory and emergency department.

"**Hospital Lease**" means that certain Amended and Restated General Acute Care Hospital Lease dated January 1, 2001, between Cerritos Gardens General Hospital Company, as lessor, and Seller, as lessee, for the premises located at 21530 South Pioneer Blvd., Hawaiian Gardens, California 90716, including all extensions of the term of such lease.

"**Hospital License**" means General Acute Care Hospital License No. 930000030 issued to Seller by the California Department of Public Health.

"**Hospital Premises**" means the premises leased by Seller pursuant to the Hospital Lease.

"**Licenses and Permits**" has the meaning set forth in Section 2.1(c) of this Agreement.

"**Liens, Claims and Encumbrances**" has the meaning set forth in Section 2.3 of this Agreement.

"**MOB Leases**" means the MOB Suite 208 Lease and the MOB Suite 209 Lease.

"**MOB Subleases**" means the MOB Suite 208 Sublease and the MOB Suite 209 Sublease.

"**MOB Suite 208 Lease**" means that certain Lease Agreement dated February 28, 2011, between Cerritos Garden General Hospital Company, as landlord, and Seller, as tenant, for the premises at 21520 S. Pioneer Blvd., Suite 208, Hawaiian Gardens, California 90716, as amended by that certain First Amendment to Lease Agreement for Suite 208 dated February 25, 2014, and including all extensions of the term of such lease.

"**MOB Suite 208 Sublease**" means any and all subleases in effect as of the Effective Time pursuant to which Seller subleases all or any portion of the premises leased by Seller under the MOB Suite 208 Lease.

"**MOB Suite 209 Lease**" means that certain Lease Agreement dated April 25, 2011, between Cerritos Garden General Hospital Company, as landlord, and Seller, as tenant, for the premises at 21520 S. Pioneer Blvd., Suite 209, Hawaiian Gardens, California 90716, as amended by that certain Amendment No. 1 to Lease Agreement dated April 18, 2014, and including all extensions of the term of such lease.

"**MOB Suite 209 Sublease**" means any and all subleases in effect as of the Effective Time pursuant to which Seller subleases all or any portion of the premises leased by Seller under the MOB Suite 209 Lease.

"**Office Lease**" means that certain Standard Industrial/Commercial Single-Tenant Lease – Net dated December 16, 2002, between The Irving I. Moskowitz Foundation, as lessor, and

3

Seller, as lessee, for the premises at 22101 Norwalk Blvd., Hawaiian Gardens, California 90716, and including all extensions of the term of such lease.

"**Person**" means a natural person, a governmental entity, agency or representative (at any level of government), a corporation, partnership, limited liability company, limited partnership, joint venture, trust or other entity or association, as the context requires.

"**Petition Date**" has the meaning set forth in the recitals of this Agreement.

"**Promise DIP Indebtedness**" means the indebtedness owing by Seller to the Promise DIP Lender, or any successor or assignee of the Promise DIP Lender, pursuant to (a) that certain Debtor-in-Possession Credit and Security Agreement dated June 21, 2016, as amended, modified or supplemented, and (b) the Loan Documents as defined therein.

"**Promise DIP Lender**" means Promise Gardens Lending Company, Inc., a Delaware corporation that is an Affiliate of Buyer, and its successors and assigns.

"**PTO**" means the liabilities of Seller for vacation and other paid time off of Seller Employees as of the Effective Time.

"**Purchased Assets**" has the meaning set forth in Section 2.1 of this Agreement.

"**Purchase Price**" has the meaning set forth in Section 3.1 of this Agreement.

"**Regulatory Approvals**" has the meaning set forth in Section 6.8 of this Agreement.

"**SEIU Collective Bargaining Agreement**" means, to the extent existing as of the date of this Agreement, the collective bargaining agreement between Seller and the Service Employees International Union 121RN.

"**Seller**" has the meaning set forth in the introduction to this Agreement.

"**Seller Employees**" mean all Persons who are employees of Seller immediately prior to the Effective Time, whether such employees are full-time employees, part-time employees, on short-term or long-term disability, or on leave of absence pursuant to Seller's policies, the Family and Medical Leave Act of 1993 or other similar local law.

"**Seller Employee Benefit Plans**" means all employee benefit plans or fringe benefit plans for Seller Employees, whether provided by third parties or by Seller, including without limitation: (a) all employee health insurance plans, dental plans, vision plans, life insurance plans, disability plans and workers' compensation plans; and (b) all 401(k) plans.

"**Seller Liabilities**" mean any and all debts, costs, liabilities, obligations and commitments of Seller, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, or determined, undetermined or undeterminable, whether arising before, at or after the Effective Time.

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS

2.1    <u>Purchased Assets</u>.  On the Closing Date and effective as of the Effective Time, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, receive and accept from Seller, all of the following rights, assets and properties owned or leased by Seller, whether tangible or intangible, real, personal or mixed, movable or fixed, and wherever located (collectively, the "**Purchased Assets**"):

(a)    the Hospital Lease and the MOB Leases, including all security deposits held under the Hospital Lease and the MOB Leases by the counterparties to the Hospital Lease and the MOB Leases, and all claims, causes of action, rights and defenses against the counterparties to the Hospital Lease and the MOB Leases;

(b)    the MOB Subleases, including all security deposits held by Seller under the MOB Subleases, and all claims, causes of actions, rights and defenses against the counterparties to the MOB Subleases;

(c)    all rights, to the extent assignable or transferable, to all licenses, permits, approvals (including pending approvals), registrations and other licenses, permits, approvals and registrations issued to Seller by any Governmental Authority relating to the ownership, development or operations of the Hospital and the Hospital Premises (**"Licenses and Permits"**), including without limitation, the Licenses and Permits listed in **Schedule 2.1(c)** hereto;

(d)    all inventory and supplies, including without limitation, all medical supplies, drugs, housekeeping, janitorial and office supplies, food, and other disposables and consumables;

(e)    all equipment, machinery, furniture and furnishings, fixtures, tools, vehicles and other tangible personal property, including without limitation, the motor vehicles listed in **Schedule 2.1(e)** hereto;

(f)    all of the contracts and leases set forth on **Schedule 2.1(f)** (the "**Assumed Contracts**"), all amounts payable to Seller under the Assumed Contracts, all security deposits held by counterparties to the Assumed Contracts or by Seller, and all claims, causes of action, rights and defenses against counterparties to the Assumed Contracts;

(g)    all rights, to the extent assignable or transferable, in all express or implied warranties, representations and guaranties of any manufacturer, vendor or contractor in connection with the Purchased Assets

(h)    all books and records relating to any of the foregoing, including without limitation, all maintenance and repair records with respect to the Hospital Premises and the assets described in <u>Section 2.1(e)</u> above;

(i)    all plans, specifications, "as is" drawings, and other drawings related to any improvements made, or proposed to be made, to the Hospital Premises; and

(j)    any other assets listed in **Schedule 2.1(j)**.

2.2    <u>Excluded Assets</u>.  Buyer shall not acquire, and Seller shall retain all right, title and interest in and to, all rights, assets and property owned or leased by Seller other than the Purchased Assets (collectively, the "**Excluded Assets**"), including without limitation, the following:

(a)    all cash, cash equivalents, bank accounts, marketable securities and investment property;

(b)    all Healthcare Accounts, and all claims, causes of actions, rights and defenses with respect to Healthcare Accounts;

(c)    Seller's Medicare and Medi-Cal provider agreements;

(d)    the Office Lease;

(e)    any assets that Buyer elects not to purchase by written notice delivered to Seller prior to the Closing Date, provided that such election shall not reduce the Purchase Price;

(f)    any of the Hospital Lease, MOB Leases, MOB Subleases or Assumed Contracts that Buyer elects not to assume by written notice delivered to Seller prior to the Closing Date, provided that such election shall not reduce the Purchase Price;

(g)    any employment contracts between Seller and any Seller Employee or any employment related liabilities to any Seller Employee, including without limitation, any wages, salaries, vacation or other paid time off liabilities, or termination liabilities;

(h)    the Seller Employee Benefit Plans;

(i)    any collective bargaining agreements, including without limitation, the SEIU Collective Bargaining Agreement;

(j)    equity interests in any Affiliate of Seller;

(k)    any tax refunds or tax deposits (including funds held by Seller in respect of withholding taxes or estimated income taxes);

(l)    all claims and causes of action arising under Chapter 5 or Section 724 of the Bankruptcy Code;

(m)    all insurance contracts and all rights thereunder, including rights to credits and refunds arising from insurance contracts (except claims under insurance contracts relating to the Purchased Assets to the extent insurance proceeds have not been received prior to the Closing Date, which are part of the Purchased Assets);

6

(n)    all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off against third parties arising prior to the Closing Date with respect to the Excluded Assets or the Excluded Liabilities;

(o)    the organizational documents of Seller, its minute books, stock and ownership records and corporate seal, and all other documents and records relating to the organization, maintenance, existence and federal income taxation of Seller;

(p)    all claims and causes of action against third parties other than the claims and causes of action expressly included in the Purchased Assets; and

(q)    any other assets listed in **Schedule 2.2(q)**.

2.3    <u>No Liens, Claims or Encumbrances</u>.    The sale, assignment, transfer and conveyance of the Purchased Assets hereunder shall be made free and clear of all liens, claims (including successor liability claims), charges, security interests, or other interests or encumbrances of any kind, nature or character, including without limitation, all Seller Liabilities (collectively, "**Liens, Claims and Encumbrances**") other than the Assumed Liabilities.

2.4    <u>Assumption of Liabilities</u>.    Upon the sale of the Purchased Assets to Buyer on the Closing Date, Buyer shall assume and agree to discharge the following Seller Liabilities and only the following Seller Liabilities (collectively, the "**Assumed Liabilities**"):

(a)    obligations of Seller from and after the Closing Date (but only to the extent that such obligations do not arise out of any non-monetary default or breach by Seller) under the Hospital Lease and those MOB Leases, MOB Subleases and Assumed Contracts (and no others) which the Bankruptcy Court has authorized Seller to assume and assign to Buyer (the "**Authorized Assumed Contracts**") provided, however, that Buyer shall have no obligation or liability under the Hospital Lease or any MOB Lease, MOB Sublease or Assumed Contract that the Bankruptcy Court has authorized Seller to assume and assign to Buyer if such Assumed Contract becomes an Excluded Asset prior to the Closing Date pursuant to <u>Section 2.2(f)</u> hereof;

(b)    accrued but unpaid PTO of Seller Employees hired by Buyer as of the Closing Date; and

(c)    any sale or transfer taxes in connection with the purchase of the Purchased Assets by Buyer.

2.5    <u>Excluded Liabilities</u>.    Except for the Assumed Liabilities, Buyer shall not assume, be liable for, or be bound by, agree to perform or discharge, indemnify Seller against, or otherwise have any responsibility for, any Seller Liabilities (collectively, the "**Excluded Liabilities**"), including without limitation, any Seller Liabilities arising out of or relating to any of the following:

(a)    the release, discharge or disposal (including the movement of material through or in air, soil, surface or groundwater) of any solid wastes, pollutants or hazardous substances or the handling, storage, use, transportation or disposal of any of the foregoing, as these terms are defined by current federal, state or local law, in or from the Hospital;

7

(b)    the termination of employment by Seller at any time prior to, on or after the Closing Date of any Seller Employees; or

(c)    any foreign, federal, state or local taxes incurred by Seller at any time prior to, on or after the Closing Date.

2.6    <u>Prorations</u>.  To the extent not an Assumed Liability or not otherwise prorated pursuant to this Agreement, Seller and Buyer shall prorate (as of the Effective Time), if applicable, real estate and personal property taxes, assessments, costs of utilities and other similar charges against real and personal property.

## ARTICLE 3
## PURCHASE PRICE AND CLOSING

3.1    <u>Purchase Price</u>.  The purchase price payable by Buyer for the Purchased Assets (the "**Purchase Price**") shall be the following:

(a)    the sum of One Million Dollars ($1,000,000) payable at Closing as an offset against the outstanding Promise DIP Indebtedness as of the Closing Date; provided, however, that if the outstanding Promise DIP Indebtedness as of the Closing Date is less than One Million Dollars ($1,000,000), Buyer shall pay the deficiency to Seller in cash at Closing; plus

(b)    cash payments by Buyer to the counterparties to the Authorized Assumed Contracts in amounts equal to the Cure Amounts under their respective Authorized Assumed Contracts, which amounts shall be paid by Buyer within seven calendar days after the Closing Date.

3.2    <u>Allocation of Purchase Price</u>.  Prior to the Closing Date, Seller and Buyer shall mutually agree to allocate the Purchase Price among the Purchased Assets in accordance with applicable rules and regulations.  All tax returns and reports filed by Seller and Buyer shall be consistent with such allocation, as shall be final and binding upon them pursuant to this <u>Section 3.2</u>.  This Purchase Price allocation shall be for tax purposes only and shall not have any effect on any distribution or disbursement of funds to secured or unsecured creditors in the Chapter 11 Case.

3.3    <u>Closing</u>.  Subject to the provisions of this Agreement, the closing of the sale of the Purchased Assets to Buyer (the "**Closing**") will take place at 10:00 a.m., local time, on the second Business Day after the conditions set forth in <u>Article 7</u> and <u>Article 8</u> of this Agreement have been satisfied or waived (other than those conditions which by their terms are not to be satisfied until the Closing, subject to the waiver or fulfillment at Closing of those conditions) (the "**Closing Date**"), at the offices of Buchalter Nemer P.C., 1000 Wilshire Blvd., Suite 1500, Los Angeles, California 90017-2457, or at such other date, time or place as Buyer and Seller shall agree, time being of the essence.  Regardless of the actual time of the Closing on the Closing Date, the Closing shall be deemed effective as of 12:01 a.m. local time on the Closing Date (the "**Effective Time**").

8

3.4    Termination.  Unless otherwise waived by Buyer in writing, this Agreement shall be terminated and abandoned prior to the Closing:

        (a)    upon execution by Buyer and Seller of a written instrument to such effect;

        (b)    upon entry of an order of the Bankruptcy Court approving a higher or better offer by any Person other than Buyer for the purchase of any of the Purchased Assets;

        (c)    upon entry of an order of the Bankruptcy Court denying Seller's motion for approval of the transactions contemplated by this Agreement;

        (d)    if the Authorizing Order has not been entered on or before July 15, 2016; or

        (e)    if the Closing has not occurred on or before November 15, 2016.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows:

4.1    Organization.  Seller is a nonprofit public benefit corporation, duly incorporated, validly existing and in good standing under the laws of the state of California.

4.2    Authorization.  Seller has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated hereby.  This Agreement (subject to the entry of an appropriate order or orders of the Bankruptcy Court) constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

4.3    Title to Assets.  At the Closing, Seller shall transfer the Purchased Assets to Buyer, pursuant to the Authorizing Order, free and clear of all Liens, Claims and Encumbrances other than the Assumed Liabilities.

4.4    No Other Brokers.  Except for Wilshire Pacific Capital Advisors, LLC, neither Seller nor any of its officers directors or employees have employed or made any agreement with any broker, finder or similar agent for any finder's fee, brokerage fees or commission or similar payment in connection with the transactions contemplated by this Agreement.  Wilshire Pacific Capital Advisors, LLC is a FINRA licensed and California licensed broker dealer.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

5.1    Organization.  Buyer is a limited partnership, duly organized, validly existing and in good standing under the laws of the State of California, and its general partner, Promise Healthcare of California, Inc. is a corporation, duly incorporated, validly existing and in good standing under the laws of the State of California.  Any Person to whom Buyer assigns this

Agreement is duly organized, validly existing and in good standing under the laws of the state of its incorporation or organization, and is duly qualified to do business and is in good standing in the state of its organization.

5.2     Authorization.  Buyer has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated hereby.  This Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

5.3     Financing.  Buyer has sufficient cash, committed and available lines of credit or other sources of committed and available funds to enable it to perform all of its obligations under this Agreement, including payment of the Purchase Price in accordance with the terms of this Agreement.

**ARTICLE 6
COVENANTS**

6.1     Bankruptcy Court Authorization.

(a)     On or before July 1, 2016, Seller shall file with the Bankruptcy Court a motion or motions for the order or orders referred to in Section 6.1(b) of this Agreement.  In addition to the matters described in Section 6.1(b), such motion or motions shall seek an order of the Bankruptcy Court approving the bidding procedures set forth on **Exhibit 6.1(a)** hereto (the "**Bidding Procedures**"), which order shall be in form and substance reasonably acceptable to Buyer.

(b)     This Agreement shall become effective upon entry of an order or orders of the Bankruptcy Court (collectively, the "**Authorizing Order**"), which order or orders shall be in form and substance reasonably satisfactory to Buyer:

(i)     authorizing and approving Seller's execution and delivery of this Agreement;

(ii)     authorizing and approving the sale, assignment, transfer and conveyance of the Purchased Assets to Buyer free and clear of all Liens, Claims and Encumbrances;

(iii)     determining the amounts necessary to compensate each of the counterparties to the Hospital Lease, the MOB Leases, the MOB Subleases, and the Assumed Contracts for any unpaid monetary obligations and pecuniary loss liabilities of Seller arising prior to the Closing Date (the "**Cure Amounts**");

(iv)     authorizing the assumption and assignment to Buyer of each of the Hospital Lease, the MOB Leases, the MOB Subleases, and the Assumed Contracts free and clear of all Liens, Claims and Encumbrances, including all liabilities and obligations of Seller arising out of any breach or default by Seller prior to the Closing Date;

10

(v)    ordering and determining that the following provisions of the Hospital Lease are unenforceable as against Buyer: (A) the last sentence of Section 12.2.8 providing for an increase in base rent upon assignment; (B) Section 12.2.9 providing for an increase in the cash security deposit upon assignment; (C) Section 12.12.1 requiring that any and all monies or other consideration payable or otherwise to be delivered in connection with an assignment pursuant to the Bankruptcy Code be paid or delivered to the lessor; and (D) Section 12.12.2 specifying notice periods for a proposed assignment and assumption pursuant to the Bankruptcy Code and any application for a proposed assignment and assumption pursuant to the Bankruptcy Code, and providing for a right of first refusal of the lessor with respect to a proposed assignment and assumption pursuant to the Bankruptcy Code;

(vi)    ordering and determining that except as provided in Section 6.2(v) above, each of the Hospital Lease, the MOB Leases, the MOB Subleases, and the Assumed Contracts shall be a valid and enforceable contract of Buyer from and after the Closing Date;

(vii)    authorizing and approving the consummation of all of the other transactions provided for in this Agreement; and

(viii)    including findings that Buyer is a purchaser acting in good faith, as such term is used in the Bankruptcy Code, and is entitled to rely on the protections of Section 363(m) of the Bankruptcy Code.

6.2    Additional Assumed Contracts.  In addition to the Assumed Contracts which shall be assumed and assigned to Buyer pursuant to the Authorizing Order, Buyer shall have the right at any time prior to the Closing to designate any other contracts or leases of Seller that Buyer desires to assume (the "**Additional Contracts**").  Upon Buyer's designation of any such Additional Contracts, Seller shall promptly file a motion with the Bankruptcy Court for an order of the Bankruptcy Court authorizing and approving the assumption and assignment to Buyer of such Additional Contracts upon the same terms and conditions provided under the Authorizing Order for the assumption and assignment to Buyer of the Assumed Contracts.  Buyer shall be solely responsible for payment of any Cure Amounts in connection with any Additional Contracts and Leases assumed and assigned to Buyer pursuant to this Section 6.2.

6.3    Access to Information.  Prior to the Closing, Seller shall permit Buyer and its representatives to have reasonable access, during regular business hours, to the properties, the employees and the books and records of Seller, and shall furnish to Buyer such financial and operating information with respect to the business and properties of Seller as Buyer shall, from time to time, reasonably request.  Buyer shall have the right to engage in reasonable communications with the customers and suppliers of Seller, the parties to licenses and other contracts and agreements with Seller, and the consultants and advisors to Seller. Notwithstanding the forgoing, in no event shall Seller be obligated to provide (a) any information the disclosure of which would cause (i) the loss of any legal privilege available to Seller relating to such information or (ii) Seller to breach a confidentiality obligation to which it is bound, or (b) access for any invasive environmental testing of any property, and Buyer shall not be entitled to conduct any invasive environmental testing at, on or under any property owned or occupied by Seller.  Any access or investigation pursuant to this Section 6.3 shall be

11

conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller.

6.4    Conduct of Business.  Prior to the Closing, the Hospital shall be operated by Seller only in the ordinary course of business, consistent with current practice, taking into account that Seller is a debtor-in-possession and subject to orders of the Bankruptcy Court, and except (i) as otherwise required or permitted by this Agreement (including without limitation, as may be necessary or appropriate for winding down or closure of operations of the Hospital prior to the Closing), (ii) as required by any contract existing as of the date hereof to which Seller is a party and which has been made available to Buyer and which has not been rejected prior to the Closing, (iii) as required by any applicable law or any requirements or limitations resulting from the Chapter 11 Case or orders of the Bankruptcy Court, or (iv) as otherwise consented to in writing by Buyer (such consent not to be unreasonably withheld, conditioned or delayed), Seller shall not take or cause any of the following actions:

(a)    the sale, transfer or acquisition by Seller of any assets other than in the ordinary course of business consistent with current practice;

(b)    the entry into any contract or lease, or the amendment to any contract or lease, other than purchase and sale orders entered into in the ordinary course of business consistent with current practice; or

(c)    the increase in the rate of compensation of any employee.

6.5    Maintenance of Premises.  Until the Closing Date, Seller shall be solely responsible, at its sole cost and expense, for (a) maintaining the Hospital Premises in a safe and secure condition, (b) if the Hospital Premises are materially damaged, repairing such premises, and (c) maintaining property insurance and commercial general liability insurance with coverage equivalent to the coverage under Seller's insurance policies in effect as of the date of this Agreement.

6.6    Employees.  Buyer shall have no obligation to hire any Seller Employee.  Seller Employees shall have the right to apply to Buyer for employment; provided, however, that Seller shall have no obligation to afford any hiring preference to any Seller Employee, and the hiring of any Seller Employee by Buyer shall be subject to the business requirements and operational and workforce needs of Buyer.  Buyer shall provide reasonable notification to Seller Employees of the opportunity to apply for employment by Buyer.

6.7    Attorney General Consent.  Promptly after entry of the Authorizing Order, Seller and Buyer shall cooperate in obtaining any required review and consent by the Attorney General to the sale of the Purchased Assets to Buyer in accordance with this Agreement and the Authorizing Order pursuant to Title 11, Chapter 15, Section 999.5 of the California Code of Regulations ("**Attorney General Consent**"), including without limitation, preparing and submitting to the Attorney General a notice of the transactions contemplated by this Agreement within ten (10) calendar days after entry of the Authorizing Order, participating in any required Attorney General or public meetings, and negotiating any conditions proposed by the Attorney

BN 21000003v7

General for the consummation of such transactions, which conditions (if any) shall be in form and substance reasonably acceptable to Buyer.

6.8    Regulatory Approvals.    Promptly after entry of the Authorizing Order, Buyer shall use its best reasonable commercial efforts to obtain approval by the Centers for Medicare & Medicaid Services and the California Department of Public Health, as applicable, for the following actions by Buyer (collectively, the "**Regulatory Approvals**"): (a) change of the designation of Buyer's main hospital campus from its East Los Angeles Campus to its Suburban Medical Center Campus effective on or before the Closing Date; (b) consolidation of the Hospital License with Buyer's acute care hospital license such that the Hospital Premises shall be a designated satellite campus of Buyer's long term acute care hospital (LTACH) under Buyer's Medicare provider number effective on the Closing Date; (c) moving the designated location of (i) all of Buyer's LTACH beds from Buyer's East Los Angeles Campus to the Hospital Premises, and (ii) a number of LTACH beds to be specified by Buyer from Buyer's Suburban Medical Center Campus to the Hospital Premises, on dates to be specified by Buyer occurring on or after the Closing Date; (d) converting a number of beds under the Hospital License (the number of such beds to be specified by Buyer) to a licensed skilled nursing facility or other post-acute care facility effective on a date to be specified by Buyer occurring on or after the Closing Date; and (e) keeping any remaining beds under the Hospital License (which remaining beds shall not exceed fifty percent (50%) of the beds under the Hospital License) in suspense after the Closing Date.

6.9    Duty To Confer.    Seller shall confer with Buyer concerning, and furnish to Buyer prior to its submission to the Bankruptcy Court or the Attorney General, all of the motions, orders and notices contemplated in this Article 6 and any other document that Seller may desire to submit to the Bankruptcy Court or the Attorney General in connection with any of the foregoing. All such motions, orders, notices and other documents shall comply with the terms and provisions of this Agreement and shall be in form and substance reasonably acceptable to Buyer.

**ARTICLE 7**
**CONDITIONS TO OBLIGATIONS OF BUYER**

The obligations of Buyer to effect the Closing hereunder are subject to the satisfaction (unless waived by Buyer in writing), at or before the Closing, of each of the following conditions:

7.1    Representations and Warranties True.    The representations and warranties of Seller contained in this Agreement shall be true, complete and accurate in all material respects as of the Closing.

7.2    Performance.    Seller shall have performed, fulfilled and complied, in all material respects, with all covenants and agreements required by this Agreement to be performed, fulfilled and complied with by it at or before the Closing.

7.3    Bankruptcy Court Order.    The Authorizing Order shall have become final and not subject to appeal.

13

7.4     Attorney General Consent.  The Attorney General shall have consented or waived consent to the purchase of the Purchased Assets by Buyer in accordance with this Agreement and the Authorizing Order and on terms and conditions reasonably satisfactory to Buyer.

7.5     Regulatory Approvals.  Buyer shall have received all of the Regulatory Approvals on terms and conditions reasonably satisfactory to Buyer.

7.6     No Proceedings.  No order of any court of competent jurisdiction shall have been entered enjoining or restraining the sale of any of the Purchased Assets to Buyer, and no court of competent jurisdiction shall have determined that the acquisition of the Purchased Assets by Buyer constitutes a violation of applicable law or would be in contravention of the rights of any Person.

7.7     Licenses and Permits in Effect.  Except for suspension of the Hospital License if the Hospital is closed prior to the Closing Date, none of the Licenses or Permits shall have been revoked or suspended by any Governmental Authority, and neither Buyer nor Seller shall have received any communication from any Governmental Authority threatening revocation or suspension of any of the Licenses or Permits.

7.8     Casualty Loss.  Neither the Purchased Assets, nor the Hospital Premises or any other facilities of Seller in which the Purchased Assets are located, shall have suffered any material damage or destruction (whether or not such damage or destruction is covered by insurance) from fire, flood, earthquake or otherwise.

7.9     Instruments of Transfer.  Seller shall have delivered to Buyer bills of sale in form and substance reasonably acceptable to Buyer, effective to vest in Buyer good and marketable title to the Purchased Assets free and clear of all Liens, Claims and Encumbrances.

## ARTICLE 8
## CONDITIONS TO OBLIGATIONS OF SELLER

The obligations of Seller to effect the Closing hereunder are subject to the satisfaction, at or before the Closing, of each of the following conditions:

8.1     Representations and Warranties True.  The representations and warranties of Buyer contained in this Agreement shall be true, complete and accurate in all material respects as of the Closing.

8.2     Performance.  Buyer shall have performed, fulfilled and complied, in all material respects, with all covenants and agreements required by this Agreement to be performed, fulfilled and complied with by it on or prior to the Closing.

8.3     Bankruptcy Court Order.  The Authorizing Order shall have become final and not subject to appeal; provided, however, if Buyer has waived the condition set forth in Section 7.3 hereof, Seller shall be deemed also to have waived the condition set forth in this Section 8.3.

14

8.4     Attorney General Consent. The Attorney General shall have consented or waived consent to the purchase of the Purchased Assets by Buyer in accordance with this Agreement and the Authorizing Order.

8.5     No Proceedings. No order of any court of competent jurisdiction shall have been entered enjoining or restraining the sale of any of the Purchased Assets to Buyer, and no court of competent jurisdiction shall have determined that the acquisition of the Purchased Assets by Buyer constitutes a violation of applicable law or would be in contravention of the rights of any Person.

8.6     Delivery of Consideration. Buyer shall have delivered the portion of the Purchase Price described in Section 3.1(a) hereof.

## ARTICLE 9
## POST-CLOSING COVENANTS

9.1     Further Assurances and Cooperation. After the Closing, each of Seller and Buyer shall execute, acknowledge and deliver to the other any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by the other at any time, and shall take any and all other actions reasonably requested by the other at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to Buyer the Purchased Assets, and as may be necessary to fully consummate the transactions contemplated by this Agreement and to fully perform the obligations of the parties hereunder. After the consummation of the transactions contemplated by this Agreement, the parties agree to reasonably cooperate with each other and to take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

9.2     Post-Closing Access by Seller. After the Closing, Buyer shall permit Seller and its representatives to have reasonable access, during regular business hours, to the financial, corporate and other books and records relating to the operation of Seller's businesses prior to the Closing Date to the extent reasonably necessary for administration of the Chapter 11 Case and the resolution of claims asserted against Seller in the Chapter 11 Case.

9.3     Collection of Healthcare Accounts. If requested by Seller, and subject to approval of the Bankruptcy Court, Buyer and Seller shall enter into an agreement, on terms and conditions reasonably acceptable to Buyer and Seller, for Buyer to service and collect Seller's Healthcare Accounts (other than Medicare cost report settlements) after the Closing Date for the benefit of Seller's estate and creditors, including without limitation, the Promise DIP Lender.

9.4     Emergency Services. After the Closing, Buyer shall provide emergency or urgent care services at the Hospital Premises in accordance with any applicable conditional use permit (CUP) of the City of Hawaiian Gardens, as such CUP may be amended, modified or supplemented after the Closing Date.

9.5     Site Neutral Beds. Buyer shall make "site neutral" beds available at the Hospital Premises to short term acute care patients (a) to the extent permitted under Seller's LTACH

15

Medicare provider agreement and applicable laws and regulations, and (b) subject to the needs of Buyer's long term acute care patients.

## ARTICLE 10
## MISCELLANEOUS

    10.1   <u>Notices</u>.  All notices, requests, consents, demands and other communications hereunder shall be in writing (including a writing delivered by facsimile transmission) and shall be deemed to have been duly given (i) when delivered, if sent by registered or certified mail (return receipt requested), (ii) when delivered, if delivered personally or by facsimile, or (iii) on the following Business Day, if sent by United States Express Mail or overnight courier, in each case to the parties at the following addresses (or at such other addresses as shall be specified by like notice):

If to Seller to:

> Gardens Regional Hospital and Medical Center, Inc.
> 3719 Meadville Drive Center
> Sherman Oaks, California 91403
> Attention:  Brian Walton, Chairman of the Board
> Telephone: _____
> Facsimile: _____

and

> Gardens Regional Hospital and Medical Center, Inc.
> 21530 S. Pioneer Blvd.
> Hawaiian Gardens, California 90716
> Attention:  Stan Otake, CEO
> Telephone:  (877) 877-1104
> Facsimile: _____

with a copy to:

> Dentons US LLP
> 601 South Figueroa Street, Suite 2500
> Los Angeles, California 90017-5704
> Attention:  Samuel R. Maizel, Esq.
> Telephone: (213) 892-2910
> Facsimile:  (213) 623-9924

If to Buyer to:

> Promise Hospital of East Los Angeles, L.P.
> c/o Promise Healthcare of California
> 999 Yamato Road, Third Floor
> Boca Raton, Florida 33431

BN 21000003v7

Attention:  Peter R. Baronoff, CEO
Telephone: (561) 869-3100
Facsimile:  (561) 995-9845

with a copy to:

Buchalter Nemer, P.C.
1000 Wilshire Blvd., Suite 1500
Los Angeles, California 90017-2457
Attention:  Mary H. Rose, Esq.
Telephone: (213) 891-5727
Facsimile:  (213) 630-5629

10.2    Expenses. Each party to this Agreement shall pay its own expenses in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby, including the fees of any attorneys, accountants, financial advisors, investment bankers or other professionals engaged by such party.

10.3    Entire Agreement. This Agreement contains the entire agreement between the parties and supersedes all prior agreements, arrangements and understandings relating to the subject matter hereof.  There are no written or oral agreements, understandings, representations, or warranties between the parties other than those set forth in this Agreement.

10.4    Amendment.    This Agreement may not be modified, amended, altered or supplemented except by a written agreement executed by all of the parties hereto.

10.5    Waiver.  Waiver by any party of any breach or failure to comply with any provision of this Agreement by any other party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.  No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving party and delivered, in the manner required for notices generally, to each affected party.

10.6    Severability. In case any provision of this Agreement shall be found by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be construed and enforced as if it had been narrowly drawn so as not to be invalid illegal or unenforceable, and the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

10.7    Successors and Assigns. This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns.  Seller may not assign, delegate or otherwise transfer its rights or duties hereunder without the prior written consent of Buyer.  Buyer may assign its rights and duties hereunder to any Affiliate of Buyer, provided that no such assignment by Buyer shall relieve Buyer of its obligations hereunder.

10.8    Headings.    The descriptive headings of sections and subsections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

10.9    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to the choice of law principles thereof.

10.10    Jurisdiction.    Each party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement and the transactions contained in or contemplated by this Agreement exclusively in (a) the Bankruptcy Court so long as the Chapter 11 Case remains open and (b) after the close of the Chapter 11 Case (if the Chapter 11 Case is not reopened) or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Central District of California or any California State court sitting in Los Angeles County (together with the Bankruptcy Court, the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement or the transactions contemplated hereby (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto, and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 10.1 hereof.

10.11    Counterparts; Facsimile Signatures.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile or electronic scan and upon such delivery the facsimile or electronic scan signature shall be deemed to have the same effect as if the original signature had been delivered to the other parties.

[Signatures on Following Page]

BN 21000003v7

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**SELLER**

GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC., a California nonprofit public benefit corporation

By:_____
Name:  Brian Walton
Title:   Chairman of the Board


By:_____
Name:  Stan Otake
Title:   Chief Executive Officer


**BUYER**

PROMISE HOSPITAL OF EAST LOST ANGELES, L.P., a California limited partnership

By:    Promise Healthcare of California, Inc., a California corporation, its General Partner


By:_____
Name:  Peter R. Baronoff
Title:   Chief Executive Officer

[Signature Page to Asset Purchase Agreement]

BN 21000003v7

**Schedule 2.1(c)**

**LICENSES AND PERMITS**

1.  General Acute Care Hospital License No. 930000030 issued by the California Department of Public Health to Gardens Regional Hospital and Medical Center, Inc.

2.  Hospital Inpatient Pharmacy Permit, License No. HSP 42970, issued by the California Board of Pharmacy to Gardens Regional Hospital and Medical Center

3.  Sterile Compounding License, License No. LSC 100279, issued by the California Board of Pharmacy to Gardens Regional Hospital and Medical Center

4.  Controlled Substance Registration Certificate, DEA Registration No. BT5697973, issued by the United States Drug Enforcement Administration to Gardens Regional Hospital and Medical Center

5.  Clinical Laboratory License, Lab ID No. CLF 00002159, CLIA No. 05D0059575, issued by the California Department of Public Health to Gardens Regional Hospital and Medical Center

6.  Clinical Laboratory License, Lab ID No. CLF 00002644, CLIA No. 05D665952, issued by the California Department of Public Health to Tri City Medical Center Pulmonary Laboratory

7.  Certificate of Registration (Radiation), Registration No. FAC00033320, issued by the California Department of Public Health to Gardens Regional Hospital & Medical Center

8.  Annual Unified Program Facility Permit (Hazardous Materials Disclosure Program, Hazardous Waste Generator Program, and Underground Storage Tank Program (UST)), LA Co. CUPA No. AR: AR0020966, issued by the Los Angeles County Fire Department to Tri City Regional Medical Ctr

9.  Permit to Operate Air Pressure Tank, State Serial No. A023264-12, N.B. #/SER.# 225839, issued by the California Department of Industrial Relations, Division of Occupational Safety & Health, Pressure Vessel Unit, to Tri City Regional Medical Center

10. Permit to Operate Steam Boiler, State Serial No. B020648-05, N.B.#SER.# 55512, issued by the California Department of Industrial Relations, Division of Occupational Safety & Health, Pressure Vessel Unit, to Tri City Regional Medical Center

11. Permit to Operate Steam Boiler, State Serial No. B020649-05, N.B.#SER.# 55513, issued by the California Department of Industrial Relations, Division of Occupational Safety & Health, Pressure Vessel Unit, to Tri City Regional Medical Center

1

12.    Proprietary Private Security Employer License No. PSE 412 issued by the California Bureau of Security and Investigative Services to Gardens Regional Medical Center dba Tri-City Regional Medical Center

BN 21000003v7

## Schedule 2.1(e)

## MOTOR VEHICLES

| Year | Make | Model | VIN | Vehicle Type | Use |
|------|------|-------|-----|--------------|-----|
| 2000 | Chevy | Maxivan | 1GAHG39J5Y1240672 | Maxivan | Passenger Transp |
| 2006 | Toyota | Sienna | 5TDZA23CX6S428637 | Minivan | Passenger Transp |
| 2006 | Toyota | Sienna | 5TDZA23C66S529867 | Minivan | Passenger Transp |
| 1996 | GMC | Truck | 1GDJC34J5TE553973 | Truck | Cargo |

3

# Schedule 2.1(f)

## ASSUMED CONTRACTS

None.

BN 21000003v7

## Schedule 2.1(j)

### OTHER PURCHASED ASSETS

None.

BN 21000003v7

## Schedule 2.2(q)

## OTHER EXCLUDED ASSETS

None.

BN 21000003v7

**Exhibit 6.1(a)**

**BIDDING PROCEDURES**

The sale of certain assets (the "**Assets**") of Gardens Regional Hospital and Medical Center, Inc. (the "**Debtor**") to Promise Hospital of East Los Angeles, L.P. ("**Promise**") pursuant to the Asset Purchase Agreement dated as of July 1, 2016 (the "**Agreement**") shall be subject to overbids on the following terms and conditions:

1.  Any person desiring to submit an overbid to purchase the Assets must submit the overbid in writing to counsel for the Debtor (with copies to counsel for Promise, and if a committee of unsecured creditors has been appointed (the "**Committee**"), counsel for the Committee) at or before 5:00 p.m. (Prevailing Pacific Time) on July 8, 2016.  The overbid must be in writing and must be accompanied by:

    (a)    a refundable deposit of $250,000 by wire transfer to the attorney trust account of the Debtor's counsel (the "**Deposit**"), and if the overbidder is a secured creditor of the Debtor who intends to make a credit bid, evidence of the amount, priority and basis for such secured creditor's secured claim against the Debtor;

    (b)    evidence of availability in cash, or a binding commitment for availability in cash, of at least $2,000,000 to purchase the Assets;

    (c)    a signed asset purchase agreement on terms that (i) are substantially in the form of the Agreement and not less favorable to the Debtor than the Agreement, and (ii) provide for payment in cash of the full amount of the outstanding indebtedness of the Debtor to Promise Gardens Lending Company, Inc. or its successors and assigns (the "**Promise DIP Lender**") within ten (10) days after entry of an order of the Bankruptcy Court approving such overbidder as the successful bidder;

    (d)    a signed commitment by the overbidder to provide debtor-in-possession financing to the Debtor, in amounts and on terms not less favorable to the Debtor than the debtor-in-possession financing provided to the Debtor by the Promise DIP Lender, within ten (10) days after entry of an order of the Bankruptcy Court approving such overbidder as the successful bidder; and

    (e)    a redline of the overbidder's signed asset purchase agreement against the Agreement.

2.  No overbid will be accepted unless the purchase price provides for:

    (a)    payment in cash of the full amount of the outstanding indebtedness of the Debtor to the Promise DIP Lender within ten (10) days after entry of an order of the Bankruptcy Court approving such overbidder as the successful bidder, together with a commitment by the overbidder concurrently to provide debtor-in-possession financing to

7

the Debtor in amounts and on terms not less favorable to the Debtor than the debtor-in-possession financing provided to the Debtor by the Promise DIP Lender; plus

      (b)      payment in cash or by valid credit bid (or a combination of cash and valid credit bid) of at least $150,000 more than that amount payable to the Debtor by cash or credit bid under the Agreement.

3.      Any overbidder must offer to purchase the Assets on terms not materially more burdensome or conditional to the Debtor than the terms of the Agreement, and such offer must not be subject to the outcome of any unperformed due diligence.

4.      Promise, and any overbidder who has duly paid the Deposit and whose bid otherwise complies with these overbidding requirements, will have the right to further bid at an auction to be held at 10:00 a.m. (Prevailing Pacific Time) at the Offices of Dentons US LLP, 601 South Figueroa Street, Suite 2500, Los Angeles, California 90017-5704. Any bidding subsequent to the initial overbid will be increments of not less than $100,000.

5.      If Promise is not the successful overbidder, Promise will be entitled to receive, upon entry of an order of the Bankruptcy Court approving a successful overbidder other than Promise, the following amounts from the successful overbidder's Deposit: (i) a break-up fee in the amount of $50,000; plus (b) reimbursement of Promise's reasonable expenses in connection with the Agreement in an amount up to $40,000.

6.      Any successful overbidder who is afforded the opportunity to purchase the Assets and who fails to timely close such purchase will irrevocably forfeit its Deposit. Each unsuccessful overbidder (i.e., each overbidder who is not afforded the opportunity to purchase the Assets) will recover its Deposit upon the entry of an order of the Bankruptcy Court approving a successful overbidder other than such unsuccessful overbidder.

BN 21000003v7