SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
JOHN A. MOE, II (Bar No. 066893)
john.moe@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:     (213) 623-9300
Facsimile:     (213) 623-9924

Attorneys for Debtor,
GARDENS REGIONAL HOSPITAL
AND MEDICAL CENTER, INC.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC., dba GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER,<br><br>Debtor. | Case No. 2:16-bk-17463-ER<br><br>Chapter 11<br><br>**DEBTOR'S MEMORANDUM ON RESULTS OF THE AUCTION AND IN SUPPORT OF ENTRY OF SALE ORDER AND ADDITIONAL BRIEFING ON NEED FOR CONTINUED DIP FINANCING**<br><br>Hearing:<br>Date:        July 26, 016<br>Time:       10:00 a.m.<br>Place:      Courtroom 1568<br><br>[Relates to Docket Nos. 142, 153, 164, 189 and 194]<br><br>Judge:     Hon. Ernest M. Robles |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

# TABLE OF CONTENTS

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**Page(s)**

I.      INTRODUCTION ................................................................................................. 1

II.     THE AUCTION ................................................................................................... 1

    A.      The Procedural Orders ............................................................................. 1

    B.      Marketing .................................................................................................. 2

    C.      The Auction ............................................................................................... 3

    D.      The Winning Bid ....................................................................................... 4

    E.      The Back Up Bidder ................................................................................. 6

    F.      The Evaluation Process ............................................................................ 7

III.    LEGAL ISSUES .................................................................................................. 7

    A.      Debtors Are Given Wide Lattitude To Conduct A Sale ........................... 7

    B.      The Debtor Appropriately Permitted A Late Entrant Into the Auction ................... 8

    C.      The Debtor Appropriately Denied Re-Entry To A Bidder ....................... 9

    D.      The Debtor Appropriately Considered Weighted Factors ..................... 10

    E.      As A Not For Profit Entity, The Debtor Must Consider Non-Economic Factors ........................ 12

    F.      A Sale Free And Clear Is Appropriate ................................................... 14

IV.     ASSUMPTION OF EXECUTORY CONTRACTS AND UNDEXPIRED LEASES ............................................................................................................. 15

V.      DIP FINANCING .............................................................................................. 16

VI.     CONCLUSION .................................................................................................. 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Bakalis*,
    220 B.R. 525 (Bankr. E.D.N.Y. 1998)...........................................................................10, 11, 12

*State ex rel. Butterworth v. Anclote Manor Hosp., Inc.*,
    566 So.2d 296 (Fla. App. 2 Dist. 1990) .........................................................................13

*Clear Channel Outdoor, Inc. v. Knupfer* (*In re PW, LLC*),
    391 B.R. 25 (B.A.P. 9th Cir. 2008)...............................................................................15

*In re Edwards*,
    228 B.R. 552 (Bankr. E.D. Pa. 1998)..........................................................................8, 9

*In re Farmland Indus., Inc.*,
    289 B.R. 122 (B.A.P. 8th Cir. 2003)..............................................................................11

*In re Food Barn Stores, Inc.*,
    107 F.3d 558 (8th Cir. 1997).................................................................................7, 8, 10

*In re Grubb & Ellis Co.*,
    2012 WL 1036071 (Bankr. S.D.N.Y. Mar. 27, 2012)..................................................10

*In re Grumman Indus., Inc.*,
    467 B.R. 694 (S.D.N.Y. 2012) .....................................................................................14

*Hegy v. Cmty. Counseling Ctr. of Fox Valley*,
    158 F. Supp. 2d 892 (N.D. Ill. 2001) ...........................................................................13

*In re Henry Mayo Newhall Mem'l Hosp.*,
    282 B.R. 444 (B.A.P. 9th Cir. 2002).............................................................................14

*In re Muscongus Bay Co.*,
    597 F.2d 11 (1st Cir. 1979) .............................................................................................7

*In re Shary*,
    152 B.R. 724 (Bankr. N.D. Ohio 1993) ........................................................................15

*Summers v. Cherokee Children & Family Servs.*,
    112 S.W.3d 486 (Tenn. Ct. App. 2002) ........................................................................13

*In re Sunland, Inc.*,
    507 B.R. 753 (Bankr. D.N.M. 2014)...............................................................................8

*In re United Healthcare System, Inc.*,
    1997 WL 176574 (D.N.J. Mar. 26, 1997).....................................................................13

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

100394831\V-2

*In re Wabash Valley Power Ass'n,*
    72 F.3d 1305 (7th Cir. 1996), *cert. denied,* 519 U.S. 965 (1996) .............................................14

*Wintz v. Am. Freightways, Inc.,*
    219 F.3d 807 (8th Cir. 2000) ............................................................................................11

**Statutes**

11 U.S.C. § 303 ....................................................................................................................13

11 U.S.C. § 363 .................................................................................................................7, 12

11 U.S.C. § 363(d)(1) ...........................................................................................................12

11 U.S.C. § 363(f)(1)-(5) (2012) ....................................................................................14, 15

11 U.S.C. §1112(c) ..............................................................................................................13

California Corporations Code §5914 .......................................................................................6

California Corporations Code §5915 .......................................................................................6

California Corporations Code section 5920 *et seq.* ................................................................12

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

100394831\V-2

Gardens Regional Hospital and Medical Center, Inc., d/b/a Gardens Regional Hospital Medical Center, Inc., (the "Debtor"), files this Memorandum in support of the auction of the Debtor's assets, completed on July 19, 2016 and to explain its need for additional DIP financing.

## I.    INTRODUCTION

The Debtor, pursuant to the Court's order, conducted an auction commencing on July 13, 2016, and concluding on July 19, 2016.   The value of the Stalking Horse Bid prior to the auction was approximately $8.5 million.  Four bidders actively participated in the auction over approximately 30 hours of bidding.  The Winning Bid at the conclusion of the auction was from Strategic Global Management, Inc. ("Strategic") at approximately $19.5 million.  In addition, the Winning Bid provides for the continuation of the Hospital's medical services, including its Emergency Department, for the community, and continued employment for most of its employees.  The Official Committee of Unsecured Creditors supports the selection of the Winning Bidder by the Debtor.  By any measure, this auction was a success for all parties in interest.

In its *Order Amending The Court's Previous Order (A) Approving Procedures in Connection With The Sale of Certain of The Debtor's Assets; (B) Scheduling The Related Auction And Hearing to Consider Approval of Sale; (C) Approving Procedures Related to The Assumption of Certain Executory Contracts And Unexpired Leases; (D) Approving The Form And Manner Of Notice Thereof; (E) Approving Break-Up Fees; And (F) Granting Related Relief.* [Docket No. 194], entered on July 15, 2016, the Court directed the Debtor to submit a report on the results of the auction, and explain "the Debtor's continuing need for financing in the event the asset sale is approved."  This is that report and explanation.

## II.    THE AUCTION

### A.    The Procedural Orders

On July 1, 2016, the Debtor filed its *Notice Of Motion And Motion Of The Debtor And Debtor-In-Possession Pursuant To Section 105(A), 363, And 365 Of The Bankruptcy Code For An Order (I) (A) Approving Procedures In Connection With The Sale Of Certain Of The Debtor's*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

-1-

1    *Assets; (B) Scheduling The Related Auction And Hearing To Consider Approval Of Sale;*

2    *(C) Approving Procedures Related To The Assumption Of Certain Executory Contracts And*

3    *Unexpired Leases; (D) Approving The Form And Manner of Notice Thereof; (E) Approving*

4    *Break-Up Fees; And (F) Granting Related Relief; And (II) (A) Authorizing The Sale of Certain of*

5    *The Debtor's Assets Free And Clear of Liens, Claims, Encumbrances, And Other Interests; (B)*

6    *Approving The Assumption And Assignment of Certain Executory Contracts And Unexpired*

7    *Leases; And (C) Granting Related Relief* (the "Motion") [Docket No. 142].

8        The Court issued a tentative ruling on July 5, 2016 [Docket No. 147], approving the

9    Motion, subsequent to which the Court entered its *Order (A) Approving Procedures in*

10   *Connection With The Sale of Certain of The Debtor's Assets; (B) Scheduling The Related Auction*

11   *And Hearing to Consider Approval of Sale; (C) Approving Procedures Related to The*

12   *Assumption of Certain Executory Contracts And Unexpired Leases; (D) Approving The Form*

13   *And Manner Of Notice Thereof; (E) Approving Break-Up Fees; And (F) Granting Related Relief.*

14   [Docket No. 153].

15       Because the auction took four days to complete, the Court entered three *Orders* [Docket

16   Nos. 164, 189 and 194] rescheduling dates including the date by which the auction would be

17   completed (11:00 p.m. on July 19th), the date for this Report (July 20th), the date and time for any

18   Opposition (4:00 p.m. on July 22nd) and the date and time for the hearing (10:00 a.m. on

19   July 26th).  The auction was completed at approximately 9:30 p.m. on Tuesday, July 19, 2016.

20   **B.    <u>Marketing</u>**

21       Eric Weissman of Wilshire Pacific Capital Advisors, LLC ("Wilshire"), marketed the

22   Hospital extensively, since 2015, in order to obtain bidders for the auction.  Those actions

23   included creating a virtual data room with information for prospective bidders, contacting more

24   than two dozen prospective bidders, including the entities that participated in the auction, as well

25   as other potential buyers including but not limited to Alecto Healthcare, Prime Healthcare

26   Management, Imperial Holdings Group, Premier Healthcare Group, Naerok Group International,

27   SAK Management Services, ER Hospitals, Community Healthcare Partners, Skilled Nursing

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 2 -

Group, Perotoneal Dialysis Centers of America and CHA Health Systems.  Because the Debtor did not own the real estate and that it was a defendant in numerous cases, it was difficult to get prospective buyers interested in the assets.

After  the Bankruptcy Case was commenced, Mr. Weissman contacted, again, more than a dozen potential buyers.  On behalf of the Debtor Mr. Weissman entered into non-disclosure agreements with 14 potential buyers.  As a result of Mr. Weissman's efforts, four bidders ultimately attended the auction and bid on the bulk of the Debtor's assets.

## C.    The Auction

As set forth in the initial *Order* [Docket No. 153], opening bids and a $250,000 deposit were due on or before 4:00 p.m. on Friday, July 8, 2016.  Three parties submitted opening bids and the required Good Faith Deposit, including the Stalking Horse Bidder, Promise Healthcare of East Los Angeles ("Promise"), Harbor Gardens Capital I, LLC ("Harbor"), and Strategic.

On Tuesday afternoon, July 12, 2016, a fourth bidder,  Le Summit Healthcare, LLC ("Le Summit"), submitted an opening bid and early in the morning of July 13, 2016, Le Summit provided a cashier's check for the Good Faith Deposit.  The Debtor, its counsel and financial advisor considered whether to permit Le Summit to participate in the auction (including consultation with counsel for the Official Committee of Unsecured Creditors (the "Committee")), because its bid arrived after the July 8th deadline.  Based on a review of information submitted by Le Summit, applicable precedent, and the importance of maximizing recovery for the benefit of creditors, the Debtor made the decision to permit Le  Summit to attend the auction and bid.

The auction commenced at 10:00 a.m., on Wednesday, July 13, 2016.  The Debtor, its attorneys and financial advisor, met extensively with representatives of the four bidders to ensure the Debtor understood the bids, and that the bidders understood what they were bidding on and how those bids would be evaluated by the Debtor.

The auction continued on Thursday, July 14, 2016, with five rounds of bidding.  In the fourth round, Promise passed and, as required by the Bid Procedures Order, was therefor

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

eliminated from future bidding.  A fifth round of bidding then proceeded with the remaining three bidders.

On Friday, July 14th, Promise informed the Debtor that it wished to reenter the bidding process.  After careful consideration of Promise's request, including meeting with counsel for Promise in the morning of July 18th and consultation with counsel for the Committee, the Debtor decided not to permit Promise to re-enter the bidding.

The auction continued on July 18th and July 19, 2016.  In the evening of July 19th, Harbor passed and subsequently Le Summit passed, leaving Strategic as the winning bid, and Le Summit as the Back Up Bidder.

After the conclusion of the auction of substantially all the assets, the Debtor addressed an asset purchase agreement submitted by a potential buyer, Roxbury Healthcare Services, LLC and Sycamore Healthcare Services, LLC, but only as to buying potential causes of action owned by the Debtor against those two entities and several related entities.[1]  After the Committee's counsel raised a strong objection to the sale of these assets, the Debtor concluded that it would not sell these assets or other similar assets at the auction.[2]  Thus, those assets remain unaffected by the auction.

### D.    The Winning Bid

The high bid, and therefore the winning bid, included the following components: (i) stepping into the position of Promise as the existing DIP Lender and offering up to $2.5 million in

---

[1] This bidder sought only to purchase the Debtor's claims and causes of action against the following parties:  Roxbury Healthcare Services, LLC; Sycamore Healthcare Services, LLC; S&W Health Management, Inc., Selvin & Weiner apc [sic]; Beryl Weiner and all of the respective officers, directors, members, agents, employees, contractors and managers.

[2] Similar assets of the Debtor include claims and causes of action against Harbor-Gardens Capital I, LLC, Paladin Healthcare Capital, PGM, LLC, Joel Freedman, and RollinsNelson Grp, Inc., and all of their respective officers, directors, members, agents, employees, contractors and managers, as well as any claims or causes of action against current or former officers and directors or any insurance related to those claims or causes of action.   Withdrawing these claims and causes of action from the auction should not be taken as any indication that the Debtor is expressing an opinion on the merits or value of any such claim or cause of action.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DIP funding to the Debtor (to be forgiven at closing);[3] (ii) payment of approximately $8 million in cash at closing, which, among other things, provides sufficient funds to pay all Prepetition Secured Creditors who claim to have a security interest in the accounts receivable in full at closing, as well as to cure all payments required with regard to various leases, pay a cure amount to the United States and the State of California to facilitate the transfer of the Debtor's Medicare and Medi-Cal Provider Agreements and to pay any obligations of the Debtor with regard to Paid Time Off to its employees;[4] (iii) providing the estate with five promissory notes in the amount of $1 million each, payable on December 31, 2018, 2019, 2020, 2021, and 2022 respectively;[5] (iv) paying to the Estate up to $4 million of collections on the first $7 million of accounts receivables which exist on the closing date and are being purchased by Strategic;[6] and (v) paying all the "cure" costs associated with any executory contracts which Strategic designates to have assumed by the Debtor and assigned to it.  Additionally, Strategic agreed to many non-monetary factors in its winning bid, including: (i) agreeing not to purchase certain causes of action the sale of which the Committee had opposed; (ii) keeping the hospital in operation, including keeping an Emergency Department operational; (iii) retaining more than 50% of the Debtor's employees; (iv) to maintain the existing collective bargaining agreement; and (v) confirming that it did not require

[3] The Debtor and all bidders still bidding agreed that if the Court denied the Debtor's request to increase the DIP Loan maximum amount from its current $2 million to the offered $2.5 million, the amount would be forgiven from the bid.

[4] Strategic can, if it hires a former employee of the Debtor and simply assume the Debtor's liability for unpaid PTO, or, if it does not hire the former employee, will pay off the employee's PTO, subject to  cap of $540,000.

[5] These promissory notes are to be secured by the assets of the new hospital operator, but can be subject to subordination for payment to any operating line of credit in the ordinary course of business.

[6] All bidders and the Debtor agreed that the successful buyer would be able to charge 6% collection costs, and the payments to the Estate would be "net" of those costs.  The Winning Bid provided explicitly that Strategic would receive the first $2 million of collections; that the Estate would then be paid the next $500,000 of collections; that Strategic would receive the next $500,000 of collections; then the Estate would be paid the next $2.5 million of collections; then Strategic would keep the next $500,000 of collections, the Estate would be paid the next $1 million of collections; and, finally, that Strategic would then keep all collections from the accounts receivables over $7,000,000.

100394831\V-2

additional consents from third parties to close the transaction, other than government regulatory

authorities.  The net value to the Estate of this bid is at least $19.5 million.

The assets included to be purchased by Strategic, and those assets excluded from the sale,

are shown on Exhibit  A hereto.

California Corporations Code § 5914 requires a nonprofit corporation, like the Debtor, to

submit a written notice to the California Attorney General and to obtain a written consent of the

Attorney General <u>prior to</u> entering into any agreement or transaction to transfer a material amount

of the corporation's assets, or where there is a transfer of control over a material amount of the

corporation's assets.  California Corporations Code §5915 provides the Attorney General with up

to 60 days to evaluate the notice of transaction, during which time the Attorney General usually

conducts a public hearing and retains an expert to do an evaluation of the transaction.   The

Attorney General can extend this for one additional 45-day period.  Thus, while the Debtor does

not expect any difficulties in obtaining Attorney General approval for this buyer under these

circumstances, it is very unlikely that the sale can close in less than 60 days, and may take as

much as 105 days.

## E.    The Back Up Bidder

The second highest bid was from Le Summit, which becomes the Back Up Bidder

pursuant to the Bid Procedures Order.   Le Summit's bid differed from Strategic's bid in that Le

Summit offered only $2,325,000 in additional DIP financing, provided approximately $7 million

at closing in cash, and offered, with regard to the collection of accounts receivables, a total of

$5,525,000 of the first $7 million to be collected to be paid to the Estate.[7]  Additionally, the back

up bid provided that the hospital would remain in the ownership of a not-for-profit entity.

---

[7] With regard to the accounts receivable, the Back Up Bid provided explicitly that Le Summit
would receive the first $1 million of collections; that the Estate would then be paid the next
$525,000 of collections, that Le Summit would receive the next $475,000 of collections, then the
Estate would be paid the next 5 million of collections, then Le Summit would then keep all
collections from the accounts receivables over $7,000,000.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

F.    **The Evaluation Process**

Through the course of the auction, the Debtor evaluated each bid, as the bids were made, and considered, all bids, in each round, following each round of bidding.  The Debtor's financial advisor created a matrix to allow the competing bids to be compared to each other and copies were distributed to all bidders after each round.  Additionally, the Debtor's financial advisor was entering the bids into a spreadsheet which was displayed on a screen in the conference room so that all could see his entries and calculations.

The Debtor provided that in its evaluations of bids, there would be discounts for the value of payments to be made in the future pursuant to the promissory notes, to reflect both the time value of money and the risk of non-payment.  Additionally, with regard to the collections of accounts receivables, the Debtor provided in its evaluation of bids that the value attributed to offers to pay over collections to the Estate on accounts receivables over $4 million would be discounted to reflect the risk of non-collection.

In addition to the monetary components, the Debtor considered certain non-monetary issues in determining the winning and back up bids.   These factors included bidders (i) agreeing to maintain the function of the hospital as a short-term, acute care hospital with an Emergency Department, (ii) not requiring the Debtor to sell certain causes of action to which the Committee had expressed an objection to their sale at this time, (iii) retaining more than 50% of the Debtor's employees, (iv) not requiring the Debtor to reject its collective bargaining agreement, and (v) attesting that, other than governmental approvals, such as from the California Attorney General, no consents were required to close the transaction.

III.    **LEGAL ISSUES**

A.    **Debtors Are Given Wide Latitude To Conduct A Sale**

Debtors in Possession and trustees are given wide latitude in their conduct of sales under section 363 of the Bankruptcy Code.  "[A]n unwaivering adherence to formality is not normally advisable in bankruptcy cases."  *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564 (8th Cir. 1997). [T]he court must . . . remain mindful of the ubiquitous desire of the unsecured creditors, and a

primary objective of the [Bankruptcy Code], to enhance the value of the estate at hand." *Id; see also In re Muscongus Bay Co.*, 597 F.2d 11, 12-13 (1st Cir. 1979) (finding bankruptcy court "acted within the scope of its broad discretion" in extending bidding period upon receipt of late offer).

> [E]mploying a sliding scale approach, the importance of estate enhancement diminishes as an auction participant's reasonable expectations, and the gravity of finality, increase. At some point, such as when the court actually enters an order approving the sale, expectations become sufficiently crystallized so as to render it improper to frustrate anticipated results except in the limited circumstances where there is a grossly inadequate price or fraud in the conduct of the proceedings. In other situations, where the sale had not progressed to a comparable plateau, a reviewing court should evaluate the bankruptcy judge's decisions on a case by case basis, with due regard both for the parties' expectations and the judge's broad discretion to weigh the multifarious interests involved.

*Food Barn Stores, Inc.,* 107 F.3d at 865 (internal citations omitted).

## B.    The Debtor Appropriately Permitted A Late Entrant Into the Auction

The Debtor, after consultation with the Committee, agreed to consider Le Summit as a qualified bidder although it submitted its bid and good faith deposit late. The Bid Procedures Order reserves the Debtor's right to "waive terms and conditions set forth [in the bidding procedures] with respect to all potential bidders" and to "extend the deadlines set forth herein." (Bidding Procedures, at 8-9, attached as Exhibit 1 to the Bid Procedures Order [Docket No. 153].) Similar reservations of a debtor's discretion to extend deadlines for qualified bids have repeatedly been upheld by bankruptcy courts. "The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate. To accomplish that goal, bankruptcy courts are necessarily given discretion and latitude in conducting the sale." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Sunland, Inc.*, 507 B.R. 753, 760 (Bankr. D.N.M. 2014) (allowing debtor to consider untimely bid where sale order and bidding procedures reserved trustee's right to reject a qualified bid or adjourn sale hearing if it determining that accepting a particular bid was not in the best interests of the estate).

Additionally, allowing an additional bidder, even though it was an untimely filed bid, allows for a more robust process to maximize value for the Estate and its creditors. Given the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1   very short time-line involved in this auction, it was permitted because it was in the best interest of

2   the Estate.    The Debtor properly determined that denying the untimely bidder the right to

3   participate in the auction "would . . .  put form over substance," and would accomplish nothing

4   but "the elimination of a higher and better offer for the assets."  *In re Edwards*, 228 B.R. at 562.

5      **C.    The Debtor Appropriately Denied Re-Entry To A Bidder**

6

7   The Stalking Horse Bidder, which initially participated in the auction, announced during

8   bidding on Thursday July 14, 2016, that it would not submit a bid in that round stating it was

9   "passing", and subsequently left the auction site.   There was a subsequent round of bidding on

10  July 14, 2016, after the Stalking Horse Bidder passed, and before the auction was adjourned for

11  the day.  The following Monday, July 18, 2016, the Stalking Horse Bidder returned and sought to

12  reenter the auction.  The Debtor, after consultation with the Committee, denied this request based

    on the required  bidding procedures.

13  The Bid Procedures Order is clear and unambiguous in how the auction was to proceed.

14

15      [B]idding at the Auction with regard to Assets subject to the Stalking Horse Bid,
        will begin with the Starting Bid and continue in bidding increments (each a

16      "Subsequent Bid") providing a net value to the Debtor's estate of at least an
        additional $100,000 above the prior bid.  … A round of bidding will conclude

17      after each participating Qualified Bidder has had the opportunity to submit a
        Subsequent Bid with full knowledge of the Leading Bid. Qualified Bidders will

18      not have the opportunity to pass.   [Emphasis added.]

19  Bidding Procedures, at  7.  The Bid Procedures Order requires Qualified Bidders to make all bids

20  after the Stalking Horse Bid "in bidding increments . . . providing a net value to the Debtor's

21  estate of at least an additional $100,000 above the prior bid."  *Id.*  "Qualified Bidders will not

22  have the opportunity to pass."  *Id.*

23  During the auction, the Stalking Horse Bidder had the opportunity during the round to

24  submit a Subsequent Bid in an amount at least $100,000 higher than the prior bid, but the

25  Stalking Horse Bidder declined to do so.  Therefore, under the terms of the Bidding Procedures,

26  the bidder lost its status as a Qualified Bidder and was no longer eligible to participate in the

27  auction.  Having lost that status, the Debtor was under no obligation to allow the Stalking Horse

28  Bidder to re-enter the auction.  Additionally, *given that the remaining bidders had already*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 9 -

*participated in an additional round of bidding*, after the Stalking Horse Bidder passed on its

*opportunity to bid*, it would have been unfair to the other bidders to allow the Stalking Horse

Bidder to rejoin the auction, after effectively not participating in two rounds of bidding. It is

appropriate to employ a "sliding scale approach" in which the "importance of estate enhancement

diminishes as an auction participant's reasonable expectations, and the gravity of finality,

increase." *In re Food Ba*rn, 107 F.3d at 565.   Given the facts here, it was entirely appropriate

before the bidding began to allow a late bidder to participate, but to reject the request to re-enter

the process after bidding had commenced, and in fact, after subsequent bidding rounds had been

conducted.

### D.        The Debtor Appropriately Considered Weighted Factors

The Debtor was within its rights to both discount the value of future payments, as well as

to weigh various non-economic factors when determining the Successful Bid. Under the Bidding

Procedures:

> A Qualified Bid will be valued based upon several factors including, without
> limitation, (i) the amount of such bid, (ii) the risks and timing associated with
> consummating such bid, (iii) any proposed revisions to the form of Stalking Horse
> APA, (iv) experience operating hospitals, (iv) commitment to keep the hospital
> open, in whole or in part, as a "community hospital" with an emergency room or
> other urgent care services, and some short term acute care beds, (vi) plans and
> commitments as to retention and treatment of the Debtor's employees, and (vii)
> any other factors deemed relevant by the Debtor in its reasonable discretion, in
> consultation with any Official Committee.

Bidding Procedures, at 5.  The Debtor's valuation of the Qualified Bids falls soundly within its

discretion and business judgment and should not be overturned.

In any event, bankruptcy courts do not always require a debtor to select the bid with the

highest economic value.  *In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998) (Noting "the

highest bidder at an auction can <u>typically</u> expect to be declared the winner"(emphasis added) but

that "a 'highest bid' is not always the 'highest and best' bid.  The inclusion of 'best' in that

conjunction is not mere surplusage.").  Particularly where the terms of competing bids are not

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    identical it can be difficult to identify what constitutes the "highest and best" bid. *See In re*

2    *Grubb & Ellis Co.*, 2012 WL 1036071, at *4 (Bankr. S.D.N.Y. Mar. 27, 2012) ("In the context of

3    auctions, courts defer to a debtor's business judgment when selecting the highest and best bid.").

4        Bankruptcy courts are given wide discretion in overseeing and approving asset sales. *See*

5    *Wintz v. Am. Freightways, Inc.*, 219 F.3d 807, 812 (8th Cir. 2000); *see also In re Farmland Indus.,*

6    *Inc.,* 289 B.R. 122, 126 (B.A.P. 8th Cir. 2003) (stating bankruptcy courts have "considerable

7    discretion in approving asset sales and [are] granted ample latitude to strike a balance between

8    fairness, finality, integrity, and maximization of assets").

9        An exemplary case involving a trustee's discretion to accept a "highest and best" bid that

10    did not necessarily constitute the highest economic bid is *In re Bakalis*, 220 B.R. 525 (Bankr.

11    E.D.N.Y. 1998). In *Bakalis*, the debtor held a controlling interest in Olympian Bank, a small

12    community bank in New York City. The bankruptcy trustee held an auction for the debtor's

13    assets at which there were two principal bidders. The first bidder, Atlantic Bank of New York

14    (Atlantic) proposed a purchase price of $11.2 million structured as a merger but included

15    substantial closing contingencies and walk away clauses in the event Olympian Bank's board of

16    directors did not approve the sale within 90 days and the shareholders of the bank did not approve

17    the sale within 150 days. *Id.* at 530. By contrast, Olympian Holdings, LLC's (Holdings) final bid

18    offered $10.5 million in base consideration, structured as a simple stock purchase agreement, and

19    was only conditioned upon regulatory approval. *Id.* at 529. The trustee ultimately chose

20    Holdings' bid as the "highest and best" even though it was for $700,000 less based on "various

21    contingencies or 'outs' that would allow Atlantic to avoid closing the transaction," as well as a

22    timeframe within Atlantic's bid which the trustee deemed "much too tight". *Id.* at 530.

23    Additionally, the trustee feared that if Atlantic failed to consummate the merger, the estate would

24    be left with an asset with depreciated value. *Id.* at 531.

25        Atlantic objected to the trustee's decision to sell the debtor's assets to Holdings based on

26    the argument that it had the superior bid. The court rejected this objection, agreeing with the

27    trustee's conclusion that Holdings' bid was "the most advantageous to the estate, basing his

28    decision on a totality of relevant considerations." *Id.* at 532. The court specifically praised the

trustee for "carefully weigh[ing] the competing bids rather than mechanically recommending the facially higher bid.  *Id.*  The court concluded that "[t]he Trustee declined the temptation of jeopardizing virtually assured benefits by supporting a bid that exposes the estate to a much greater risk of, among other things, a failed closing and the associated chance of being left with a devalued asset."  *Id.; see also Broadmoor Place, Invs.,* 994 F.2d 744, 745 (10th Cir. 1993) (court awarded sale to purchaser that had lower offering amount but whose offer "provided fewer contingencies and facilitated a more immediate closing").

In this case, the Debtor acted within its business judgment by considering the various non-economic factors outlined within the Bidding Procedures including the "risk and timing" associated with each bid, the bidder's "experience operating hospitals," its "commitment to keep the hospital open . . . as a 'community hospital' with an emergency room or other urgent care services," and its willingness to retain causes of action following the sale.  (Bidding Procedures, at 5.)  These factors are well within the Debtor's discretion and justify its decision that the Successful Bid was the "highest and best" bid notwithstanding the fact that it did not entail the highest amount of direct consideration.  *Cf. In re Bakalis,* 220 B.R. at 536 (acknowledging that debtor's board of directors would understandably be required to consider such factors as the debtor's prospects for growth, its current employees, its retired employees and other beneficiaries, its customers and creditors, and its ability to provide services as a going concern when deciding whether to approve proposed sale to winning bidder in bankruptcy).

**E.    As A Not For Profit Entity, The Debtor Must Consider Non-Economic Factors**

The Debtor is a not-for-profit ("NFP") entity, which must consider non-monetary factors in the sale of its assets.  Pursuant to the Bankruptcy Code, the sale of a NFP debtor's assets pursuant to Section 363 must be "in accordance with nonbankruptcy law that governs the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust." 11 U.S.C. § 363(d)(1).   To be sure, California Corporations Code section 5920 *et seq* ., requires the California Attorney General's review and consent for any sale or transfer of a health care facility owned or operated by a nonprofit corporation whose assets are held in public trust.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    This requirement covers health care facilities that are licensed to provide 24-hour care, including

2    hospitals.  The review process includes public meetings and, when necessary, preparation of

3    expert reports. The Attorney General's decision often requires the continuation of existing levels

4    of charity care, continued operation of emergency rooms and other essential services, and other

5    actions necessary to avoid adverse effects on healthcare in the local community.  Thus, because

6    the Debtor's sale of assets must be in accordance with applicable non-bankruptcy law, it requires

7    the Debtor to consider such factors in its decision on which bids to accept.

8        In addition, although directors of NFP corporations have fiduciary duties that to a large

9    extent parallel the duties of for-profit directors, the duties of a board of a NFP are not to

10   maximize the value of the enterprise, but rather to the stated purpose and mission of the NFP

11   corporation.  *In re United Healthcare System, Inc.*, 1997 WL 176574, at *5 (D.N.J. Mar. 26,

12   1997) ("The officers and directors of a nonprofit organization are charged with the fiduciary

13   obligation to act in furtherance of the organization's charitable mission."); *Summers v. Cherokee

14   Children & Family Servs.*, 112 S.W.3d 486, 504 (Tenn. Ct. App. 2002) ("nonprofit directors must

15   be 'principally concerned about the effective performance of the nonprofit's mission'").    The

16   board of an insolvent nonprofit must remain true to its mission as set forth in its organizational

17   documents.  In fact, in forgoing the corporate mission to pursue a path of value maximization, a

18   nonprofit board could expose itself to liability for violating the nonprofit's organizational

19   documents.  *See Hegy v. Cmty. Counseling Ctr. of Fox Valley*, 158 F. Supp. 2d 892, 897 (N.D. Ill.

20   2001) (allegations that defendant-officers acted contrary to nonprofit's bylaws "would be

21   sufficient to demonstrate that they acted outside the scope of their corporate authority"); *State ex

22   rel. Butterworth v. Anclote Manor Hosp., Inc.*, 566 So.2d 296, 298-99 (Fla. App. 2 Dist. 1990)

23   (directors of nonprofit breached fiduciary duties and acted in ways that were inconsistent with the

24   corporation's articles of incorporation).

25       That a NFP debtor is somewhat different than a for profit debtor is made clear by the

26   treatment of the creditors of an insolvent nonprofit corporation under the Bankruptcy Code.  For

27   example, unlike creditors of a for-profit corporation, creditors of a nonprofit cannot put the

28   nonprofit into bankruptcy by filing an involuntary bankruptcy petition against it, *see* 11 U.S.C. §

- 13 -

100394831\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

303, and may not compel a nonprofit debtor to convert its case from chapter 11 to chapter 7

liquidation, *see* 11 U.S.C. §1112(c).   Further, while creditors of for-profits in bankruptcy can

expect to receive the residual value of an insolvent for-profit corporation unless the debtor is sold

or a plan is approved providing for a recapitalization, courts have generally held that creditors of

nonprofits are not entitled to the residual value of the enterprise in bankruptcy.   This means that

unlike in a bankruptcy of a for-profit corporation, managers and directors of a reorganized

nonprofit may often retain control of the nonprofit over the objection of an impaired class of

creditors.  *See, e.g., In re Wabash Valley Power Ass'n*, 72 F.3d 1305, 1314 (7th Cir. 1996), *cert.*

*denied*, 519 U.S. 965 (1996) (members of nonprofit debtor did not hold "interests" and therefore

plan did not violate absolute priority rule where the members retained control and received some

economic benefit from the reorganized debtor); *In re Henry Mayo Newhall Mem'l Hosp.*, 282

B.R. 444, 453 (B.A.P. 9th Cir. 2002) (noting that creditors of nonprofit debtors, which have no

equity owners, are at a disadvantage because "they are not able to assert the Bankruptcy Code's

absolute priority rule to block unacceptable plans.").

### F.    A Sale Free And Clear Is Appropriate

The Debtor has requested that, under section 363(f) of the Bankruptcy Code, the proposed

sale be effected "free and clear" of encumbrances, interests or liens in the property.  11 U.S.C. §

363(f) (2012); *see also In re Grumman Indus., Inc.*, 467 B.R. 694, 702 (S.D.N.Y.  2012)

(discussing generally "free and clear" provision in section 363(f) of the Bankruptcy Code).

Section 363(f) "empowers the trustee to sell the debtor's assets 'free and clear of any interest in

such property of an entity other than the estate.'"   This section has been broadly interpreted and is

held to extinguish claims that "arise from the property being sold."

The alternative five conditions spelled out in section 363(f) under which a sale free and

clear may be authorized are the following:

> (1)  applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;
> (2)  such entity [the holder of the interest] consents;
> (3)  such interest is a lien and the price at which such property is to
> be sold is greater than the aggregate value of all liens on such
> property;

(4)  such interest is in bona fide dispute; or
(5)  such entity could be compelled, in a legal or equitable
proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5) (2012); *see In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993)

(stating the five conditions in section 363(f) are disjunctive and sale is proper where trustee can

prove existence of any of the five conditions).

Section 363(f)(3) of the Bankruptcy Code permits a sale free and clear of an interest in

property specifically where the interest is a lien, and where the sale price exceeds the aggregate

value of all liens.  Here the Debtor's assets are encumbered by approximately $4.5 million of

prepetition secured debt, while the cash component of the purchase price, to be paid at closing, is

$8 million.  Thus, the purchase price exceeds the aggregate amount of all claims held by creditors

who hold a lien or security interest in the property being sold.  *Clear Channel Outdoor, Inc. v.*

*Knupfer* (*In re PW, LLC*), 391 B.R. 25, 40 (B.A.P. 9th Cir. 2008).  Even if one includes the DIP

financing, the total value of liens is only $5 million, and the proposed transaction provides for

separate treatment, and payment, of the DIP financing.

## IV.    ASSUMPTION OF EXECUTORY CONTRACTS AND UNDEXPIRED LEASES

The successful bidder has agreed to pay $221,000 on the Debtor's leases of real property,

an amount the Landlord's attorney has confirmed is the amount due, and to separately pay up to

$283,000 to cure any existing defaults with regard to the assumption and assignment of the

Debtor's Medicare and Medi-Cal Provider Agreements.

The successful bidder also has agreed to pay the cure costs of any contracts and non-real

estate leases that are assumed.  However, beyond the leases of real property, which will be

assumed, assigned and cured, the successful bidder has not had sufficient time in the less than 24

hours since the auction concluded to determine which of approximately 296 executory contracts

and unexpired non-real estate leases should be assumed and assigned.

Accordingly, the Debtor has not sent out a Notice on which executory contracts and

unexpired non-real estate leases will be assigned and assumed, and the cure amount for each.

The Debtor, with the concurrence of the successful bidder, requests that the Court set a hearing in

two weeks, at which hearing those executory contracts and non-real estate leases to be assumed,

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

100394831\V-2

1   assigned and cured will be identified, with the amount of the cure payment.  The Debtor proposes

2   that the Notice of the assumption and assignment of executory contracts and non-real estate

3   leases, and the amount of the cure payment due on each, be served by overnight mail, not later

4   than five days before the hearing.

5   **V.      DIP FINANCING**

6          The Debtor has conducted a successful sale, that will pay off in full the secured creditors,

7   bring current the past due real estate lease payments, create a substantial fund for unsecured

8   creditors, pay administrative claims, and provide up to $2,500,000 in replacement Debtor In

9   Possession Financing.  The Replacement DIP Financing will not only take out the current DIP

10  lender, the replacement DIP is critical to the Debtor's consummation of the sale, because the sale

11  must be approved by the California Attorney General before the sale can be completed.  It will

12  take an estimated 75 days to obtain that approval.

13         The attached budget sets forth the Debtor's need for cash to keep the Hospital operating,

14  while it seeks the approval of the sale from the Attorney General.  Without the DIP Financing, it

15  may not have sufficient liquidity to remain in operation until the successful bidder obtains

16  approval to take over the operation of the Hospital.

17         The Debtor has already borrowed, through the DIP Loan with a Promise related entity,

18  $500,000; the modified DIP Loan and Credit Agreement, which will be filed prior to the hearing,

19  seeks approval of the additional $1,500,000 (or $2,000,000 if approved by this Court), to be

20  issued in tranches of $1,000,000 (which includes repayment of the $500,000 from the prior DIP

21  Lender and an additional $500,000 to be borrowed) , then two $500,000 tranches.  Strategic (the

22  successful Bidder), will be given the same liens as Promise had.  The Secured Creditors, who will

23  be paid in full at closing, will get replacement liens in postpetition accounts receivable (just as

24  they were given in connection with the DIP Financing provided by Promise) until the Debtor can

25  close the sale, after which they will be paid in full from the sale proceeds.  The situation today,

26  after the auction, is far better financially, than the situation before the auction.

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

100394831\V-2

1    The Debtor should be permitted to obtain the replacement DIP Financing, re-paying

2   Promise its $500,000 DIP Loan, and drawing down an additional $500,000 to keep the Hospital

3   operating under the same terms and conditions under which Promise provided DIP Financing.

**VI.    CONCLUSION**

5    For all these reasons, the Court should approve the results of the auction and enter an

6   order approving the winning bid and the back up bid.  Additionally, the Court should enter a final

7   order authorizing DIP Financing through Strategic.

Dated:  July 20, 2016                          DENTONS US LLP
                                               SAMUEL R. MAIZEL
                                               JOHN A. MOE, II


                                               By____/s/ Samuel R. Maizel_____
                                                      SAMUEL T. MAIZEL

                                               Attorneys for Debtor
                                               Gardens Regional Hospital and Medical
                                               Center, Inc.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

100394831\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

# EXHIBIT A

## ASSETS BEING PURCHASED

(a)    all of the real property that is leased by Seller and used with respect to the operation of the Hospital, together with all buildings, improvements and fixtures located thereupon, including, without limitation, all buildings and other improvements then under construction ("Leased Real Property");

(b)    all the tangible personal property owned by Seller and used by Seller in the operation of the Hospital, including equipment, furniture, machinery, vehicles and office furnishings, (the "Personal Property"), including, without limitation, Personal Property set forth on a Schedule to be provided;

(c)    all of Seller's rights, to the extent assignable or transferable, to all licenses, provider numbers, permits, approvals, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to Seller for use in the operation of the Hospital (the "Licenses"), including, without limitation, the License and Medicare Provider Numbers set forth on a Schedule to be provided;

(d)    all of Seller's interest, to the extent assignable or transferable, in and to all of the following (the "Assumed Leases"): (i) personal property leases with respect to the operation of the Hospital that have been designated by Purchaser as a lease to be assumed by Purchaser pursuant to Section 1.11 herein or set forth on a Schedule to be provided (the "Personal Property"), (ii) the real property leases for all real property leased by Seller and set forth on a Schedule be provided (the "Leased Real Property"), and (iii) the real property leased by Seller and subleased to a third party and set forth on a Schedule to be provided (the "Tenant Leases");

(e)    all of Seller's interest, to the extent assignable or transferable, in an d to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the Hospital that have been designated by Purchaser as a contract to be assumed (the "Assumed Contracts");

(f)    all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party) with respect to amounts overpaid by Seller to any third party with respect periods prior to the Effective Time (e.g. such overpaid amounts may be determined by billing audits undertaken by Seller or Seller's consultants);

(g)    to the extent assignable or transferable, all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables (i) located at the Hospital or (ii) used in the operation of the Hospital (the "Inventory") except as set forth in a Schedule to be provided;

(h)    other than Utility Deposits, all prepaid rentals, deposits, prepayments and similar amounts relating to the Assumed Contracts and/or the Assumed Leases, which were made with respect to the operation of the Hospital (the "Prepaids"), the current categories and amounts of which are set forth on a Schedule to be provided;

(i)    to the extent assignable or transferable, all accounts, notes, interest and other receivables of Seller, including, without limitation, accounts, notes or other amounts receivable, and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, disproportionate share payments and Seller Cost Report settlements related thereto, in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the Hospital, billed and unbilled, recorded and unrecorded, for

-1-

services, goods, products and supplies provided by Seller prior to the Effective Time whether payable by Medicare, Medicaid, or any other payer (including an insurance company), or any health care provider or network (such as health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the forgoing, private pay patients, private insurance or by any other source (collectively, "Accounts Receivable");

(j)        to the extent assignable or transferable, all documents, records, correspondence, work papers and other documents, other than patient records, relating to the Accounts Receivable (the "Receivable Records");

(k)        to the extent assignable or transferable, (i) all rights, claims and causes of action of Seller related to and/or arising out of the Accounts Receivable and rights to settlements and retroactive adjustments, if any, whether arising under a Seller Cost Report or otherwise, for any reporting periods ending on or prior to the Effective Time, whether open or closed, arising from or against the United States government under the terms of the Medicare program or TRICARE (formerly the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS")); and (ii) causes of action under Sections 544, 547, 548, and 550 of the Bankruptcy Code against the parties listed on a Schedule to be provided;

(l)        all Hospital Care Assurance Program ("HCAP") payments and payments from the State of California or any of its administrative entities or other entitles to support the Business and/or the Hospital (together with Medicare and California Medicaid supplemental payments, the "Supplemental Payments") received on and after the Effective Time regardless of the State fiscal year for which the Supplemental Payments are made in reference to and regardless of the State fiscal year for which the data was derived to calculate eligibility for such payments.

(m)        to the extent assignable or transferrable, all of the following that are not proprietary to Seller and/or Seller's affiliates: operating manuals, files and computer software with respect to the operation of the Hospital, including, without limitation, all patient records, medical records, employee records, financial records, equipment records, construction plans and specifications, and medical and administrative libraries; provided, however, that any patient records and medical records which are not required by law to be maintained by Seller as of the Effective Time shall be an Excluded Asset;

(n)        to the extent assignable or transferable, all rights in all warranties of any manufacturer or vendor in connection with the Personal Property;

(o)        the right to use the name "Gardens Regional Hospital and Medical Center" and all names for related entities;

(p)        all goodwill of the Hospital evidenced by the Assets;

(q)        the Hospital's website(s) together with certain content therein;

(r)        to the extent transferable or assignable, Seller's right or interest in the telephone and facsimile numbers used with respect to the operation of the Hospital;

(s)        the names and symbols of the Hospital set forth on a Schedule to be provided;

(t)        to the extent assignable or transferable, Seller's Medicare and Medicaid provider numbers and Lock Box Account(s) subject to approval by the appropriate governmental and regulatory agencies; and

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

100394831\V-2

(u)      except for the Excluded Assets, to the extent assignable or transferable, any other assets owned by Seller with respect to the operation of the Hospital that are used in the operation of the Hospital.

**Excluded Assets**

(a) cash, cash equivalents and short-term investments;

(b) all Seller Plans and the assets of all Seller Plans and any asset that would revert to the employer upon the termination of any Seller Plan, including, without limitation, any assets related to Seller's 457 or 403(b) plan and/or assets representing a surplus or overfunding of any Seller Plan;

(c) all contracts that are not Assumed Contracts (the "Excluded Contracts");

(d) all leases that are not Assumed Leases (the "Excluded Leases");

(e) the portions of Inventory, Prepaids, and other assets disposed of, expended or canceled, as the case may be, by Seller after the Signing Date and prior to the Effective Time in the ordinary course of business;

(f) assets owned and provided by vendors of services or goods to the Hospital;

(g) all of Seller's organizational or corporate record books, minute books and tax records;

(h) all causes of action of Seller or Seller's bankruptcy estate (including parties acting for or on behalf of Seller's bankruptcy estate, including, but not limited to, the official committee of unsecured creditors appointed in the Bankruptcy Case) not specifically set forth in a Schedule to be provided; including causes of action arising out of any claims and causes of action under chapter 5 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law, and any rights to challenge liens asserted against property of the Seller's bankruptcy estate, including, but not limited to, liens attaching to the Purchase Price paid to the Seller, and the proceeds from any of the foregoing; provided, however that Purchaser shall acquire and be deemed to release and waive as of the Effective Time causes of action under Sections 544, 547, 548, and 550 of the Bankruptcy Code against the parties listed on a Schedule to be provided;

(i) all insurance policies and contracts and coverages obtained by Seller or listing Seller as insured party, a beneficiary or loss payee, including prepaid insurance premiums, and all insurance proceeds under any of the foregoing, and all subrogation proceeds related to any insurance benefits arising from or relating to Assets prior to the Closing Date, except for insurance policies and contract treated as an Assumed Contract hereunder;

(j) all deposits made with any entity that provides utilities to the Hospital (the "Utility Deposits");

(k) all rents, deposits, prepayments, and similar amounts relating to any contract or lease that is not an Assumed Contract or Assumed Lease;

(l) all unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat laws;

(m) all bank accounts of Seller;

(n) all writings and other items that are protected from discovery by the attorney-client

- 3 -

privilege, the attorney work product doctrine or any other cognizable privilege or protection;

(o) the rights of Seller to receive mail and other communications with respect to Excluded Assets or Excluded Liabilities;

(p) all director and officer insurance;

(q) all tax refunds of Seller;

(r) all documents, records, operating manuals and film pertaining to the Hospital that the parties agree that Seller is required by law to retain;

(s) all patient records and medical records which are not required by law to be maintained by Seller as of the Effective Time;

(t) all documents, records, correspondence, work papers and other patient records that may not be transferred under applicable law, and any other documents, records, or correspondence (including with respect to any employees) that may not be transferred under applicable law;

(u) the rights of Seller and its affiliates under this Agreement; and

(v) any assets identified in a Schedule to be provided.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300