SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
JOHN A. MOE, II (Bar No. 066893)
john.moe@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:    (213) 623-9300
Facsimile:    (213) 623-9924

Attorneys for Debtor,
GARDENS REGIONAL HOSPITAL
AND MEDICAL CENTER, INC.

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC., dba GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER,[1]<br><br>Debtor. | Case No. 2:16-bk-17463-ER<br><br>Chapter 11<br><br>**DEBTOR'S STATUS REPORT**<br><br>Status Conference:<br><br>Date: December 7, 2016<br>Time: 10:00 a.m. Pacific<br>Location: Courtroom 1568<br><br>Judge:    Hon. Ernest M. Robles |

**TO THE HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE, THE COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS AND ITS COUNSEL, SECURED CREDITORS, PARTIES REQUESTING SPECIAL NOTICE, THE UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, AND THE OFFICE OF THE UNITED STATES TRUSTEE:**

---

[1] The Debtor is a California nonprofit public benefit corporation, Fed. Tax I.D. No. 33-0738307. The Debtor's mailing address is 21530 Pioneer Boulevard, Hawaiian Gardens, California 90716.

101976869\V-1                                                            - 1 -

# STATUS REPORT

## I.   Status of the Case

The Debtor, a California nonprofit public benefit corporation, operates Gardens Regional Hospital and Medical Center.

On June 6, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California (the "Court"). The Debtor continues to operate its business and manage its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case (the "Case").

## II.   Status of the Pending Sale to Strategic

The Debtor, pursuant to the Court's orders, conducted an auction commencing on July 13, 2016, and concluding on July 19, 2016. The Winning Bid at the conclusion of the auction was from Strategic Global Management, Inc. ("Strategic") at approximately $19.5 million. In addition, the Winning Bid provides for the continuation of the Hospital's medical services, including its Emergency Department, for the community, continued employment for at least one-half of its employees, and for the transfer of the Debtor's Medicare and Medi-Cal Provider Agreements to Strategic, subject to applicable closing conditions. *See Order (A) Authorizing The Sale Of Substantially All Of The Debtor's Assets Pursuant To Sections 105(a), 363 And 365 Of The Bankruptcy Code To Strategic Global Management, Inc. Free And Clear Of Liens, Claims, Encumbrances, And Other Interests; (B) Approving The Assumption And Assignment Of Executory Contracts And Unexpired Leases Relating Thereto; And (C) Granting Related Relief* [Docket No. 256] ("Sale Order"). As anticipated, Strategic subsequently assigned its rights to purchase the Debtor's assets to KPC Gardens Medical Center, Inc. ("KPC Gardens").

Dentons US LLP was initially retained pursuant to Court order on June 20, 2016 [Docket No. 101] to serve as bankruptcy counsel. However, due to the Debtor's continued financial difficulties, Dentons US LLP's scope of employment was extended to include labor law and health law issues. [Docket No. 515] In this role, Dentons assisted the Debtor in preparing and

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

submitting an application to the California Attorney General asking for her permission to close the Sale. On November 18, 2016, the Attorney General issued her decision on the proposed Sale. A copy of that decision is attached hereto as Exhibit A. While it was overall a positive response, the Attorney General imposed many conditions on the Sale and Strategic, at least two of which are very problematic and are currently preventing closing of the Sale. Based on discussions with Strategic, the Debtor has concluded that Strategic will not proceed with the proposed Sale, absent revisions to the conditions or revisions to the terms of the Sale.

One of the conditions imposed by the Attorney General is that Strategic maintain approximately $2.25 million in charitable care levels for six years following the Sale. *See* Condition IV, at 4, Conditions to Approval of Sale, Exhibit A. This is based on a five-year historical average of charitable care provided by the Debtor. However, the implementation of the Affordable Care Act ("ACA") (commonly referred to as "ObamaCare") has dramatically reduced charitable care nationwide over the past three years. For example, a recent report by Triumph Healthcare Finance reported that "[n]onprofit hospitals located in those 30 states [referring to those states which expanded Medicaid eligibility under the ACA] reported on average 13 percent less bad debt from unpaid bills in 2014, according to Moody's Investor Service. And according to the Kaiser Family Foundation, hospitals in Medicaid expansion states [which includes California] reported an average of a 32 percent decrease in uninsured patients and a 40 percent cut in unreimbursed costs of care for patients without the ability to pay. For one hospital in Illinois, they saw their uncompensated charity care drop from $342 million from $500 million the year before." Triumph Healthcare Finance, *How the Affordable Care Act has Impacted Working Capital in Healthcare*, Oct. 18, 2016 (available at www.triumphbancorp.com/newssf; lasted visited on November 28, 2016).

The Debtor's historical record in this regard is no different than the national trend. It has seen a steep decline in its levels of charitable care since the implementation of the ACA. In fact, while its five year average is over $2 million, its two year average is just over $1 million, last year it provided less than $600,000 in charitable care and the Debtor is trending to provide even less in the current year. Thus, using a five year average without adjustment for the change in

- 3 -

circumstances is being described as a material adverse change by Strategic.  The Debtor, its counsel, and representatives of Strategic are meeting with representatives of the Attorney General in Sacramento on Monday, December 5, 2016, to ask for reconsideration of this condition.  In the event that meeting proves unsuccessful, the Debtor reserves the right to file a motion to seek the Court's review of this condition as an abuse of the Attorney General's discretion.  Alternatively, the continued existence of this condition may require a material modification of the Sale, including a potentially significant reduction in consideration paid by Strategic to the Debtor.  In short, any sale of the Debtor's assets is now in jeopardy as a result of the conditions on the Sale imposed by the Attorney General.

Additionally, Strategic is concerned about Condition XIV, which requires Strategic to (a) participate in the Hospital Quality Assurance Fees Program ("HQAF") by "assuming all known and unknown monetary obligations under the Medi-Cal program" owed by the Debtor, and (b) sign a Financial Responsibility Agreement with the State, which also imposes successor liability on Strategic. *See* Condition XIV, at 7, Conditions to Approval of Sale, Exhibit A.  Putting aside for the time being the questions of whether the State can, through the approval process, effectively ignore (i) the automatic stay imposed by section 362 of the Bankruptcy Code (which stays acts to collect on prepetition debts); (ii) the well established precedent that a sale under section 363 of the Bankruptcy Code can cut off successor liability for a purchaser; and (iii) the anti-discrimination provisions of section 525 of the Bankruptcy Code which prohibit the State from denying, revoking, suspending or refusing to "renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, [or] discriminate with respect to such a grant" against the Debtor or "another person with whom such … debtor has been associated" because a debtor "has not paid a debt that is dischargeable" in bankruptcy,  absent a settlement with the State on the transfer of the Medi-Cal relationship which resolves and limits this liability, the proposed Sale will be simply too risky for any potential buyer.  This is because there is at least one claim filed against the Debtor which alleges liability related to the Medi-Cal program, and although it was filed by a private law firm, it was allegedly filed on behalf of the State; <u>that claim is for $270 million</u>.  Thus, without any reference to potential unknown claims, if this condition is

- 4 -

not somehow limited a buyer would be assuming some risk that it will be held liable for a $270 million claim.

The Debtor and KPC Gardens have been have been informed that it will take approximately seven months for the State of California to issue a new Operating License and a new Pharmacy License to KPC Gardens. Therefore, the Debtor and KPC Gardens have drafted additional documents, so that the Buyer can manage the day-to-day operations of the hospital on the basis of a "sale leaseback transaction," pending issuance of the Licenses. During this interim period, KPC Gardens will be fully managing Garden's operations, subject to the Debtor's oversight, pending issuance of the Licenses to KPC Gardens. The Debtor has no ability to maintain operations for that seven-month period, because it will have insufficient funds to maintain operations.

Accordingly, the Debtor and KPC Gardens are entering into four agreements, pursuant to which Gardens can manage the Hospital subject to the Debtor's ultimate responsibility and under the Debtor's licenses, but during which time KPC Gardens will take over the day-to-day control and management of Gardens, and fund operations: (1) First Amendment to Asset Purchase Agreement; (2) Interim Leaseback Agreement; (3) Billing and Collection Services Agreement; and (4) Post-Closing Interim Management and Lease Agreement. The Debtor will be filing a motion to obtain Court approval of these documents shortly. These agreements will permit the Hospital to remain open and operating, under the management and control of KPC Gardens, subject to oversight by the Debtor. The agreements will permit the Hospital to operate under the currently existing Licenses, while awaiting the issuance of new Licenses to KPC Gardens.

**III.     Status of Negotiations Regarding The Medicare Relationship**

An essential element of the proposed Sale is the transfer of the Medicare relationship from the Debtor to Strategic and a resolution of pending issues between the Centers for Medicare and Medicaid Services and the Debtor.

In the Sale Order, at paragraph 17, on page 7, lines 19-24, the Court set a deadline as follows: "The Debtor shall file a notice no later than forty (40) days after entry of this Order of its intent with regard to a transfer of the Medicare Provider Agreement and Medi-Cal Provider

- 5 -

Agreement to Strategic, and, in the event that a transfer is proposed, whether that transfer will be as a license under section 363 of the Bankruptcy Code or as an executory contract under section 365 of the Bankruptcy Code." (the "Notice Deadline").  Further, in the Sale Order, at paragraph 17, on page 7, lines 24-28, the Court set another deadline as follows:  "The Debtor shall proceed on an expedited basis to obtain a further order of this Court prior to the expiration of sixty (60) days after entry of this Order if there is a dispute between the Debtor and the United States and/or the State of California with regard to the nature of the proposed transfer of the Medicare Provider Agreement or the Medi-Cal Provider Agreement." (the "Order Deadline").

The Debtor submitted a settlement proposal to the United States on August 29, 2016, and, after settlement discussions with the United States Attorney's Office, submitted a revised settlement proposal to the United States on October 7, 2016.  The Debtor was informed on November 29, 2016 that the proposed settlement has been given final approval by the United States Attorney.  Settlement papers are being prepared.

**IV.     Status of Negotiations Regarding The Medi-Cal Relationship**

The Debtor has an Institutional Provider Agreement and corresponding hospital enrollment and certification (collectively, the "Provider Agreement") with the State of California Department of Health Care Services (the "State"), which enables the Debtor to receive Medi-Cal payments for services provided to Medi-Cal beneficiaries. The Debtor submitted a settlement proposal to the State, also on August 29, 2016.  Counsel for the State responded to counsel for the Debtor on October 11, 2016.  More correspondence between the Debtor and the State followed, but on November 17, 2016, the State notified the Debtor that it "was not interested" in a settlement.   However, subsequent discussions have been more fruitful, and a settlement now appears possible.  There are at least three pending issues:

(1) The Debtor allegedly owes approximately $2.4 million to the State related to the Hospital Quality Assurance Fees Program (HQAF").  The Debtor has requested a settlement on this issue which allows the payment of this amount over three years.  Additionally, as the economic benefits of this program will all be to Strategic, the Debtor has requested that Strategic agree to make these payments.

(2) Strategic wants assurances from the State that any fraud allegations against the Debtor by the State or any other interests or claims of the State arising out of the pending qui tam actions against the Debtor will not become liabilities of Strategic under a theory of successor liability or any applicable state statutes. Counsel for the State is working with his client to provide assurances that such liability does not accrue. *See* California Welfare and Institutions Code section 14169.61(d) (successor liability for buyer of healthcare facility "shall exclude liabilities arising from the fraudulent or intentionally criminal act of a prior operator if the new operator did not knowingly participate in or continue the fraudulent or criminal act after becoming the licensee.").

(3) The State wants Strategic to assume successor liability for any open Medi-Cal cost report years; Strategic is unwilling to do so. This is related to the discussion of Condition XIV, discussed earlier herein. This issue may be settled because the State has recently provided the Debtor with the historical analysis of the potential State claims related to the Medi-Cal relationship.

The following is the Debtor's past overpayment history from the Medi-Cal program: (i) Fiscal Year Ending ("FYE") 12/31/11, amount Debtor was overpaid: $22,807, State audit of Debtor's cost report completed 11/30/15; (ii) FYE 12/31/12, overpayment of $23,317, audit completed 11/3/15; (iii) FYE 12/31/13, overpayment of $8,913, audit completed 02/16/16. All the above amounts were recovered by the state, so they are not presently outstanding as part of the State's claim. However, for FYE 12/31/14, only a tentative settlement was issued May 4, 2016; the tentative settlement amount is zero. Moreover, the cost report for FYE 12/31/15 has yet to be audited, and the cost report for FYE 12/31/16 has not yet been submitted. Given the historical average of approximately $11,503 in overpayments, the Debtor has proposed a cash payment to the State to resolve the still unaudited cost report years.

Postpetition, the State has been offsetting 20% of all Medi-Cal payments to pay itself on the HQAF related claim, resulting in more than $40,346.60 having been offset between June 6, 2016 (the "Petition Date") and September 1, 2016 alone. Additionally, the State offset an additional approximately $1.4 million in late October, again without the Court's permission.

Although there is cause for optimism there are no definite resolutions of the various issues with the Medi-Cal program yet or assurances that such resolutions can be achieved. The Debtor, assisted by Counsel for the Creditors' Committee, is working diligently to resolve all these issues so as to allow the Sale to close, which will ensure the availability of the hospital's services for the community.

The Debtor filed an emergency motion seeking the Court's decision on how the Debtor should transfer the Medi-Cal relationship. [Docket No. 536] However, that motion was denied without prejudice. [Docket No. 540] Recent progress has caused the Debtor to delay re-filing that motion but the Debtor reserves the right to renew the motion.

## V. Status of the Hospital's Operations and Finances

The Debtor continues to operate at a loss and has exhausted its existing Debtor in Possession Financing. Therefore, it is conducting a reduction in force of its employees to allow it to preserve cash and reduce operating expenses. Of course, the Debtor will continue to provide quality care to its patients and maintain required staffing ratios.

The Debtor had hoped to close the Sale by now, but the conditions imposed by the Attorney General have put that closing off for at least a week or more. Additionally, documenting the settlement with the United States, and resolving the pending issues with the State related to the transfer of the Medi-Cal relationship make closing now impossible. Thus, the Debtor has negotiated with Strategic for an additional DIP lending in the amount of $500,000, for general operating expenses and up to an additional $130,000 as needed to compensate employees whose employment is being terminated for pre-closing Paid Time Off ("PTO"), and will be filing a motion for Court approval of that additional financing shortly. Unlike the existing DIP Financing, which will be forgiven by Strategic when the Sale closes, this additional financing is an advance against the cash component of the Sale payments. Additionally, Strategic has indicated that it is not committed to providing any additional funds in excess of this additional $500,000 and the $130,000 PTO advance. As a result, the Debtor needs to resolve the issues with the Attorney General and the Medi-Cal Program before this additional funding is exhausted.

## VI. Status of Claims Filed Against the Hospital

On August 10, 2016, the Court set the general claims bar date for October 31, 2016. [Docket No. 308] To date, 278 claims have been filed totaling $6,050,276,659.89. Of that amount, $7,458,823.96 are secured claims, $66,070.64 are priority claims, and $5,304,328,193.25 are general unsecured claims. Of the general unsecured claims, most are the result of three law suits all relating to an alleged healthcare fraud scheme related to the presentation of false claims, kickbacks and use of fake implantable hardware. However, the Debtor denies any liability. One law firm filed more than 50 proofs of claims on behalf of more than 50 insurance companies, <u>asserting a claim for $100 million for each insurance company</u>, even though the Debtor is only one of 53 defendants being sued in this law suit. Another law firm, on the same set of facts, filed a proof of claim asserting a claim of over $270 million allegedly on behalf of the State of California. Again, the Debtor is only one of 25 defendants named in the law suit. Again, the Debtor denies any liability. The Debtor is preparing claims objections to these claims.

The governmental bar date is December 5, 2016, and therefore it has not passed, but Counsel for the Debtor has been informed that the United States will be filing a proof of claim to preserve its rights pending Court approval of the settlement with the Debtor.

Dated:  November 30, 2016

DENTONS US LLP
SAMUEL R. MAIZEL
JOHN A. MOE, II


By  /s/ Samuel R. Maizel
         SAMUEL R. MAIZEL

Attorneys for Gardens Regional Hospital and Medical Center, Inc.