**ASSET PURCHASE AGREEMENT**

**Between**

**GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC.,**
**Debtor and Debtor-in-Possession**

**and**

**AMERICAN SPECIALTY MANAGEMENT GROUP, INC.**

**MAY [__], 2017**

103642925\V-1

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE 1 DEFINITIONS ........................................................................................................ 1

ARTICLE 2 PURCHASE AND SALE OF ASSETS ................................................................... 5

    2.1    Purchased Assets ........................................................................................................ 5

    2.2    Excluded Assets ......................................................................................................... 6

    2.3    No Liens, Claims or Interests .................................................................................... 7

    2.4    Assumption of Liabilities .......................................................................................... 7

    2.5    Excluded Liabilities .................................................................................................. 8

    2.6    Prorations .................................................................................................................. 8

ARTICLE 3 PURCHASE PRICE AND CLOSING .................................................................... 8

    3.1    [Reserved] ................................................................................................................. 8

    3.2    Purchase Price ........................................................................................................... 8

    3.3    Allocation of Purchase Price ..................................................................................... 9

    3.4    Closing ...................................................................................................................... 9

    3.5    Termination ............................................................................................................... 9

    3.6    Previously Approved Break-Up Fee .......................................................................... 9

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER .................................. 9

    4.1    Organization .............................................................................................................. 9

    4.2    Authorization ............................................................................................................ 9

    4.3    Title to Assets ......................................................................................................... 10

    4.4    No Other Brokers .................................................................................................... 10

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 10

    5.1    Organization ............................................................................................................ 10

    5.2    Authorization .......................................................................................................... 10

    5.3    Financing ................................................................................................................. 10

ARTICLE 6 COVENANTS ...................................................................................................... 10

    6.1    Bankruptcy Court Authorization ............................................................................. 10

    6.2    Additional Assumed Contracts ............................................................................... 11

    6.3    Suspension of Hospital License .............................................................................. 12

    6.4    No Hospital Operations ........................................................................................... 12

    6.5    Maintenance of Premises ........................................................................................ 12

i

**TABLE OF CONTENTS**
(continued)

**Page**

6.6   Employees ................................................................. 12

6.7   Access to Information ............................................. 12

6.8   Duty To Confer ....................................................... 13

ARTICLE 7 CONDITIONS TO OBLIGATIONS OF BUYER ................................. 13

7.1   Representations and Warranties True ...................... 13

7.2   Performance ............................................................. 13

7.3   Bankruptcy Court Order .......................................... 13

7.4   No Proceedings ........................................................ 13

7.5   Licenses and Permits ............................................... 13

7.6   Hospital Lease .......................................................... 14

7.7   Casualty Loss ........................................................... 14

7.8   Instruments of Transfer ........................................... 14

7.9   Post-Closing Agreements ........................................ 14

ARTICLE 8 CONDITIONS TO OBLIGATIONS OF SELLER ................................ 14

8.1   Representations and Warranties True ...................... 14

8.2   Performance ............................................................. 14

8.3   Bankruptcy Court Order .......................................... 14

8.4   No Proceedings ........................................................ 14

8.5   Delivery of Consideration ....................................... 15

8.6   Post-Closing Agreements ........................................ 15

ARTICLE 9 POST-CLOSING COVENANTS ........................................ 15

9.1   Further Assurances and Cooperation ...................... 15

9.2   Post-Closing Access by Seller ................................ 15

9.3   Collection of Healthcare Accounts ......................... 16

9.4   Emergency Services and Other Obligations ........... 16

ARTICLE 10 MISCELLANEOUS ........................................ 16

10.1   Post-Closing Buyer Operations .............................. 16

10.2   Notices ..................................................................... 16

10.3   Expenses .................................................................. 18

10.4   Entire Agreement .................................................... 18

ii

**TABLE OF CONTENTS**
(continued)

**Page**

10.5   Amendment ................................................................................................ 18

10.6   Waiver ....................................................................................................... 18

10.7   Severability ............................................................................................... 18

10.8   Successors and Assigns ............................................................................. 18

10.9   Headings ................................................................................................... 18

10.10  Governing Law .......................................................................................... 18

10.11  Jurisdiction ............................................................................................... 18

10.12  Counterparts: Facsimile Signatures ......................................................... 19

SCHEDULES

Schedule 2.1(b) ¬ Licenses and Permits
Schedule 2.1(e) ¬ Motor Vehicles
Schedule 2.1(f) ¬ Assumed Contracts
Schedule 2.1(j) ¬ Other Purchased Assets
Schedule 2.2(r) ¬ Other Excluded Assets

EXHIBITS

Exhibit 6.1(b)(x)-1 ¬ Post-Closing Interim Leaseback Agreement
Exhibit 6.1(b)(x)-2 ¬ Post-Closing Interim Management Agreement

103642925\V-1

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made and entered into as of May [__], 2017 by and between AMERICAN SPECIALTY MANAGEMENT GROUP, Inc., a Delaware corporation ("**Buyer**"), and GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC., a California nonprofit public benefit corporation ("**Seller**").

WHEREAS, on June 6, 2016 (the "**Petition Date**"), Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Bankruptcy Court**"), commencing Case No. 2:16-bk-17463-ER (the "**Chapter 11 Case**");

WHEREAS, Seller is continuing to manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Buyer wishes to buy, and Seller wishes to sell, certain assets of Seller on the terms and conditions set forth in this Agreement;

WHEREAS, the Seller entered into an Asset Purchase Agreement (the **Promise Asset Purchase Agreement")** with Promise Hospital of East Los Angeles, L.P. ("**Promise**"), which was attached to a Sale Motion, Docket No. 706, filed on April 12, 2017 in case No. 2:16-bk-17463-ER (the "**Sale Motion**"), which Asset Purchase Agreement required the Bankruptcy Court's approval.  On May 3, 2017, the Bankruptcy Court held an auction for the assets of the Seller (the "**Sale Motion Hearing**"), at which the Buyer was declared the winning bidder; and

WHEREAS, the Buyer has timely submitted to the Court, an objection to the Promise Asset Purchase Agreement with a higher bid and conditions that will fulfill the City of Hawaiian Gardens imposed Conditional Use Permit;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings set forth in this Article 1.

"**Additional Contracts**" has the meaning set forth in Section 6.2 of this Agreement.

"**Affiliate**" of a specified Person means a Person who directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified.

"**Assumed Contracts**" has the meaning set forth in Section 2.1(f) of this Agreement.

"**Assumed Liabilities**" has the meaning set forth in Section 2.4 of this Agreement.

1

"**Attorney General**" means the Attorney General of the State of California.

"**Authorized Assumed Contracts**" has the meaning set forth in <u>Section 2.4(a)</u> of this Agreement.

"**Authorizing Order**" has the meaning set forth in <u>Section 6.1(b)</u> of this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals of this Agreement.

"**Business Day**" means a day that is not a Saturday, Sunday or holiday in the State of California.

"**Buyer**" has the meaning set forth in the introduction to this Agreement.

"**Chapter 11 Case**" has the meaning set forth in the recitals of this Agreement.

"**Chosen Courts**" has the meaning set forth in <u>Section 10.11</u> of this Agreement.

"**Closing**" has the meaning set forth in <u>Section 3.4</u> of this Agreement.

"**Closing Date**" has the meaning set forth in <u>Section 3.4</u> of this Agreement.

"**CUP**" has the meaning set forth in <u>Section 9.4</u> of this Agreement.

"**Cure Amounts**" has the meaning set forth in <u>Section 6.1(b)(iii)</u> of this Agreement.

"**DEA Certificate**" means Controlled Substance Registration Certificate, DEA Registration No. BT5697973, issued to Seller by the United States Drug Enforcement Administration.

"**Deposit**" has the meaning set forth in <u>Section 3.1</u> of this Agreement.

"**Effective Time**" has the meaning set forth in <u>Section 3.4</u> of this Agreement.

"**Excluded Assets**" has the meaning set forth in <u>Section 2.2</u> of this Agreement.

"**Excluded Liabilities**" has the meaning set forth in <u>Section 2.5</u> of this Agreement.

"**Governmental Authority**" means any nation, province, state or other political subdivision thereof, and any agency, natural person or other entity exercising executive, legislative, regulatory or administrative functions of or pertaining to government, including without limitation, the California State Board of Equalization, the California Board of Pharmacy, the California Bureau of Security and Investigative Services, the California Department of Industrial Relations, the California Department of Managed Health Care, the California Department of Public Health, the California Employment Development Department, the California Franchise Tax Board, the California Office of Statewide Health Planning and Development, the Centers for Medicare & Medicaid Services, the City of Hawaiian Gardens, the

2

Internal Revenue Service, the Los Angeles County Fire Department, the Los Angeles County Treasurer and Tax Collector, Medi-Cal, TRICARE, the United States Department of Health and Human Services, the United States Drug Enforcement Agency, and the United States Food and Drug Administration.

"**Healthcare Accounts**" means all accounts, accounts receivable, rights to payment, health care insurance receivables, general intangibles, payment intangibles, instruments, promissory notes, chattel paper, supporting obligations, and letter of credit rights arising out of the delivery of medical, surgical, diagnostic or other healthcare related goods or services, including without limitation, all rights and claims to payment under Medicare (including Medicare cost report settlements), Medi-Cal, TRICARE, the Children's Health Insurance Program, the Disproportionate Share Hospital Program, and the Hospital Quality Assurance Fee Program.

"**Hospital**" means Gardens Regional Hospital and Medical Center, formerly Tri-City Regional Medical Center, a 137-bed acute care hospital owned by Seller and located at 21530 South Pioneer Blvd., Hawaiian Gardens, California 90716, including the hospital pharmacy, laboratory and emergency department.

"**Hospital Landlord**" means Cerritos Gardens General Hospital Company, a California limited partnership.

"**Hospital Lease**" means that certain Amended and Restated General Acute Care Hospital Lease dated January 1, 2001, as amended by that certain Amendment No. 1 to Amended and Restated General Acute Care Hospital Lease dated February 25, 2013, between the Hospital Landlord, as lessor, and Seller, as lessee, for the premises located at 21530 South Pioneer Blvd., Hawaiian Gardens, California 90716, including all extensions of the term of such lease.

"**Hospital Lease Cure Obligation**" has the meaning set forth in Section 3.2(c) of this Agreement.

"**Hospital License**" means General Acute Care Hospital License No. 930000030 issued to Seller by the California Department of Public Health.

"**Hospital License Renewal Fees**" means the renewal fees for the Hospital License for the period from March 13, 2017 to March 12, 2018, in the amount of $61,356.82.

"**Hospital Premises**" means the premises leased by Seller pursuant to the Hospital Lease.

"**Inpatient Pharmacy Permit**" means Hospital Inpatient Pharmacy Permit, License No. HSP 42970, issued to Seller by the California Board of Pharmacy.

"**Licenses and Permits**" has the meaning set forth in Section 2.1(b) of this Agreement.

"**Liens, Claims and Interests**" has the meaning set forth in Section 2.3 of this Agreement.

"**OSHPD**" means the California Office of Statewide Health Planning and Development.

3

"**Person**" means a natural person, a governmental entity, agency or representative (at any level of government), a corporation, partnership, limited liability company, limited partnership, joint venture, trust or other entity or association, as the context requires.

"**Petition Date**" has the meaning set forth in the recitals of this Agreement.

"**Post-Closing Interim Leaseback Agreement**" has the meaning set forth in Section 6.1(b)(x) of this Agreement.

"**Post-Closing Interim Management Agreement**" has the meaning set forth in Section 6.1(b)(x) of this Agreement.

"**Previously Approved Break-Up Fee**" means the break-up fee and reimbursement of professional fees, in the aggregate amount of Ninety Thousand Dollars ($90,000) authorized and approved by the Bankruptcy Court to be paid to Promise, as the stalking horse bidder for assets of Seller, by order entered July 28, 2016, Docket No. 256, and an additional Ten Thousand Dollars ($10,000) included in the Promise Asset Purchase Agreement.

"**Promise**" has the meaning set forth in the recitals of this Agreement.

"**Promise Asset Purchase Agreement**" has the meaning set forth in the recitals of this Agreement.

"**PTO**" means the liabilities of Seller for vacation and other paid time off of Seller Employees as of the Effective Time.

"**Purchased Assets**" has the meaning set forth in Section 2.1 of this Agreement.

"**Purchase Price**" has the meaning set forth in Section 3.2 of this Agreement.

"**Sale Motion**" has the meaning set forth in the recitals of this Agreement.

"**Sale Motion Hearing**" has the meaning set forth in the recitals of this Agreement.

"**SEIU Collective Bargaining Agreement**" means, to the extent existing as of the date of this Agreement, the collective bargaining agreement between Seller and the Service Employees International Union 121RN.

"**Seller**" has the meaning set forth in the introduction to this Agreement.

"**Seller Employee Benefit Plans**" means all employee benefit plans or fringe benefit plans for Seller Employees, whether provided by third parties or by Seller, including without limitation: (a) all employee health insurance plans, dental plans, vision plans, life insurance plans, disability plans and workers' compensation plans; and (b) all 401(k) plans.

"**Seller Employees**" mean all Persons who are or were employees of Seller at or prior to the Effective Time, whether such employees are or were full-time employees, part-time

4

employees, on short-term or long-term disability, or on leave of absence pursuant to Seller's policies, the Family and Medical Leave Act of 1993, or other similar local law.

"**Seller Liabilities**" mean any and all debts, costs, liabilities, obligations and commitments of Seller, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, or determined, undetermined or undeterminable, whether arising before, at or after the Effective Time.

"**Seller's Attorneys**" means Dentons US LLP.

"**Sterile Compounding License**" means Sterile Compounding License, License No. LSC 100279, issued to Seller by the California Board of Pharmacy.

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS

2.1    Purchased Assets.  On the Closing Date and effective as of the Effective Time, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, receive and accept from Seller, all of the following rights, assets and properties owned or leased by Seller, whether tangible or intangible, real, personal or mixed, movable or fixed, and wherever located (collectively, the "**Purchased Assets**"):

(a)    the Hospital Lease, including all security deposits held under the Hospital Lease, and all claims, causes of action, rights and defenses against the Hospital Landlord under or relating to the Hospital Lease;

(b)    all rights, to the extent assignable or transferable, to all licenses, permits, approvals (including pending approvals), registrations and other licenses, permits, approvals and registrations issued to Seller by any Governmental Authority relating to the ownership, development or operations of the Hospital and the Hospital Premises ("**Licenses and Permits**"), including without limitation, the Licenses and Permits listed in **Schedule 2.1(b)** hereto, subject to any rights of the Hospital Landlord under Sections 1.1, 6 and 35 of the Hospital Lease;

(c)    all inventory and supplies, including without limitation, all medical supplies, drugs, housekeeping, janitorial and office supplies, food, and other disposables and consumables;

(d)    subject to the rights of the Hospital Landlord under Sections 1.1, 6 and 35 of the Hospital Lease, all equipment, machinery, furniture and furnishings, fixtures, tools, vehicles and other tangible personal property at the Hospital Premises;

(e)    all motor vehicles, including without limitation, the motor vehicles listed in **Schedule 2.1(e)** hereto;

(f)    all of the contracts and leases set forth on **Schedule 2.1(f)** (the "**Assumed Contracts**"), all amounts payable to Seller under the Assumed Contracts, all security deposits held by counterparties to the Assumed Contracts or by Seller, and all claims, causes of action, rights and defenses against counterparties to the Assumed Contracts;

5

(g)    all rights, to the extent assignable or transferable, in all express or implied warranties, representations and guaranties of any manufacturer, vendor or contractor in connection with the Purchased Assets;

(h)    subject to the rights of the Hospital Landlord under Sections 1.1, 6 and 35 of the Hospital Lease, all books and records, whether in electronic or written form, relating to any of the foregoing, including without limitation, all survey, engineering and environmental reports, maintenance and repair records, seismic compliance records, and hospital, laboratory, pharmacy and OSHPD inspection and survey reports, certifications and waivers with respect to the Hospital, the Hospital Premises and the assets described in Section 2.1(d) and Section 2.1(e) above;

(i)    all plans, specifications, "as is" drawings, and other drawings related to any improvements made, or proposed to be made, to the Hospital Premises; and

(j)    any other assets listed in **Schedule 2.1(j)**.

2.2    Excluded Assets. Buyer shall not acquire, and Seller shall retain, all right, title and interest in and to all rights, assets and property owned or leased by Seller other than the Purchased Assets (collectively, the "**Excluded Assets**"), including without limitation, the following:

(a)    all cash, cash equivalents, bank accounts, marketable securities and investment property;

(b)    all Healthcare Accounts, and all claims, causes of actions, rights and defenses with respect to Healthcare Accounts;

(c)    Seller's Medicare and Medi-Cal provider agreements;

(d)    all real property leases other than the Hospital Lease;

(e)    all personal property leases;

(f)    all physician contracts;

(g)    all employment contracts between Seller and any Seller Employee and any employment related liabilities to any Seller Employee, including without limitation, any wages, salaries, PTO, or termination liabilities;

(h)    all Seller Employee Benefit Plans;

(i)    any collective bargaining agreements, including without limitation, the SEIU Collective Bargaining Agreement;

(j)    any assets that Buyer elects not to purchase by written notice delivered to Seller prior to the Closing Date, provided that such election shall not reduce the Purchase Price;

6

(k)      any of the Assumed Contracts that Buyer elects not to assume by written notice delivered to Seller prior to the Closing Date, provided that such election shall not reduce the Purchase Price;

(l)      any tax refunds or tax deposits (including funds held by Seller in respect of withholding taxes or estimated income taxes);

(m)      all claims and causes of action arising under Chapter 5 or Section 724 of the Bankruptcy Code;

(n)      all insurance contracts and all rights thereunder, including rights to credits and refunds arising from insurance contracts (except claims under insurance contracts relating to the Purchased Assets to the extent insurance proceeds have not been received prior to the Closing Date, which are part of the Purchased Assets);

(o)      all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off against third parties arising prior to the Closing Date with respect to the Excluded Assets or the Excluded Liabilities;

(p)      the organizational documents of Seller, its minute books, stock and ownership records and corporate seal, and all other documents and records relating to the organization, maintenance, existence and federal income taxation of Seller;

(q)      all claims and causes of action against third parties other than the claims and causes of action expressly included in the Purchased Assets; and

(r)      any other assets listed in **Schedule 2.2(r)**.

2.3      No Liens, Claims or Interests.  The sale, assignment, transfer and conveyance of the Purchased Assets hereunder shall be made free and clear of all liens, claims, charges, security interests, or other interests or encumbrances of any kind, nature or character, including without limitation, all successor liability claims and interests and all Seller Liabilities (collectively, **"Liens, Claims and Interests"**) other than the Assumed Liabilities.

2.4      Assumption of Liabilities.  Upon the sale of the Purchased Assets to Buyer on the Closing Date, Buyer shall assume and agree to discharge the following Seller Liabilities and only the following Seller Liabilities (collectively, the **"Assumed Liabilities"**):

(a)      the Hospital Cure Obligation;

(b)      obligations of Seller from and after the Closing Date (but only to the extent that such obligations do not arise out of any non-monetary default or breach by Seller) under the Hospital Lease and those Assumed Contracts (and no others) which the Bankruptcy Court has authorized Seller to assume and assign to Buyer (the **"Authorized Assumed Contracts"**), provided, however, that Buyer shall have no obligation or liability under any Assumed Contract that the Bankruptcy Court has authorized Seller to assume and assign to Buyer if such Assumed Contract becomes an Excluded Asset prior to the Closing Date pursuant to Section 2.2(k) hereof; and

7

(c)      any sale or transfer taxes in connection with the purchase of the Purchased Assets by Buyer.

2.5      Excluded Liabilities.  Except for the Assumed Liabilities, Buyer shall not assume, be liable for, or be bound by, agree to perform or discharge, indemnify Seller against, or otherwise have any responsibility for, any Seller Liabilities (collectively, the "**Excluded Liabilities**"), including without limitation, any Seller Liabilities arising out of or relating to any of the following:

(a)      the release, discharge or disposal (including the movement of material through or in air, soil, surface or groundwater) of any solid wastes, pollutants or hazardous substances or the handling, storage, use, transportation or disposal of any of the foregoing, as these terms are defined by current federal, state or local law, in or from the Hospital;

(b)      the termination of employment by Seller at any time prior to, on or after the Closing Date of any Seller Employees; or

(c)      any foreign, federal, state or local taxes incurred by Seller at any time prior to, on or after the Closing Date.

2.6      Prorations.  To the extent not an Assumed Liability or not otherwise prorated pursuant to this Agreement, Seller and Buyer shall prorate (as of the Effective Time), if applicable, real estate and personal property taxes, assessments, costs of utilities and other similar charges against real and personal property.

## ARTICLE 3
## PURCHASE PRICE AND CLOSING

3.1      [Reserved].

3.2      Purchase Price.  The purchase price payable by Buyer for the Purchased Assets (the "**Purchase Price**") shall be the following:

(a)      Cash payment to Seller of Six Million, Seven Hundred Thousand Dollars ($6,700,000.00) in the form of cashier's checks at the Sale Motion Hearing;

(b)      assumption by Buyer at Closing of all obligations to compensate the Hospital Landlord for any unpaid monetary obligations and pecuniary loss liabilities of Seller arising prior to the Closing Date in an amount not to exceed the sum of (i) $203,778.53, plus (ii) any unpaid base rent under the Hospital Lease for the period from February 1, 2017 to the Closing Date (the "**Hospital Lease Cure Obligation**"); plus

(c)      cash payments by Buyer to the counterparties to the Authorized Assumed Contracts in amounts equal to the Cure Amounts under their respective Authorized Assumed Contracts, which amounts shall be paid by Buyer within seven calendar days after the Closing Date; plus

8

(d)    if Seller has paid the Hospital License Renewal Fees, reimbursement to Seller of the Hospital License Renewal Fees in the amount of $61,356.82.

3.3    Allocation of Purchase Price.  Prior to the Closing Date, Seller and Buyer shall mutually agree to allocate the Purchase Price among the Purchased Assets in accordance with applicable rules and regulations. All tax returns and reports filed by Seller and Buyer shall be consistent with such allocation, as shall be final and binding upon them pursuant to this Section 3.3. This Purchase Price allocation shall be for tax purposes only and shall not have any effect on any distribution or disbursement of funds to secured or unsecured creditors in the Chapter 11 Case.

3.4    Closing.  Subject to the provisions of this Agreement, the closing of the sale of the Purchased Assets to Buyer (the "**Closing**") will take place at 10:00 a.m., local time, on the second Business Day after the conditions set forth in Article 7 and Article 8 of this Agreement have been satisfied or waived (other than those conditions which by their terms are not to be satisfied until the Closing, subject to the waiver or fulfillment at Closing of those conditions) (the "**Closing Date**"), at the offices of Simon Resnik and Hayes LLP, 15233 Ventura Blvd, Suite 250, Sherman Oaks, California 91403, or at such other date, time or place as Buyer and Seller shall agree, but which date shall be no later than two Business Days after the foregoing conditions have been so fulfilled or waived, time being of the essence. Regardless of the actual time of the Closing on the Closing Date, the Closing shall be deemed effective as of 12:01 a.m. local time on the Closing Date (the "**Effective Time**").

3.5    Termination.  Unless otherwise waived by Buyer in writing, this Agreement shall be terminated and abandoned prior to the Closing:

(a)    upon execution by Buyer and Seller of a written instrument to such effect;

(b)    upon entry of an order of the Bankruptcy Court approving a higher or better offer by any Person other than Buyer for the purchase of any of the Purchased Assets;

(c)    upon entry of an order of the Bankruptcy Court denying Seller's motion for approval of the transactions contemplated by this Agreement;

3.6    Previously Approved Break-Up Fee.  The Previously Approved Break-Up Fee shall be paid by the Seller to Promise on the Closing Date.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows:

4.1    Organization.  Seller is a nonprofit public benefit corporation, duly incorporated, validly existing and in good standing under the laws of the state of California.

4.2    Authorization.  Seller has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated hereby. This Agreement (subject to the

9

entry of an appropriate order or orders of the Bankruptcy Court) constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

4.3     Title to Assets.  At the Closing, Seller shall transfer the Purchased Assets to Buyer, pursuant to the Authorizing Order, free and clear of all Liens, Claims and Interests other than the Assumed Liabilities.

4.4     No Other Brokers.  Except for Wilshire Pacific Capital Advisors, LLC, neither Seller nor any of its officers, directors or employees have employed or made any agreement with any broker, finder or similar agent for any finder's fee, brokerage fees or commission or similar payment in connection with the transactions contemplated by this Agreement. Wilshire Pacific Capital Advisors, LLC is a FINRA licensed and California licensed broker dealer.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

5.1     Organization.  Buyer is a corporation, duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

5.2     Authorization.  Buyer has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated hereby. This Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

5.3     Financing.  Buyer has sufficient cash, committed and available lines of credit or other sources of committed and available funds to enable it to perform all of its obligations under this Agreement, including payment of the Purchase Price in accordance with the terms of this Agreement.

## ARTICLE 6
## COVENANTS

6.1     Bankruptcy Court Authorization.

(a)     [Reserved].

(b)     This Agreement shall become effective upon entry of an order or orders of the Bankruptcy Court (collectively, the "**Authorizing Order**"), which order or orders shall be in form and substance reasonably acceptable to Buyer:

(i)     authorizing and approving Seller's execution and delivery of this Agreement;

(ii)     authorizing and approving the sale, assignment, transfer and conveyance of the Purchased Assets to Buyer free and clear of all Liens, Claims and Interests;

103642925\V-1

(iii)     approving the amount of the Hospital Cure Obligation and determining the amounts necessary to compensate each of the counterparties to any Assumed Contracts for any unpaid monetary obligations and pecuniary loss liabilities of Seller arising prior to the Closing Date (the "**Cure Amounts**");

(iv)     authorizing the assumption and assignment to Buyer of each of the Hospital Lease and any Assumed Contracts free and clear of all Liens, Claims and Interests, including all liabilities and obligations of Seller arising out of any breach or default by Seller prior to the Closing Date;

(v)     ordering and determining that the following provisions of the Hospital Lease are unenforceable as against Buyer: (A) the last sentence of Section 12.2.8 providing for an increase in base rent upon assignment; (B) Section 12.2.9 providing for an increase in the cash security deposit upon assignment; (C) Section 12.12.1 requiring that any and all monies or other consideration payable or otherwise to be delivered in connection with an assignment pursuant to the Bankruptcy Code be paid or delivered to the lessor; and (D) Section 12.12.2 specifying notice periods for a proposed assignment and assumption pursuant to the Bankruptcy Code and any application for a proposed assignment and assumption pursuant to the Bankruptcy Code, and providing for a right of first refusal of the lessor with respect to a proposed assignment and assumption pursuant to the Bankruptcy Code;

(vi)     ordering and determining that except as provided in Section 6.1(b)(v) above, each of the Hospital Lease and the Assumed Contracts shall be a valid and enforceable contract of Buyer from and after the Closing Date;

(vii)     authorizing and approving the consummation of all of the other transactions provided for in this Agreement;

(viii)     ordering and determining that the sale of the Purchased Assets to Buyer and the transactions contemplated by this Agreement do not require approval or consent of the Attorney General, and are not subject to any pre- or post-Closing conditions by the Attorney General, pursuant to Sections 363(d) or 541(f) of the Bankruptcy Code, Sections 5914 *et seq.* or Section 5913 of the California Corporations Code, Section 999.5 of the California Code of Regulations, or otherwise;

(ix)     including findings that Buyer is a purchaser acting in good faith, as such term is used in the Bankruptcy Code, and is entitled to rely on the protections of Section 363(m) of the Bankruptcy Code; and

(x)     authorizing and approving (A) a post-closing interim leaseback agreement between Buyer as landlord and Seller as tenant substantially in the form of Exhibit 6.1(b)(x)-I hereto (the "**Post-Closing Interim Leaseback Agreement**"), (B) a post-closing interim management agreement between Buyer as manager and Seller as licensee substantially in the form of Exhibit 6.1(b)(x)-2 hereto (the "**Post-Closing Interim Management Agreement**"), and (C) the transactions contemplated by each of such agreements.

6.2     <u>Additional Assumed Contracts</u>.  In addition to any Assumed Contracts which shall be assumed and assigned to Buyer pursuant to the Authorizing Order, Buyer shall have the

11

right at any time prior to the Closing to designate any other contracts or leases of Seller that Buyer desires to assume (the "**Additional Contracts**"). Upon Buyer's designation of any such Additional Contracts, Seller shall promptly file a motion with the Bankruptcy Court for an order of the Bankruptcy Court authorizing and approving the assumption and assignment to Buyer of such Additional Contracts upon the same terms and conditions provided under the Authorizing Order for the assumption and assignment to Buyer of the Assumed Contracts. Buyer shall be solely responsible for payment of any Cure Amounts in connection with any Additional Contracts assumed and assigned to Buyer pursuant to this Section 6.2.

6.3    Suspension of Hospital License.  Prior to the filing of Seller's motion for entry of the Authorizing Order, Seller shall (a) cease all hospital, pharmacy, laboratory and emergency department operations, (b) discharge all hospital patients, and (c) take all actions necessary to place its Hospital License in suspense.

6.4    No Hospital Operations.  From and after the filing of Seller's motion for entry of the Authorizing Order, Seller shall not (a) operate the Hospital as general acute care hospital or other health facility or conduct any hospital, pharmacy or laboratory operations, (b) provide any inpatient or outpatient medical, surgical, diagnostic or preventative care or treatment, or (c) provide any medical, nursing, surgical, anesthesia, laboratory, radiology, pharmacy, dietary, or emergency services.

6.5    Maintenance of Premises.  Until the Closing Date, Seller shall be solely responsible, at its sole cost and expense, for (a) maintaining the Hospital Premises in a safe and secure condition, (b) if the Hospital Premises are materially damaged, repairing such premises, and (c) maintaining property insurance and commercial general liability insurance with coverage equivalent to the coverage under Seller's insurance policies in effect as of the date of this Agreement.

6.6    Employees.  Buyer shall have no obligation to hire any Seller Employee. Seller Employees shall have the right to apply to Buyer for employment; provided, however, that Seller shall have no obligation to afford any hiring preference to any Seller Employee, and the hiring of any Seller Employee by Buyer shall be subject to the business requirements and operational and workforce needs of Buyer. Buyer shall provide reasonable notification to Seller Employees of the opportunity to apply for employment by Buyer.

6.7    Access to Information.  Prior to the Closing, Seller shall permit Buyer and its representatives to have reasonable access, during regular business hours, to the properties, the employees and the books and records of Seller, and shall furnish to Buyer such financial and operating information with respect to the business and properties of Seller as Buyer shall, from time to time, reasonably request. Buyer shall have the right to engage in reasonable communications with the customers and suppliers of Seller, the parties to licenses and other contracts and agreements with Seller, and the consultants and advisors to Seller. Notwithstanding the forgoing, in no event shall Seller be obligated to provide (a) any information the disclosure of which would cause (i) the loss of any legal privilege available to Seller relating to such information or (ii) Seller to breach a confidentiality obligation to which it is bound, or (b) access for any invasive environmental testing of any property, and Buyer shall not be entitled to conduct any invasive environmental testing at, on or under any property owned or occupied by Seller.

12

6.8     Duty To Confer. Seller shall confer with Buyer concerning, and furnish to Buyer prior to its submission to the Bankruptcy Court, the Attorney General, or any Governmental Authority, all of the motions, orders and notices contemplated in this Article 6 and any other document that Seller may desire to submit to the Bankruptcy Court, the Attorney General, or any Governmental Authority in connection with any of the foregoing. All such motions, orders, notices and other documents shall comply with the terms and provisions of this Agreement and shall be in form and substance reasonably acceptable to Buyer.

## ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF BUYER

The obligations of Buyer to effect the Closing hereunder are subject to the satisfaction (unless waived by Buyer in writing), at or before the Closing, of each of the following conditions:

7.1     Representations and Warranties True. The representations and warranties of Seller contained in this Agreement shall be true, complete and accurate in all material respects as of the Closing.

7.2     Performance. Seller shall have performed, fulfilled and complied, in all material respects, with all covenants and agreements required by this Agreement to be performed, fulfilled and complied with by it at or before the Closing.

7.3     Bankruptcy Court Order. The Authorizing Order, ordering and determining all of the matters described in Section 6.1(b) of this Agreement, shall have become final and not subject to appeal.

7.4     No Proceedings. No order of any court of competent jurisdiction shall have been entered enjoining or restraining the sale of any of the Purchased Assets to Buyer, and no court of competent jurisdiction shall have determined that the acquisition of the Purchased Assets by Buyer constitutes a violation of applicable law or would be in contravention of the rights of any Person.

7.5     Licenses and Permits.

(a)     The Hospital License shall be in suspense.

(b)     Seller shall have discontinued the Hospital Inpatient Pharmacy Permit and the Sterile Compounding License.

(c)     Seller shall have cancelled the DEA Certificate and shall have satisfied all requirements associated with cancellation of the DEA Certificate, including without limitation, performing an inventory and completion and submission of all necessary Form 222's.

(d)     Seller shall have given notice to the Laboratory Field Services branch of the California Department of Public Health and to the Centers for Medicare & Medicaid Services under the Clinical Laboratory Improvements Amendments Act (CLIA) regarding closure of the Hospital laboratory.

13

103642925\V-1

(e)    Seller shall have complied with all applicable laws and regulations regarding decommissioning of radioactive materials.

(f)    Seller shall have voluntarily terminated its Medicare and Medi-Cal provider numbers as of the date of closure of the Hospital.

(g)    Except as provided in this <u>Section 7.5</u>, none of the Licenses or Permits shall have been revoked or suspended by any Governmental Authority, and neither Buyer nor Seller shall have received any communication from any Governmental Authority threatening revocation or suspension of any of the Licenses or Permits.

7.6    <u>Hospital Lease</u>.  The Hospital Lease shall be in full force and effect and shall not have been rejected in the Chapter 11 Case.

7.7    <u>Casualty Loss</u>.  The Hospital Premises shall not have suffered any material damage or destruction (whether or not such damage or destruction is covered by insurance) from fire, flood, earthquake or otherwise.

7.8    <u>Instruments of Transfer</u>.  Seller shall have delivered to Buyer bills of sale in form and substance reasonably acceptable to Buyer, effective to vest in Buyer good and marketable title to the Purchased Assets free and clear of all Liens, Claims and Interests.

7.9    <u>Post-Closing Agreements</u>.  Seller shall have executed and delivered to Buyer the Post-Closing Interim Leaseback Agreement and the Post-Closing Interim Management Agreement, and the Hospital Landlord shall have executed and delivered its consent to the Post-Closing Interim Leaseback Agreement.

## ARTICLE 8
## CONDITIONS TO OBLIGATIONS OF SELLER

The obligations of Seller to effect the Closing hereunder are subject to the satisfaction, at or before the Closing, of each of the following conditions:

8.1    <u>Representations and Warranties True</u>.  The representations and warranties of Buyer contained in this Agreement shall be true, complete and accurate in all material respects as of the Closing.

8.2    <u>Performance</u>.  Buyer shall have performed, fulfilled and complied, in all material respects, with all covenants and agreements required by this Agreement to be performed, fulfilled and complied with by it at or before the Closing.

8.3    <u>Bankruptcy Court Order</u>.  The Authorizing Order shall have become final and not subject to appeal; provided, however, if Buyer has waived the condition set forth in <u>Section 7.3</u> hereof, Seller shall be deemed also to have waived the condition set forth in this <u>Section 8.3</u>.

8.4    <u>No Proceedings</u>.  No order of any court of competent jurisdiction shall have been entered enjoining or restraining the sale of any of the Purchased Assets to Buyer, and no court of competent jurisdiction shall have determined that the acquisition of the Purchased Assets by

14

Buyer constitutes a violation of applicable law or would be in contravention of the rights of any Person.

8.5     Delivery of Consideration.  Buyer shall have delivered to Seller the cash portion of the Purchase Price described in Section 3.2(a) hereof.

8.6     Post-Closing Agreements.  Buyer shall have executed and delivered to Buyer the Post-Closing Interim Leaseback Agreement and the Post-Closing Interim Management Agreement, and the Hospital Landlord shall have executed and delivered its consent to the Post-Closing Interim Leaseback Agreement.

## ARTICLE 9
## POST-CLOSING COVENANTS

9.1     Further Assurances and Cooperation.  After the Closing, each of Seller and Buyer shall execute, acknowledge and deliver to the other any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by the other at any time, and shall take any and all other actions reasonably requested by the other at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to Buyer the Purchased Assets, and as may be necessary to fully consummate the transactions contemplated by this Agreement and to fully perform the obligations of the parties hereunder. After the consummation of the transactions contemplated by this Agreement, the parties agree to reasonably cooperate with each other and to take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement, and the transactions contemplated hereby.

9.2     Post-Closing Access by Seller.

(a)     For a period of seven (7) years following the Closing Date or such longer period as required by law (the "**Document Retention Period**"), unless the Bankruptcy Court authorizes a shorter period (in which case such shorter period shall be the Document Retention Period), Buyer shall keep and preserve all medical records, patient records, medical staff records and other books and records which are among the Purchased Assets as of the Effective Time, but excluding any records which are among the Excluded Assets. Buyer will afford to the representatives of Seller, the Official Committee of Unsecured Creditors of Seller, any liquidating trustee of Seller's bankruptcy estate (collectively, "**Seller Parties**"), including their counsel and accountants, full and complete access to, and copies of such records with respect to time periods prior to the Effective Time during normal business hours after the Effective Time, to the extent reasonably needed by any Seller Party for any lawful purpose, and provided that such Seller Party reimburses Buyer's reasonable out-of-pocket costs incurred in connection with the copying of such records. Buyer acknowledges that as a result of entering into this Agreement, it will gain access to patient records and other information which are subject to rules and regulations concerning confidentiality. Buyer shall abide by any such rules and regulations relating to the confidential information it acquires. Buyer shall maintain the patient and medical staff records at the Hospital in accordance with applicable law and the requirements of its insurance carriers. After the expiration of the Document Retention Period, if Buyer intends to

15

destroy other otherwise dispose of any of the documents described in this Section 9.2(a), Buyer shall provide written notice to Seller of Buyer's intention no later than forty-Five (45) calendar days prior to the date of such intended destruction of disposal. Any of the Seller Parties shall have the right, at its sole cost, to take possession of such documents during such forty-five (45) calendar day period. If any of the Seller Parties does not take possession of such documents during such forty-five (45) calendar day period, Buyer shall be free to destroy or otherwise dispose of such documentation upon the expiration of such forty-five (45) calendar day period.

(b)    Buyer shall provide reasonable cooperation to the Seller Parties and their insurance carriers in connection with the administration of Seller's bankruptcy estate, including without limitation, in connection with all claims and causes of action or audits relating to the Excluded Assets, the Excluded Liabilities, or Seller's operation of the Hospital that any Seller Party may elect to pursue, dispute or defend in respect of events occurring prior to the Effective Time. Such cooperation shall include, without limitation, making any Seller Employees who are hired by Buyer after the Effective Time available for interviews, depositions, hearings and trials in connection with the administration of Seller's bankruptcy estate, which cooperation shall be provided without payment of any fees or expenses to Buyer or to such employees other than reasonable out-of-pocket expenses for travel and copying.

9.3    Collection of Healthcare Accounts.  If requested by Seller, and subject to approval of the Bankruptcy Court, Buyer and Seller shall enter into an agreement, on terms and conditions reasonably acceptable to Buyer and Seller, for Buyer to service and collect Seller's Healthcare Accounts (other than Medicare cost report settlements) after the Closing Date for the benefit of Seller's estate and creditors. Buyer shall be entitled to a collection fee of 6.0% of the net amounts collected pursuant to such agreement.

9.4    Emergency Services and Other Obligations.  After the Closing, Buyer will comply with the requirements of all applicable conditional use permits and special use permits (collectively "**CUP**") of the City of Hawaiian Gardens relating to the Hospital Premises and/or Seller, including, but not limited to, that Buyer shall provide, or cause to be provided by a third party, 24-hour Emergency Medical Services as defined per Title 22 of California Code of Regulations, at the Hospital Premises in accordance with any CUP of the City of Hawaiian Gardens, as each such CUP may be amended, modified or supplemented after the Closing Date, and Buyer shall further comply with City of Hawaiian Gardens City Council Resolution No. 024-2017 Approving Case No. PLNG2017-0061.

# ARTICLE 10
## MISCELLANEOUS

10.1    Post-Closing Buyer Operations.  After the Closing, Buyer intends to work with the California Department of Public Health and all regulatory agencies to reopen the Hospital as a general acute care facility. Buyer intends to provide a 24-hour Emergency Department and work with Los Angeles County Emergency Medical Service Agency in bringing back paramedic receiving privileges.

10.2    Notices.  All notices, requests, consents, demands and other communications hereunder shall be in writing (including a writing delivered by facsimile transmission) and shall

16

be deemed to have been duly given (i) when delivered, if sent by registered or certified mail (return receipt requested), (ii) when delivered, if delivered personally or by facsimile, or (iii) on the following Business Day, if sent by United States Express Mail or overnight courier, in each case to the parties at the following addresses (or at such other addresses as shall be specified by like notice):

If to Seller to:

> Gardens Regional Hospital and Medical Center, Inc.
> 3719 Meadville Drive
> Sherman Oaks, California 91403
> Attention: Brian Walton, Chairman of the Board
> Telephone: (310) 600-3660
> Facsimile: _____

and

> Gardens Regional Hospital and Medical Center, Inc.
> 21530 S. Pioneer Blvd.
> Hawaiian Gardens, California 90716
> Attention: Stan Otake, CEO
> Telephone: (877) 877-1104
> Facsimile: _____

with a copy to:

> Dentons US LLP
> 601 South Figueroa Street, Suite 2500
> Los Angeles, California 90017-5704
> Attention: Samuel R. Maizel, Esq.
> Telephone: (213) 892-2910
> Facsimile: (213) 623-9924

If to Buyer to:

> American Speciality Management Goup Inc.
> 4120 Dale Road
> Modesto, California 95356
> Attention: Gurpreet Singh, M.D.

with a copy to:

> Simon Resnik and Hayes LLP
> 15233 Ventura Blvd, Suite 250
> Sherman Oaks, California 914003
> Attention: M. Jonathan Hayes, Esq.
> Telephone: (818) 783-6251
> Facsimile: (818) 827-4919

17

10.3   Expenses. Each party to this Agreement shall pay its own expenses in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby, including the fees of any attorneys, accountants, financial advisors, investment bankers or other professionals engaged by such party.

10.4   Entire Agreement. This Agreement contains the entire agreement between the parties and supersedes all prior agreements, arrangements and understandings relating to the subject matter hereof. There are no written or oral agreements, understandings, representations, or warranties between the parties other than those set forth in this Agreement.

10.5   Amendment. This Agreement may not be modified, amended, altered or supplemented except by a written agreement executed by all of the parties hereto.

10.6   Waiver. Waiver by any party of any breach or failure to comply with any provision of this Agreement by any other party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement. No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving party and delivered, in the manner required for notices generally, to each affected party.

10.7   Severability. In case any provision of this Agreement shall be found by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be construed and enforced as if it had been narrowly drawn so as not to be invalid illegal or unenforceable, and the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

10.8   Successors and Assigns. This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns. Seller may not assign, delegate or otherwise transfer its rights or duties hereunder without the prior written consent of Buyer. Buyer may assign its rights and duties hereunder to any Affiliate of Buyer, provided that no such assignment by Buyer shall relieve Buyer of its obligations hereunder.

10.9   Headings. The descriptive headings of sections and subsections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

10.10   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to the choice of law principles thereof.

10.11   Jurisdiction. Each party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement and the transactions contained in or contemplated by this Agreement exclusively in (a) the Bankruptcy Court so long as the Chapter 11 Case remains open and (b) after the close of the Chapter 11 Case (if the Chapter 11 Case is not reopened) or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Central District of California or any California State court sitting in Los Angeles County (together with the Bankruptcy Court, the

18

"**Chosen Courts**"), and solely in connection with claims arising under this Agreement or the transactions contemplated hereby (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto, and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 10.2 hereof.

    10.12   Counterparts: Facsimile Signatures.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile or electronic scan and upon such delivery the facsimile or electronic scan signature shall be deemed to have the same effect as if the original signature had been delivered to the other parties.


[Signatures on Following Page]

103642925\V-1

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**SELLER**

GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC., a California nonprofit public benefit corporation

By:_____
Name: Brian Walton
Title: Chairman of the Board

By:_____
Name:  Stan Otake
Title:   Chief Executive Officer

**BUYER**

AMERICAN SPECIALTY MANAGEMENT GROUP, INC., a Delaware Corporation

By:     American Specialty Management Group, Inc.

By: :_____
Name:  Gupreet Singh, M.D.
Title:   Chairman of the Board

[Signature Page to Asset Purchase Agreement]

103642925\V-1

**Schedule 2.1(b)**

**LICENSES AND PERMITS**

1. General Acute Care Hospital License No. 930000030 issued by the California Department of Public Health to Gardens Regional Hospital and Medical Center, Inc.

2. Hospital Inpatient Pharmacy Permit, License No. HSP 42970, issued by the California Board of Pharmacy to Gardens Regional Hospital and Medical Center

3. Sterile Compounding License, License No. LSC 100279, issued by the California Board of Pharmacy to Gardens Regional Hospital and Medical Center

4. Controlled Substance Registration Certificate, DEA Registration No. BT5697973, issued by the United States Drug Enforcement Administration to Gardens Regional Hospital and Medical Center

5. Clinical Laboratory License, Lab ID No. CLF 00002159, CLIA No. 05D0059575, issued by the California Department of Public Health to Gardens Regional Hospital and Medical Center

6. Clinical Laboratory License, Lab ID No. CLF 00002644, CLIA No. 05D665952, issued by the California Department of Public Health to Tri City Medical Center Pulmonary Laboratory

7. Certificate of Registration (Radiation), Registration No. FAC00033320, issued by the California Department of Public Health to Gardens Regional Hospital & Medical Center

8. Annual Unified Program Facility Permit (Hazardous Materials Disclosure Program, Hazardous Waste Generator Program, and Underground Storage Tank Program (UST)), LA Co. CUPA No. AR: AR0020966, issued by the Los Angeles County Fire Department to Tri City Regional Medical Ctr

9. Permit to Operate Air Pressure Tank, State Serial No. A023264-12, N.B. #/SER.# 225839, issued by the California Department of Industrial Relations, Division of Occupational Safety & Health, Pressure Vessel Unit, to Tri City Regional Medical Center

10. Permit to Operate Steam Boiler, State Serial No. B020648-05, N.B.#SER.# 55512, issued by the California Department of Industrial Relations, Division of Occupational Safety & Health, Pressure Vessel Unit, to Tri City Regional Medical Center

11. Permit to Operate Steam Boiler, State Serial No. B020649-05, N.B.#SER.# 55513, issued by the California Department of Industrial Relations, Division of Occupational Safety & Health, Pressure Vessel Unit, to Tri City Regional Medical Center

12. Proprietary Private Security Employer License No. PSE 412 issued by the California Bureau of Security and Investigative Services to Gardens Regional Medical Center dba Tri-City Regional Medical Center

103642925\V-1

### Schedule 2.1(e)

### MOTOR VEHICLES

| Year | Make | Model | VIN | Vehicle Type | Use |
|------|------|-------|-----|--------------|-----|
| 2000 | Chevy | Maxivan | I GAHG39J5Y1240672 | Maxivan | Passenger Transp |
| 2006 | Toyota | Sienna | 5TDZA23CX6S428637 | Minivan | Passenger Transp |
| 2006 | Toyota | Sienna | 5TDZA23C66S529867 | Minivan | Passenger Transp |
| 1996 | GMC | Truck | I GDJC34J5TE553973 | Truck | Cargo |

## Schedule 2.1(1)

### ASSUMED CONTRACTS

None.

## Schedule 2.1(1)

### OTHER PURCHASED ASSETS

None.

## Schedule 2.2(r)

## OTHER EXCLUDED ASSETS

None

**Exhibit 6.1(b)(x)-1**

**POST-CLOSING INTERIM LEASEBACK AGREEMENT**

[Attached]

**Exhibit 6.1(b)(x)-2**

**POST-CLOSING INTERIM MANAGEMENT AGREEMENT**

[Attached]

# FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

This First Amendment to Asset Purchase Agreement (the "**Amendment**") is made and entered into as of May 1, 2017 ("**Amended Effective Date**") by and between Gardens Regional Hospital and Medical Center, Inc. a California nonprofit public benefit corporation ("**Seller**"), and American Specialty Management Group Inc., a Delaware corporation ("**Purchaser**").

### RECITALS

On May 3, 2017, an order was entered by the United States Bankruptcy Court for the Central District of California approving the APA and the sale of the Assets to Purchaser of the Assets.

The Parties have determined that the change of ownership and related regulatory approval process in connection with the sale of the Hospital Assets will take an extended number of months, and Seller and Purchaser desire to close the APA transaction, in large part, even before the date (the "**Purchaser Licensure Date**") on which Purchaser has obtained all of the licenses, permits and authorizations from governmental agencies or governmental bodies that are required for operation of the Hospital as an acute care hospital by Purchaser in its own right and name ("**Licensure Approvals**"). Accordingly, Seller and Purchaser have agreed to have an initial closing occur (assuming all other closing conditions are met or waived) but, in order to maintain continuing licensed operation of the Hospital, and providing for earlier transfer of economic rights and responsibilities associated with such operations to Purchaser, the Parties will enter into or cause to be entered into (a) a Post-Closing Interim Management Agreement between Seller and Purchaser and (b) an Interim Leaseback Agreement between Seller and Purchaser, all as further addressed at Section 2.

In support of the preceding goals, and to address other related issues, Seller and Purchaser desire to Amend the APA, in accordance with the terms and conditions set forth in this Amendment.

### AMENDMENT

1.    **Two Step Closing.** The Closing as contemplated by the APA shall be divided into two stages, consisting of an Initial Closing and the Licensure Closing, as addressed below.

1.1    **Initial Closing.** Subject to the satisfaction or waiver by the appropriate Party of conditions precedent to closing, and other applicable provisions in the APA, as hereby amended, including delivery of the additional documents contemplated herein, the Parties shall initially close ("**Initial Closing**") on the sale of all acquired Assets other than those assets used exclusively in support pharmacy operations in the Hospital ("**Pharmacy Assets**"). Accordingly, except with respect to matters specifically referenced or contemplated herein as applicable to the Licensure Closing, or otherwise to be effective or completed as of the Purchaser Licensure Date, all references in the Agreement to the Closing shall be deemed to refer to the Initial Closing, with respect to which substantially all acquired Assets (other than the Pharmacy Assets) will be transferred and all closing steps, assumption and retention of liabilities, transition of employees and other matters other than the Pharmacy Assets will occur.

1

    **1.2**    **Pharmacy Closing.** The closing of the sale and purchase of the Pharmacy Assets ("Licensure Closing") will take place concurrent with Purchaser Licensure Date. The provisions in the APA dealing directly with the sale and transfer of the Pharmacy Assets, including without limitation those relating to transfer of title and deliverables to the extent applicable to Pharmacy Assets, including without limitation a pharmaceutical inventory and DEA Power of Attorney (collectively, "**Pharmacy Matters**") shall apply through and as of the Licensure Closing rather through and as of Initial Closing.

    **2.**    **Additional Deliveries and Adjustments.** Because the Parties desire to undertake the Initial Closing prior to receipt by Buyer of all Licensure Approvals (which is otherwise a condition to closing for Seller and Purchaser), the Parties agree to close in conjunction with the Post-Closing Interim Management Agreement, Interim Leaseback Agreement, and Billing and Collection Services Agreement as further addressed below.

    **2.1**    Purchaser and Seller shall enter into an Interim Leaseback Agreement, commencing effective as of the Effective Time, in substantially the form attached hereto as Exhibit A (subject to any reasonable modifications that may be required by the Master Landlord of the Hospital premises) ("**Interim Leaseback Agreement**"), pursuant to which Purchaser shall sublease the Hospital premises and lease related equipment back to Seller, pursuant to which Seller shall maintain occupancy rights as legally required for Seller to remain the licensee of the Hospital until the Purchaser Licensure Date.

    **2.2**    The Parties shall enter into an Post-Closing Interim Management Agreement in substantially the form of Exhibit B attached hereto ("**Post-Closing Interim Management Agreement**"), pursuant to which Seller shall, commencing effective as of the Effective Time, engage Purchaser to manage and assume financial responsibility for the Hospital operations pending receipt by Purchaser of the Licensure Approvals.

    **2.3**    Consistent with all applicable laws, in connection to the proposed Interim Arrangements, those Acquired Assets used exclusively in the operation of the Hospital's pharmacy and all other contracts required to be held by Seller, as licensee of the Hospital (collectively, "**Licensee Contracts**"), shall not be transferred, assumed or rejected at the Initial Closing. Instead, such Pharmacy Assets, and any Licensee Contracts that are Assumed Contracts, shall be subsequently assigned and transferred to Purchaser effective as of the Purchaser Licensure Date; provided, however, that expenses related thereto after the Initial Closing shall be the responsibility of Purchaser under the Post-Closing Interim Management Agreement. In addition, Seller agrees to fully cooperate with Purchaser in connection with seeking any needed consents to Assumed Contracts and in efforts by Purchaser to enter into new or restated contracts in lieu of any Licensee Contracts.

    **3.**    **Closing Conditions.** Consistent with the Interim Arrangements, and two step closing addressed above, the closing conditions in the APA relating to receipt of licenses, approvals, etc., as set forth at Sections 7.4 and 8.1 shall not apply to the extent they relate to receipt of Licensure Approvals, except to the extent that either Seller or Purchaser has received notice from Governmental Authorities, or otherwise has a reasonable basis to believe, that any required Licensure Approvals will not be issued, or able to be obtained, in the ordinary course after the Initial Closing. In addition, each Party's delivery, or arranging for delivery, of each of

the deliverable items added pursuant to this Amendment shall be conditions precedent to the other Party's obligations to close the transactions, at the Initial Closing, pursuant to the APA.

4.     **General.**

    4.1    The Parties agree to cooperate with each other to take such further actions, and provide such further documents as reasonably determined by the Parties to be necessary or recommended to further implement the modifications to the APA, and the two-step closing process, contemplated in this Amendment.

    4.2    Except to the extent expressly set forth in this Amendment, all of the provisions of the APA, are, and shall continue to be, in full force and effect in accordance with their respective terms, and each Seller and Purchaser shall remain obligated to comply with all of such party's obligations contained in the APA, and all references in the APA to the "Agreement" shall be deemed to be references to the Agreement as hereby amended.  The defined terms created in this First Amendment are incorporated into, and are hereby made a part of, the APA, as hereby amended.

    4.3    In the event of any conflict between the terms of this Amendment and the terms of the APA, the terms in this Amendment shall be controlling and supersede such conflicting terms.

    4.4    This Amendment may be executed by one or more of the parties hereto on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  This Amendment may be delivered by facsimile or electronic transmission, including by e-mail as a PDF, and facsimile or PDF copies of executed signature pages, which shall be binding as originals.

*[Signatures on Following Page]*

3

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be executed as of the date first written above.

"SELLER"                                        "PURCHASER"

Gardens Regional Hospital and Medical        American Specialty Management Group,
Center, Inc. a California nonprofit public        Inc., a Delaware corporation
benefit corporation

By: _____            By: _____

Name: _____            Name: _____

Title: _____            Title: _____

4

**EXHIBIT A**

INTERIM LEASEBACK AGREEMENT

[See Attached]

**EXHIBIT B**

**POST-CLOSING INTERIM MANAGEMENT AGREEMENT**

[See Attached]

# INTERIM LEASEBACK AGREEMENT

## INTERIM LEASEBACK AGREEMENT

THIS INTERIM LEASEBACK AGREEMENT (the "**Leaseback Agreement**") is made and entered into as of May 1, 2017, by and between Gardens Regional Hospital and Medical Center, Inc., a California nonprofit public benefit corporation ("**Tenant**"), and American Specialty Management Group, Inc., a Delaware corporation ("**Landlord**").

### RECITALS

Landlord has entered into that certain Asset Purchase Agreement dated May 3, 2017 as amended, pursuant to that certain First Amendment to the Asset Purchase Agreement, dated _____, 2017 (the "**APA**"), covering the Assets (as defined in the APA) of an acute care hospital known as Gardens Regional Hospital and Medical Center, located at 21530 South Pioneer Blvd., Hawaiian Gardens, California, 90716 (the "**Hospital**").   Pursuant to the APA, Landlord is receiving all Assets used in the operation of the Hospital including directly leasing all of the Leased Real Property (as defined in the APA) (referred to herein as the "**Real Property**").

Tenant and Landlord are entering into this Leaseback Agreement pursuant to and in consideration of an Interim Management and Lease Agreement ("**IMA**") which they are concurrently entering into.

Until the Licensure Date (as defined in the IMA), Landlord desires for Tenant to remain in legal possession of the Hospital so that Tenant's Hospital licenses will remain in effect.

Landlord desires to lease and, with respect to Real Property sublease, all of the tangible Assets used in the operation of the Hospital to Tenant, excluding Assets used solely for operation of the Hospital's pharmacy, and Tenant desires to so lease and sublease such Hospital assets from Landlord, on the terms and conditions hereinafter set forth.

### AGREEMENT

NOW, THEREFORE, in consideration of the covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    DEFINITIONS.  Any capitalized term appearing herein which is not defined shall have the same definition as ascribed under the APA or IMA, as applicable.  All references herein to the lease of the Leased Premises to Tenant shall be deemed to constitute the sublease of all Real Property and the lease of all other property included within the Leased Premises.

2.    DESCRIPTION OF THE PREMISES.  Landlord hereby leases to Tenant and Tenant leases from Landlord all of the Real Property and other fixtures, furnishings, equipment and tangible personal property used in the operation of the Hospital excluding assets used solely for operation of the Hospital's pharmacy (collectively, the "**Leased Premises**").

3.    TERM; TERMINATION.

1216392.3

1

3.1     Term.  The term of this Leaseback Agreement shall commence concurrent with the IMA Effective Time, and shall continue until terminated in accordance with the terms of Section 3.2 hereof.

3.2     Termination of IMA.  This Leaseback Agreement shall be deemed terminated concurrent with Licensure Date (as defined in the IMA).

4.     PAYMENTS BY LANDLORD.

4.1     Utilities.  Landlord shall pay all water, gas, heat, light, power, telephone service, and all other utilities and services supplied to the Leased Premises during the term hereof.

4.2     Taxes.  Landlord shall pay all real and personal property taxes, assessments and levies of any kind or nature whatsoever taxed, assessed, levied or imposed upon or against the Leased Premises during the term hereof.

4.3     Insurance.  Landlord shall pay all insurance premiums for insurance covering the Leased Premises during the term hereof.  Landlord covenants and agrees that all of the property constituting the Leased Premises is covered as of the date hereof and will be covered at all times by general liability, fire, theft and physical damage insurance.  All such insurance shall name Landlord and Tenant as insureds as their respective interests may appear.

4.4     Repairs and Maintenance; Alterations.  Landlord shall pay all costs of repairing (including replacement of) and maintaining the Leased Premises and every part thereof in good and sanitary order, condition and repair during the term hereof, reasonable wear and tear excepted, including, without limitation,  all costs of all repairs, replacements and maintenance required by any applicable governmental law, statute, ordinance, rule or regulation.  Tenant shall not make any alterations or changes to the Leased Premises without prior written approval of Landlord which may be given or withheld in Landlord's sole discretion.

5.     USE.  The Leased Premises shall be used for the operation of the Hospital, subject to the terms of the APA and the IMA.

6.     MISCELLANEOUS.

6.1     Further Assurances.  Each of the parties hereto agrees to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Leaseback Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.

6.2     Notices and Demands.  All notices and demands, requests, consents, approvals, and other similar communications under this Leaseback Agreement shall be in writing and shall be sent by personal delivery or by either (a) United States certified or registered mail, return receipt requested, postage prepaid, or (b) Federal Express or similar generally recognized overnight carrier regularly providing proof of delivery, addressed as follows:

1216392.3

2

| If to Tenant: | Gardens Regional Hospital and Medical Center, Inc.<br>3719 Meadville Drive Center<br>Sherman Oaks, CA 91403<br>Attention: Brian Walton, Chairman of the Board<br>Telephone: 310-600-3660 |
|---|---|
| If to Landlord: | American Specialty Management Group, Inc.<br>4120 Dale Road<br>Modesto CA 92506<br>Attention: Gurpreet Singh, M.D. |

Any notice so given by mail shall be deemed to have been given as of the date of delivery (whether accepted or refused) established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be, whether accepted or refused. Any such notice not so given shall be deemed given upon receipt of the same by the party to whom the same is to be given. Any party hereto may designate a different address for itself by notice to the other party in accordance with this Section 6.2.

6.3     Payment of Expenses.    Each party hereto shall bear its own legal, accounting and other expenses incurred by Landlord and Tenant in connection with the preparation and negotiation of this Leaseback Agreement and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

6.4     Entire Agreement; Amendment; Waiver.    This Leaseback Agreement, together with the other agreements referred to herein, constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements. This Leaseback Agreement may not be modified or amended except in writing signed by the parties hereto. No waiver of any term, provision or condition of this Leaseback Agreement in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Leaseback Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

6.5     Assignment.    Neither this Leaseback Agreement nor the rights, duties or obligations arising hereunder shall be assignable or delegable by Tenant or Landlord without the prior written consent of the other party, which may be granted, denied or conditioned in such party's absolute discretion except that Landlord may assign this Leaseback Agreement in connection with any permitted assignment under the IMA. Subject to the foregoing, this Leaseback Agreement shall be binding upon, and inure to the benefit of, the respective successors and assigns of the parties hereto.

6.6     Joint Venture; Third Party Beneficiaries.    Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof. The parties hereto do not intend that any third party shall have any rights under this Leaseback Agreement.

1216392.3                                    3

6.7    Captions.  The section headings contained herein are for convenience only and shall not be considered or referred to in resolving questions of interpretation.

6.8    Counterparts.  This Leaseback Agreement may be executed by one or more of the parties hereto on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. This Leaseback Agreement may be delivered by facsimile or electronic transmission, including by e-mail as a PDF, and facsimile or PDF copies of executed signature pages, which shall be binding as originals.

6.9    Governing Law.  This Leaseback Agreement shall be governed in accordance with the laws of the State of California without regard to the conflict of rules of such State.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**
**[SIGNATURE PAGE FOLLOWS]**

1216392 3

4

*[Signature Page to Interim Leaseback Agreement]*

IN WITNESS WHEREOF, the undersigned have executed this Leaseback Agreement as of the date first written above.

LANDLORD:                                          TENANT:

American Specialty Management Group,        Gardens Regional Hospital and Medical
Inc.                                               Center, Inc.


By: _____          By: _____

Name: _____          Name: _____

Its: _____          Its: _____

# POST-CLOSING INTERIM MANAGEMENT AGREEMENT

## POST-CLOSING INTERIM MANAGEMENT AGREEMENT

This Post-Closing Interim Management Agreement (this **"Agreement"**) is made and entered into as of May 1, 2017, by and between GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC., a California nonprofit public benefit corporation (**"Licensee"**), and American Specialty Management Group, Inc., a Delaware Corporation (**"Manager"**).

### RECITALS

      A.    Licensee is the licensee of Gardens Regional Hospital and Medical Center, formerly Tri-City Regional Medical Center, a 137-bed general acute care hospital located at 21530 South Pioneer Blvd., Hawaiian Gardens, California 90716 (the **"Hospital"**).

      B.    The Hospital closed on February 1, 2017, and the general acute care hospital license for the Hospital (the **"Hospital License"**) has been placed in suspense.

      C.    Licensee, as seller, and Manager, as buyer, have entered into that certain Asset Purchase Agreement dated as of       , 2017 (the **"APA"**). Pursuant to the APA, Manager has agreed to purchase certain of the assets of Licensee (the **"Purchased Assets"**).

      D.    The closing under the APA (the **"Closing"**), pursuant to which the Purchased Assets, including the Hospital Lease (as defined in the APA), are being sold, assigned, transferred, conveyed and delivered to Manager, is occurring concurrently with the execution and delivery of this Agreement.

      E.    From the Effective Time (as defined in the APA) until the effective date of the general acute care hospital license to be obtained by Manager from the California Department of Public Health (the **"New License"**) and the other licenses, permits and regulatory approvals needed for Manager to operate the Hospital as a general acute care hospital (collectively, the **"Manager Approvals"**), Manager desires to assume the management of the Hospital, as a closed hospital, on behalf of Licensee, and Licensee desires to avail itself of said management services, upon the terms and conditions set forth in this Agreement.

      F.    From the Effective Time until the effective date of the New License and the last of the Manager Approvals to be obtained by Manager (the **"Licensure Date"**), Licensee shall maintain a possessory interest in the Hospital, as a closed hospital, and the Hospital Premises (as defined in the APA) and the tangible Purchased Assets will be leased back to Licensee pursuant to a Post-Closing Interim Leaseback Agreement between Manager, as landlord, and Licensee, as tenant, being entered into concurrently with this Agreement (the **"Leaseback Agreement"**).

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

- 1 -

1.    **Term.**

    1.1    The term of this Agreement (the **"Management Period"**) shall commence at the Effective Time and shall continue until the earlier of (a) the Licensure Date or (b) the New Manager Commencement Date (as defined in Section 1.2 below). The parties acknowledge that, during the Management Period, Licensee shall remain the licensee of the Hospital and in that capacity and during such period shall retain statutory and regulatory auth0lity and responsibility for the Hospital as a closed hospital.

    1.2    In the event that Manager is unable to obtain the New License and other Manger Approvals as contemplated by this Agreement, or if Manager reasonably determines that it has no reasonable likelihood of obtaining the New License and other Manager Approvals, Licensee hereby agrees to permit Manager to conduct a search and select another manager reasonably acceptable to Licensee and to the Hospital Landlord (as defined in the APA) to manage the Hospital as a closed hospital, and obtain a new hospital license and such other licenses, permits and regulatory approvals needed to operate the Hospital as a general acute care hospital, pursuant to, at the election of Manager in consultation with the Hospital Landlord, an assignment of this Agreement or a new written management agreement between Licensee and such other manager (the effective date of such assignment or such new management agreement being referred to herein as the **"New Manager Commencement Date"**).

2.    **Grant.**

    2.1    During the Management Period, Licensee hereby appoints Manager as the sole and exclusive manager for and on behalf of Licensee and hereby grants to Manager the exclusive right to manage the Hospital under Licensee's Licenses and Permits (as defined in the APA) as a closed general acute care hospital, including without limitation, the right to undertake those certain management responsibilities and permitted activities described in Section 3 below. Manager hereby accepts such appointment for all purposes with respect to Licensee's rights, duties and responsibilities under the Licenses and Permits for the Hospital, as a closed hospital, to the fullest extent permitted by law, and agrees, to the fullest extent permitted by law, to provide management services to the Hospital, as a closed hospital, on behalf of Licensee (the **"Services"**).

    2.2    Upon the Licensure Date, the Management Period will end and the full scope of management services and responsibilities relating to management of the Hospital, as a closed hospital, under Licensee's Licenses and Permits shall terminate, at which point Manager will be fully responsible for operating the Hospital under its own New License, at its own expense.

3.    **Management Responsibility.**

    3.1    During the Management Period, but subject to Licensee's statutory and regulatory responsibility, Manager shall have full responsibility for the management of the Hospital, as a closed hospital, and agrees to assume and discharge all responsibilities, duties and obligations in connection with properly maintaining the Hospital in full compliance with all regulations and standards required of a closed general acute care hospital facility so licensed. In furtherance thereof, Manager's Services shall include, but not be limited to, the following duties, which duties shall be performed at Manager's sole cost and expense:

- 2 -

(a)    Maintaining and repairing, as needed, the Hospital Premises so as to ensure material compliance with the Hospital Lease and applicable local, state and federal law;

(b)    Providing security services reasonably necessary to prevent unlawful entry or damage to the Hospital Premises;

(c)    Affording access to the Hospital Premises and the books and records at the Hospital Premises, during regular business hours and upon at least one day's prior written notice to Manager, to Licensee's employees, independent contractors, agents, and representatives for purposes of inspecting the Hospital Premises, and to the extent necessary for conducting Licensee's financial and business affairs, including billing and collection of Licensee's accounts receivable;

(d)    Affording access to the Hospital Premises, during regular business hours and upon at least one day's prior written notice to Manager, to lessors of equipment at the Hospital Premises who have been authorized by order of the Bankruptcy Court (as defined in the APA) to remove their equipment from the Hospital Premises, provided that Manager shall have full power and authority to require that the removal of such equipment by the lessors does not damage the Hospital Premises;

(e)    Maintaining, including payment in a timely manner of applicable license and permit fees on behalf of Licensee, all licenses, permits consents, approvals and certifications required to maintain suspension of the Hospital License and compliance with applicable local, state and federal law regarding the Hospital as a closed hospital;

(f)    Maintaining the insurance required under the Leaseback Agreement, and paying all rent, utilities, taxes and insurance premiums required under the Leaseback Agreement in a timely manner;

Opening and forwarding all mail relating to the financial or business affairs of Licensee;        (h)

(g)

(i)    Periodically reporting to Licensee (or its designee), either in person or telephonically, concerning the condition of the Hospital and the Hospital Premises and the status of Manager's efforts to obtain the New License and the other Manager Approvals; and

(j)    Performing such other duties and activities as are reasonably necessary for Manager to fulfill its responsibilities under this Agreement.

3.2    **Permitted Manager Activities.** During the Management Period, Manager may do any of the following, which activities may be performed by Manager, subject to the requirements of the Hospital Lease and applicable local, state and federal law, in Manager's sole and absolute discretion and at Manager's sole cost and expense:

(a)    Make alterations, improvements and repairs to the interior or exterior of the Hospital Premises, including structural alterations, improvements and repairs;

~ 3 ~

        (b)    Remove and dispose of furniture, fixtures, equipment (other than equipment owned by equipment lessors), and supplies at the Hospital Premises;

            Move into and install furniture, fixtures, equipment and supplies at the Hospital Premises;    (d)

  (c)

            Change the name of the Hospital and install new signage at the Hospital Premises;    (f)

  (e)

        (g)    Obtain insurance for its own account with respect to the Hospital or any of the Purchased Assets in types other than, or in amounts in excess of, the insurance required under the Leaseback Agreement; and

        (h)    Perform, or permit to be performed, any other activities at the Hospital Premises that are not inconsistent with maintaining the Hospital as a closed hospital under a suspended hospital license, and receive and retain for Manager's own account all revenues and proceeds of any such activities.

        3.3    **Prohibited Manager Activities.** Notwithstanding anything to the contrary in this Agreement, the Manager shall have no auth0lity to take and shall not take any action with respect to the Excluded Assets or the Excluded Liabilities (as such terms are defined in the APA).

        3.4    **Proration of Expenses.** Nothing herein shall modify the prorations of expenses set forth in the APA.

        3.5    **Manager Compensation.** Manager shall not be entitled to any compensation for the performance of its duties under this Agreement.

        3.6    **Licensee Cooperation.** Licensee shall take no action to obstruct, disrupt, or interfere with Manager in the performance of Manager's duties or permitted activities pursuant to this Section 3.

    4.    **Continued Responsibility of Licensee.**

        4.1    During the Management Period, Licensee shall maintain, and shall not take or voluntarily permit any actions which will adversely affect, Licensee's corporate existence and its full rights as the licensee under the Hospital License as a suspended license. In addition, during the Management Period, Licensee shall cooperate with, and shall not take or voluntarily permit any actions which would impede Manager's efforts to keep in full force and effect the Hospital License as a suspended license and all other Licenses and Permits necessary or appropriate to maintain the Hospital as a closed hospital, and Licensee shall to cooperate with, and shall not take or voluntarily permit any actions which would impede, Manager's efforts to not allow any of the same to become invalid, restricted or otherwise adversely affected by the acts or omissions of Licensee or any of its officers, directors, employees, agents or representatives.

        4.2    Notwithstanding the statutory and regulatory authority and responsibility of Licensee for the continued management of the Hospital as a closed hospital during the Management

Period, it is recognized that under this Agreement, Manager shall be actually in charge of the day-to-day operation and maintenance of the Hospital as a closed hospital. In the event that any violation or alleged violation of any statute or regulation applicable to the operation or maintenance of the· Hospital as a closed hospital occurs during the Management Period then, without regard to legal or statutory fault on the pmi of Manager or of Licensee, Manager shall immediately notify Licensee of such violation or alleged violation and take reasonable efforts to avoid or minimize any related adverse consequences. Licensee retains the right to join Manager in contesting said violations upon providing Manager with notice of its intent to do so.

   4.3    Licensee agrees to execute and deliver to Manager such documents as Manager may reasonable request to maintain the Hospital License as a suspended license and the other Licenses and Permits necessary or appropriate to maintain the Hospital as a closed hospital and to facilitate Manager's obtaining of the New License and other Manager Approvals.

5.    **Cooperation with Manager Financing.**

   5.1    In connection with any financing that Manager has or desires to obtain during the Management Period ("**Manager Financing**"), Licensee agrees to execute and deliver to Manager or Manager's lender or prospective lender such financing and security documents that are reasonably requested and needed by such lender by reason of this Agreement, the Leaseback Agreement, or Manager's interest in the Purchased Assets. Without limiting the foregoing, Licensee auth0lizes any lender of Manager, under any Manager Financing, as designated by Manager, to file any Uniform Commercial Code financing statements required by such lender to perfect its security interests in the Purchased Assets.

   5.2    Notwithstanding the foregoing:

      (a)    Licensee shall not be, nor shall Licensee be required to become, liable with respect to any such Manager Financing, and Manager agrees to indemnify, protect and hold the Licensee Indemnified Parties (as hereafter defined) harmless from and against any and all Damages (as hereafter defined), whether civil or criminal, direct or consequential and no matter how arising, in any way related to, connected with or arising or resulting from any such Manager Financing; and

      (b)    The rights of the Hospital Landlord in the Purchased Assets under Sections 1.1, 6 and 35 of the Hospital Lease shall not be subject to the security interests of any lender to Manager.

6.    **Exculpation; Indemnification.**

   6.1    Manager agrees that the Licensee Indemnified Parities (as defined below) shall not have any liability (including without limitation, liability for any Damages (as defined below) in contract, tort or otherwise to Manager or the general partner of Manager, or their respective officers, directors, equity holders, affiliates, employees, agents, or any person claiming through or in right of any of the foregoing, arising from or in connection this Agreement, or the performance of the Services, except to the extent such Damages are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from either (i) the refusal of Licensee to execute and deliver to Manager any document reasonably requested by

- 5 -

Manager in connection with the purposes of this Agreement or (ii) Licensee's breach of any covenant herein wherein Licensee expressly agrees to not take or voluntarily permit any specified action.

6.2    Manager shall promptly and fully keep and hold Licensee and its officers, directors, employees, representatives, successors and assigns (collectively the **"Licensee Indemnified Parties"**) forever harmless from and shall jointly and severally indemnify and defend the Licensee Indemnified Parties from and against, without regard to materiality, any and all obligations, judgments, fines, civil money penalties, sanctions, awards, liabilities, losses, penalties, claims, costs, demands, damages, expenses, liens, and encumbrances, including investigation costs, reasonable attorneys' fees and expenses (collectively, **"Damages"**), whether civil or criminal, direct or consequential and no matter how arising, in any way related to, connected with or arising or resulting from or under this Agreement or Manager's management of the Hospital as a closed hospital or otherwise arising out of this Agreement or the performance of the Services, including the operation of the Hospital as a closed hospital after the Effective Time; except to the extent of, and excluding, any such Damages which are subject to Licensee's obligation to indemnify the Manager Indemnified Parties pursuant to Section 6.3 hereof. Notwithstanding the foregoing, it is understood that except as otherwise specifically provided for in the APA, Manager is not, by virtue of this Agreement or any term1or provision herein, assuming any claim, liability, expense, debt or other obligation of Licensee that relates to the operation of the Hospital (whether as an operating hospital or a closed hospital) prior to the Effective Time.

6.3    Licensee shall promptly and fully keep and hold Manager and the general partner of Manager, and their respective officers, directors, equity holders, affiliates, employees, agents, representatives, successors and assigns (collectively the **"Manager Indemnified Parties"**) forever harmless from and shall indemnify and defend the Manager Indemnified Parties from and against, without regard to materiality, any and all direct Damages, whether civil or criminal, to the extent such Damages are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from either (i) the refusal of the Licensee to execute and deliver to Manager any document reasonably requested by Manager in connection with the purposes of this Agreement or (ii) Licensee's breach of any covenant herein wherein Licensee expressly agrees to not take or voluntarily permit any specified action.

6.4    Licensee's sole remedy for breach of this Agreement by Manager shall be pursuant to Section 6.2 of this Agreement, and Licensee shall have no right to revoke or terminate this Agreement by reason of any breach thereof by Manager.

7.    **Lease of Hospital Premises.** During the Management Period, Manager shall sublease the Hospital Premises and the tangible Purchased Assets to Licensee at no cost and without obligations to Licensee, and Licensee shall have all rights of possession over the Hospital Premises and the tangible Purchased Assets, as further set f0 1ih in, and subject to the terms and conditions of the Leaseback Agreement.

8.    **HIPAA Compliance.** Manager agrees to take such steps as are necessary to ensure compliance with the Health Insurance P0 1iability and Accountability Act of 1996 (HIPAA), the California Confidentiality of Medical Information Act, and other applicable federal and state privacy

- 6 -

Laws ("**Privacy Laws**") with respect to the Hospital and its operations, and Licensee agrees not to take or voluntarily permit any actions which violate Privacy Laws with respect to the Hospital or its operations. Toward this end, Manager and Licensee agree to execute and deliver that certain Business Associate Agreement, attached hereto as <u>Exhibit A</u> and incorporated by reference herein, upon execution of this Agreement.

9. **Further Assurances.** Each of the parties hereto agrees to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.

10. **Relationship of Parties.** In the performance of its duties and permitted activities under this Agreement, it is understood and agreed that Manager shall, at all times, be acting and performing as an independent contractor. Manager and Licensee are not partners or joint venturers with each other and nothing herein shall be construed so as to make them partners or joint venturers or impose upon either of them any liability as partners or joint venturers.

11. **Notices.** All notices, requests, consents, demands and other communications hereunder shall be in writing (including a writing delivered by facsimile transmission) and shall be deemed to have been duly given (i) when delivered, if sent by registered or certified mail (return receipt requested), (ii) when delivered, if delivered personally or by facsimile, or (iii) on the following Business Day, if sent by United States Express Mail or overnight courier, in each case to the parties at the following addresses (or at such other addresses as shall be specified by like notice):

If to Licensee to:

Gardens Regional Hospital and Medical Center, Inc. 3719 Meadville Drive Center
Sherman Oaks, California 91403
Attention:  Brian Walton, Chairman of the Board Telephone: (310) 600-3660
Facsimile: and

Gardens Regional Hospital and Medical Center, Inc.
21530 S. Pioneer Blvd.
Hawaiian Gardens, California 90716
Attention:        Stan Otake, CEO
Telephone:      (562) 860-0401
Facsimile:       (562) 924-5871

with a copy to:

- 7 -

Dentons US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Attention: Samuel R. Maizel, Esq.
Telephone: (213) 892-2910
Facsimile: (213) 623-9924

If to Manager to:

American Specialty Management Group Inc.
4120 Dale Road
Modesto, CA 95356
Attention: Gurpreet Singh, M.D. Chairman

with a copy to:

Simon Resnick and Hayes
15233 Ventura Blvd., Suite 250
Sherman Oaks, CA 91403
Attention: M. Jonathan Hayes, Esq.

12      Expenses. Each party to this Agreement shall pay its own expenses in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby, including the fees of any attorneys, accountants, financial advisors, investment bankers or other professionals engaged by such party.

13      Entire Agreement. This Agreement, the APA and the Leaseback Agreement contain the entire agreement between the parties concerning their subject matter and supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and thereof. There are no written or oral agreements, understandings, representations, or warranties between the parties other than those set forth in this Agreement, the APA and the Leaseback Agreement.

14      Amendment. This Agreement may not be modified, amended, altered or supplemented except by a written agreement executed by all of the parties hereto.

15      Waiver. Waiver by any party of any breach or failure to comply with any provision of this Agreement by any other party shall not be construed as or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement. No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving party and delivered, in the manner required for notices generally, to each affected party.

- 8 -

16. Severability. In case any provision of this Agreement shall be found by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be construed and enforced as if it had been narrowly drawn so as not to be invalid, illegal or unenforceable, and the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

17.    Successors and Assigns. This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns. Licensee shall not be permitted to assign its rights or its obligations under this Agreement without the prior consent of Manager. Manager may assign its rights and obligations under this Agreement as provided in Section 1.2 hereof. The parties further acknowledge and agree that Manager may subcontract for any of the goods or services required to be provided by Manager pursuant to this Agreement, and Manger may assign any of its rights hereunder and/or delegate any of its obligations hereunder, so long as in each case Manager remains responsible for such subcontracted goods or services and for any of such Manager obligations hereunder.

18.    Relationship of Parties. Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof.

19.    Attorneys' Fees. In the event of any litigation or arbitration between the parties hereto arising out of this Agreement, the prevailing party therein shall be allowed to recover from the other party all court costs and reasonable attorneys fees which shall be fixed by the court or arbitrator.

20.    Headings. The descriptive headings of sections and subsections of this Agreement are inse lied for convenience only and do not constitute a part of the Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

21.    Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of California without reference to the choice of law principles thereof.

22.    Jurisdiction. Each patty hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement and the transactions contained in or contemplated by this Agreement exclusively in (a) the Bankruptcy Court so long as the Chapter 11 Case remains open and (b) after the close of the Chapter 11 Case (if the Chapter 11 Case is not reopened) or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Central District of California or any California State Court sitting in Los Angeles County (together with the Bankruptcy Court, the "Chosen Courts"), and solely in connection with claims arising under this Agreement or the transactions contemplated hereby
(i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Coutts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto, and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 11 hereof.

- 9 -

23. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and same instrument. This Agreement may be executed and delivered by facsimile or electronic scan and upon delivery the facsimile or electronic scan signature shall be deemed to have the same effect as if the original signature had been delivered to the other parties.

24.    **Conditions to Effectiveness.** The parties acknowledge that this Agreement is subject to and contingent upon both approval of the Bankruptcy Court and the occurrence of the Closing under the APA. This Agreement shall not be effective, nor shall any party have any obligations hereunder, unless and until (a) the Bankruptcy Court shall have entered an order authorizing and approving this Agreement, and (b) the Closing under the APA shall have occurred.

**Signatures on Following Page**

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

**LICENSEE:**

GARDENS REGIONAL HOSPITAL AND
MEDICAL CENTER, a California nonprofit public
benefit corporation

By: _____
Name: Brian Walton
Title:    Chairman of the Board

By: _____
Name: Stan Otake
Title:    Chief Executive Officer

**MANAGER**

American Specialty Management Group, Inc. a
Delaware Corporation

By:  American Specialty Management Group Inc.,
a Delaware corporation, its Chairman

By: _____
Name:  Gurpreet Singh, M.D.
Title:    Chairman of the Board

ACKNOWLEDGED AND CONSENTED TO:

CERRITOS GENERAL HOSPITAL
COMPANY, a California limited partnership

By:  Pioneer Carson Corp., a California
corporation, its General Partner

By: _____

Name: _____
Title: _____

- 11 -

## EXHIBIT A
## BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("Agreement") is entered into by and between AMERICAN SPECIALTY MANAGEMENT GROUP, INC. a Delaware corporation, ("**Business Associate**") and GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC., a California nonprofit public benefit corporation ("**Covered Entity**"), which is a covered entity under the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"). The parties are entering into this Agreement to assist the Covered Entity in complying with HIPAA, and to set forth Business Associate's obligations under the Health Information Technology for Economic and Clinical Health Act of 2009 (the "**HITECH Act**"), and 45 CFR Parts 160 and 164, Subpart C (the "**Security Rule**"), Subpart D (the "**Data Breach Notification Rule**"), and Subpart E (the "**Privacy Rule**") (collectively, the "**HIPAA Regulations**") and applicable State law. Terms used in this Agreement have the meanings given them in the HIPAA Regulations. This Agreement applies to any Protected Health Information Business Associate receives from Covered Entity, or creates, receives or maintains on behalf of Covered Entity, under its agreements with Covered Entity (the "**Principal Agreements**").

## AGREEMENT

1.    Business Associate may use and disclose Covered Entity's Protected Health Information to provide Covered Entity with the goods and services contemplated by the Principal Agreements. Except as expressly provided below, this Agreement does not authorize Business Associate to make any use or disclosure of Protected Health Information that Covered Entity would not be permitted to make.

2.    Business Associate will:

(a)    Not use or further disclose Covered Entity's Protected Health Information except as permitted by the Principal Agreements or this Agreement, or as required by law;

(b)    Use appropriate safeguards, and comply, where applicable, with the HIPAA Security Rule with respect to electronic protected health information, to prevent use or disclosure of Covered Entity's Protected Health Inf01mation other than as provided for by the Principal Agreements or this Agreement;

(c)    Report to Covered Entity any use or disclosure of Covered Entity's Protected Health Information not provided for by the Principal Agreements or this Agreement of which it becomes aware, including breaches of unsecured protected health information as required by the Data Breach Notification Rule (45 CFR § 164.410), and any security incident of which Business Associate becomes aware.

(d)    Ensure that any of Business Associate's subcontractors that create, receive, maintain, or transmit protected health information on behalf of the Business Associate agree in writing to the same restrictions and conditions that apply to Business Associate with respect to such information, including compliance with the HIPAA Security Rule with respect to electronic protected health information;

(e)    Make any Protected Health Information in a designated record set available to Covered Entity to enable Covered Entity to meet its obligation to provide access to the information in accordance with 45 CFR § 164.524;

(f)    Make any Protected Health Information in a designated record set available for amendment and incorporate any amendments to Protected Health Information as directed by Covered Entity pursuant to 45 CFR § 164.526;

(g)    Make available to Covered Entity the information concerning disclosures that Business Associate makes of Covered Entity's Protected Health Information required to enable Covered Entity to provide an accounting of disclosures in accordance with 45 CFR § 164.528;

(h)    To the extent that Business Associate carries out Covered Entity's obligations under the Privacy Rule, comply with the requirements of the Privacy Rule that apply to Covered Entity in the performance of such obligations;

(I)    Make Business Associate's internal practices, books, and records relating to Business Associate's use and disclosure of Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, available to the Secretary of the United States Department of Health and Human Services for purposes of determining Covered Entity's compliance with the HIPAA Regulations;

(j)    Upon termination of the Principal Agreements, return or destroy all Covered Entity's Protected Health Information that Business Associate still maintains in any form and retain no copies of such information or, if return or destruction is not feasible, extend the protections of this Agreement to that information and limit further use and disclosure to those purposes that make the return or destruction of the information infeasible.

3.    If Covered Entity determines that Business Associate has violated a material term of this Agreement, and if Business Associate fails to cure such violation within 30 days of delivery of written notice thereat: Covered Entity may immediately terminate this Agreement.

4.    Business Associate may use Covered Entity's Protected Health Information for the management and administration of Business Associate's

2

company and to carry out Business Associate's own legal responsibilities, and Business Associate may disclose the information for these purposes if Business Associate is required to do so by law, or if Business Associate obtains reasonable assurances from the recipient of the information (1) that it will be held confidentially, and used or further disclosed only as required by law or for the purpose for which it was disclosed to the recipient, and (2) that the recipient will notify Business Associate of any instances of which the .recipient is aware in which the confidentiality of the information is breached.

5.    Business Associate may use Covered Entity's Protected Health Information for data aggregation, as permitted by the Privacy Rule.

6.    Business Associate may de-identity Covered Entity's Protected Health Information, and use and disclosed the de-identified information without restriction.

7.    This Agreement is to be interpreted in accordance with HIPAA, the HITECH Act, and the regulations promulgated thereunder, as amended from time to time.

IN WITNESS WHEREOF, this Business Associate Agreement is executed as of the date first set forth above by a duly authorized representative of each party.

[Signatures are on the next page]

3

**"BUSINESS ASSOCIATE"**

AMERICAN SPECIALTY MANAGEMENT GROUP, INC., a Delaware corporation

By: American Specialty
Management Group, Inc. a
Delaware corporation


By:_____
Name: Dr. Gurpreet Singh
Title:          President


**"COVERED ENTITY"**

GARDENS REGIONAL HOSPITAL AND
MEDICAL CENTER, a California nonprofit public
benefit corporation


By:_____
Name: Brian Walton
Title:       Chairman of the Board


By:
Name:  Stan Otake
Title:       Chief Executive Officer

4