# FOR PUBLICATION



**FILED & ENTERED**

**MAY 15 2017**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY gonzalez  DEPUTY CLERK**

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

| | |
|---|---|
| In re:    Gardens Regional Hospital and Medical Center, Inc.,<br>Debtor. | Case No.:   2:16-bk-17463-ER<br><br>Chapter:   11<br><br>**MEMORANDUM OF DECISION FINDING THAT THE DEBTOR IS NOT REQUIRED TO OBTAIN THE CONSENT OF THE CALIFORNIA ATTORNEY GENERAL TO SELL THE ASSETS OF A CLOSED HOSPITAL**<br><br>Date:    May 3, 2017<br>Time:    10:00 a.m.<br>Location:  Courtroom 1568<br>         Roybal Federal Building<br>         255 East Temple Street<br>         Los Angeles, CA 90012 |

   At issue is whether the Debtor, a non-profit entity, is required to obtain the consent of the California Attorney General to sell certain assets of a closed hospital.[1] Under the relevant California statutes, a non-profit entity operating a "health facility" that wishes to sell a material amount of its assets must obtain the consent of the California Attorney General. Because a closed hospital does not qualify as a "health facility" under California law, the Court finds that the Debtor is not required to obtain the California Attorney General's consent prior to selling a material amount of its assets.

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and General Order No. 13-05 of the U.S. District Court for the Central District of California.

## I. Facts

Gardens Regional Hospital and Medical Center, Inc. (the "Debtor") commenced a voluntary Chapter 11 petition on June 6, 2016. As of the petition date, the Debtor operated a 137-bed acute care hospital located in Hawaiian Gardens, California (the "Hospital"). The Hospital contained an intensive care unit, a cardiac unit, and an eight-bed Emergency Department. In 2015, more than 8,500 patients visited the Emergency Department, and the Hospital had a total of more than 2,850 admissions. The Hospital served a high number of indigent patients and was designated as Disproportionate Share Hospital by the United States Department of Health and Human Services in connection with the Medicaid program. Disproportionate Share Hospitals receive payments from the Centers for Medicaid and Medicare Services to cover the costs of providing care to uninsured patients. The Debtor operated the Hospital as a non-profit entity.

On July 28, 2016, the Court approved the sale of the operating Hospital to Strategic Global Management, Inc. ("Strategic"), a for-profit entity, for consideration of approximately $19.5 million. Strategic assigned its rights under the Asset Purchase Agreement (the "APA") to KPC Global Management, LLC ("KPC"). Pursuant to Cal. Corp. Code § 5914(a) (West 2017), which requires a non-profit entity operating a health facility to obtain approval from the California Attorney General (the "Attorney General") when selling a material amount of its assets to a for-profit entity, the Debtor requested that the Attorney General authorize the sale. On November 18, 2016, the Attorney General approved the sale, but only on the conditions that Strategic and KPC (1) provide $2.25 million per year in charitable care for six years, (2) provide approximately $860,000 in community benefit services per year for six years, and (3) assume at least $2.4 million in liability under the Hospitality Quality Assurance Fee Program ("HQAF"). The $2.25 million charity care condition was particularly challenging for Strategic and KPC, as the Hospital had provided only approximately $500,000 in charity care in 2015. The conditions imposed by the Attorney General increased Strategic and KPC's acquisition cost by approximately $21 million.

On December 5, 2016, Strategic, the Debtor, and representatives of two unions representing the Debtor's employees met with representatives of the Attorney General to request modification of the conditions. On December 16, 2016, the Attorney General's office issued a letter stating that the conditions would not be modified. On January 9, 2017, after negotiating with Strategic, the Debtor proposed to the Attorney General a modified transaction, under which Strategic and KPC would continue operating the hospital and would assume at least $2.4 million in HQAF liability, but only if the charity care requirement was reduced to $500,000 annually. On January 11, 2017, the Attorney General's office issued a letter stating that it lacked the authority to modify the charitable care condition that it had imposed. On January 6, 2017, Strategic and KPC provided the Debtor formal notice that, in view of the conditions imposed by the Attorney General, they were exercising their option under APA to terminate the transaction.

By this point in the case, the Debtor had nearly exhausted the $3.13 million in debtor-in-possession financing it had obtained, and the lack of unencumbered assets made it impossible for the Debtor to obtain additional financing. The Hospital continued to operate at a loss, and the Debtor was on the verge of running out of cash. In view of these circumstances, on January 20, 2017, the Court granted the Debtor's emergency motion to close the Hospital. The Court found that in voting to close the Hospital, the Debtor's Board of Directors had acted in accordance with the Debtor's mission of sustaining public health and welfare, as health and welfare would be jeopardized if the Hospital continued to admit new patients when it lacked the funds to

adequately sustain operations. As of February 2, 2017, all patients in the Hospital had been discharged or relocated, and the Hospital was completely closed.

After the Hospital closed, the Debtor caused its general acute care hospital license to be placed in suspense, pursuant to Cal. Health & Safety Code § 1300(a) (West 2017).[2] A license placed in suspense may be reinstated, but only if the applicant demonstrates compliance with the requirements of Cal. Health & Safety Code § 1265. Reinstatement requires the applicant to submit, among other things, satisfactory evidence of its reputable character and its ability to comply with applicable health and safety regulations. *See* Cal. Health & Safety Code § 1265(e)–(f).

The Debtor now moves to sell the following assets of the closed Hospital (collectively, the "Assets"):

- The below-market lease to the building in which the Hospital formerly operated (the "Hospital Lease").
- The suspended hospital license, and licenses and permits relating to the pharmacy and laboratory.
- Any furniture, fixtures, and equipment at the premises that are not owned by the landlord under the Hospital Lease.
- Inventory and supplies (which have negligible value).
- Books and records.

The sale does not include the Debtor's cash and cash equivalents, accounts receivable, Medicare and Medi-Cal provider agreements, real property leases other than the Hospital Lease, or claims and causes of action against third parties. The purchaser, American Specialty Management Group ("American Specialty"), intends to seek reinstatement of the Hospital's suspended license, and open a new general acute care hospital on the premises.

The Debtor asserts that it is not required to obtain the consent of the Attorney General to sell the Assets. The Debtor's theory is that because the Hospital has closed, the Assets no longer qualify as a "health facility." As a result, the Debtor asserts, the Attorney General lacks authority to review the sale under Cal. Corp. Code § 5914(a). The Attorney General disagrees, maintaining that the Assets still constitute a "health facility" even though the Hospital is not operating. According to the Attorney General, a finding that Cal. Corp. Code § 5914(a) does not apply would enable other non-profit entities to temporarily cease operations for the purpose of selling their assets free of the Attorney General's review and consent. Such sales, the Attorney General contends, would jeopardize public welfare by allowing assets intended for charitable purposes to be acquired by for-profit entities without proper oversight.

## II. Discussion

Section 363(d)(1)[3] authorizes non-profit entities, such as the Debtor, to sell estate assets only if the sale is "in accordance with nonbankruptcy law applicable to the transfer of property by" a non-profit entity. Section 541(f) similarly provides that property held by debtors that are § 501(c)(3) corporations under the Internal Revenue Code may be transferred, but "only under the

---

[2] Cal. Health & Safety Code § 1300(a) provides in relevant part: "Any licensee or holder of a special permit may, with the approval of the state department, surrender his or her license or special permit for suspension or cancellation by the state department."

[3] Unless otherwise indicated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

same conditions as would apply if the debtor had not filed a case under this title." Section 363(b) permits the debtor to sell estate property out of the ordinary course of business, subject to court approval. The debtor must articulate a business justification for the sale. *In re Walter*, 83 B.R. 14, 19–20 (9th Cir. BAP 1988). Whether the articulated business justification is sufficient "depends on the case," in view of "all salient factors pertaining to the proceeding." *Id.* at 19–20. Section 363(f)(1) provides that a sale of estate property may be "free and clear of any interest in such property of an entity other than the estate, only if applicable nonbankruptcy law permits sale of such property free and clear of such interest …."

### A. The Attorney General's Alleged Authority to Review the Sale is an "Interest in Property," and the Assets May Be Sold Free and Clear of That Interest

Pursuant to § 363(b) and (f)(1), the Court approves the sale of the Assets free and clear of the Attorney General's claim that he may impose conditions upon the terms of the sale or the use of the Assets after the sale. Applicable nonbankruptcy law permits the sale of the Assets absent the consent or review of the Attorney General. As explained below, because the Assets do not qualify as a "health facility" under California law, the Debtor is not required to obtain the Attorney General's consent to sell the Assets. In addition, the Attorney General's contention that he is entitled to impose conditions upon the sale, including monetary conditions, constitutes an "interest in … property" of which the Assets may be sold free and clear.

The Bankruptcy Code does not define the phrase "interest in … property" for purposes of § 363(f). The Third Circuit has held that the phrase "interest in … property" is "intended to refer to obligations that are connected to, or arise from, the property being sold." *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 259 (3d Cir. 2000). That conclusion is echoed by *Collier on Bankruptcy*, which observes a trend in caselaw "in favor of a broader definition [of the phrase] that encompasses other obligations that may flow from ownership of the property." 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 363.06[1] (16th ed. 2017).

Courts have held that interests in property include monetary obligations arising from the ownership of property, even when those obligations are imposed by statute. For example, in *Mass. Dep't of Unemployment Assistance v. OPK Biotech, LLC (In re PBBPC, Inc.)*, 484 B.R. 860 (B.A.P. 1st Cir. 2013), the court held that taxes assessed by Massachusetts under its unemployment insurance statutes constituted an "interest in … property." The taxes were computed based on the Debtor's "experience rating," which was determined by the number of employees it had terminated in the past. *Id.* at 862. Because the Debtor had terminated most of its employees prior to selling its assets, its experiencing rating, and corresponding unemployment insurance tax liabilities, were very high. *Id.* The *PBBPC* court held that the experience rating was an interest in property that could be cut off under § 363(f). *Id.* at 869–70. Similarly, in *United Mine Workers of Am. Combined Benefit Fund v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581, the court held that monetary obligations imposed by the Coal Industry Retiree Health Benefit Act of 1992 constituted an "interest in … property" within the meaning of § 363(f).

Here, the Attorney General takes the position that California law empowers him to require the purchaser of the Assets to agree to certain monetary obligations, such as furnishing a specified amount of charitable care. The charitable care obligations are connected to and arise from the Assets being sold. Had the Assets not originally been earmarked for charitable purposes, the Attorney General could not seek to impose continuing charitable care obligations. The Attorney General's claim to regulatory authority is similar to the regulatory interests

asserted in *PBBPC* and *Leckie Smokeless Coal*, and therefore constitutes an "interest in … property" for purposes of § 363(f).

**B. Applicable Nonbankruptcy Law Does Not Require the Debtor to Obtain the Attorney General's Consent to Sell the Assets**

Cal. Corp. Code § 5914(a) provides in relevant part:
> Any nonprofit corporation that … operates or controls a health facility, as defined in Section 1250 of the Health and Safety Code, or operates or controls a facility that provides similar health care, shall be required to provide written notice to, and to obtain the written consent of, the Attorney General prior to entering into any agreement or transaction to … [s]ell … its assets to a for-profit corporation or entity … when a material amount of the assets of the nonprofit corporation are involved in the agreement or transaction.

Cal. Health & Safety Code § 1250 defines a "health facility" as
> a facility, place, or building that is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation and including care during and after pregnancy, or for any one or more of these purposes, for one or more persons, to which the persons are admitted for a 24-hour stay or longer ….

The parties have not identified, and the Court has been unable to locate, any decisions by California courts addressing the applicability of Cal. Corp. Code § 5914(a) and Cal. Health & Safety Code § 1250 to a closed hospital. Accordingly, the Court is required to interpret these statutes applying California's rules of statutory construction. *See Fed. Sav. & Loan Ins. Corp. v. Butler*, 904 F.2d 505, 510 (9th Cir. 1990) (applying California's rules of statutory construction to interpret Cal. Civ. Proc. Code § 877).

Under California law, the "ultimate task" in statutory interpretation "is to ascertain the Legislature's intent." *People v. Massie*, 19 Cal.4th 550, 569, 79 Cal.Rptr.2d 816, 967 P.2d 29 (1998). "Ordinarily, the words of the statute provide the most reliable indication of legislative intent." *Pac. Gas & Elec. Co. v. Cty. of Stanislaus*, 16 Cal.4th 1143, 1152, 69 Cal.Rptr.2d 329, 947 P.2d 291 (1997). Only where the statutory language is ambiguous may the Court consider "evidence of the Legislature's intent beyond the words of the statute," such as the "statutory scheme of which the provision is a part, the history and background of the statute, the apparent purpose, and any considerations of constitutionality …." *Hughes v. Bd. of Architectural Examiners*, 17 Cal.4th 763, 776, 952 P.2d 641 (1998). "When statutory language is … clear and unambiguous there is no need for construction, and *courts should not indulge in it*." *Delaney v. Superior Court*, 50 Cal.3d 785, 800, 268 Cal.Rptr. 753, 789 P.2d 934 (1990) (emphasis in original). However, the "language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." *Younger v. Superior Court*, 21 Cal.3d 102, 113, 145 Cal.Rptr. 674, 577 P.2d 1014 (1978).

Applying these principles of statutory construction, the Court finds that the Assets being sold do not qualify as a "health facility" within the meaning of Cal. Corp. Code § 5914(a) or Cal. Health & Safety Code § 1250. All patients were transferred out of the Hospital by 4:00 p.m. on February 1, 2017. As of that date, the Hospital was completely closed. All signage was covered and the doors were locked. The Hospital has not, and cannot, receive new patients. The plain language of Cal. Health & Safety Code § 1250 establishes that a facility qualifies as a "health

facility" only if it is operating and receiving patients. The statutes specifies the characteristics of a "health facility" in the present tense—a facility qualifies only if it "*is* … operated for the diagnosis, care, prevention, and treatment of human illness" (emphasis added). Cal. Health & Safety Code § 1250. "In construing statutes, the use of verb tense by the Legislature is considered significant." *Hughes*, *supra*, 17 Cal.4th at 776. The statute does not say that it applies to a facility that "is *or previously was* operated for the … treatment of human illness." In addition, a facility that is closed cannot meet the other requirements of the statute's definition—a closed facility cannot diagnose or care for patients, or admit patients for a 24-hour stay or longer. In sum, the statute clearly and unambiguously applies only to health facilities that are operating. Because the Assets being sold do not include an operating hospital, they do not constitute a "health facility," Cal. Corp. Code § 5914(a) does not apply, and the Debtor is not required to obtain the approval of the Attorney General to sell the Assets.

    The Attorney General maintains that Cal. Corp. Code § 5914(a) applies because the Debtor "controls" the Assets being sold, notwithstanding the fact that the Hospital is closed. That argument misses the mark. No one disputes that the Debtor controls the Assets in question, but that is not the issue. The issue is whether the Assets qualify as a "health facility" within the meaning of Cal. Health & Safety Code § 1250—and as explained above, they do not.

    The possibility that the purchaser may be able to reinstate the suspended license once the transaction closes does not change this fact. If the purchaser reinstates the license and opens a new general acute care hospital, the Assets may meet the definition of a "health facility" at some point in the future. But the future status of the Assets is irrelevant. All that matters is whether the Assets are a "health facility" now.

    In this regard, the Court notes that reinstatement of the license is by no means an automatic process. To obtain reinstatement the applicant must submit satisfactory evidence of its reputable character and its ability to comply with all applicable health and safety regulations. *See* Cal. Health & Safety Code § 1265. Therefore, the Court's determination that Cal. Corp. Code § 5914(a) does not apply will not allow the purchaser to operate a health facility without adequate oversight.

    The Attorney General next argues that permitting the sale to proceed without his consent will subvert Cal. Corp. Code § 5914's purpose of protecting public health, safety, and welfare, by encouraging other health facilities to temporarily cease operations in order to circumvent the Attorney General's review of a sale of those facilities' assets. According to the Attorney General, allowing the Assets to be sold free of his review, when the Assets may be used as a health facility in the future, is an absurd result that requires the Court to depart from the literal language of the statute. The Court's construction, the Attorney General maintains, would defeat the legislation's purpose of ensuring that charitable healthcare assets could not be transferred from non-profit to for-profit entities absent regulatory oversight.

    The Court does not agree that enforcing the literal language of the statute produces an absurd result demonstrably at odds with legislative intent. The Legislature enacted Cal. Corp. Code § 5914 to ensure that the public was not deprived of the benefits of charitable health facilities as a result of the transfer of those facilities' assets to for-profit entities. In enacting § 5914, the Legislature found:

> Charitable, nonprofit health facilities have a substantial and beneficial effect on the provision of health care to the people of California, providing as part of their charitable mission uncompensated care to uninsured low-income families and under-compensated care to the poor, elderly, and disabled.

>Transfers of the assets of nonprofit, charitable health facilities to the for-profit sector, such as by sale, joint venture, or other sharing of assets, directly affect the charitable use of those assets and may affect the availability of community health care services….
>
>It is in the best interests of the public to ensure that the public interest is fully protected whenever the assets of a charitable nonprofit health facility are transferred out of the charitable trust and to a for-profit or mutual benefit entity.

1996 Cal. Legis. Serv. Ch. 1105 (A.B. 3101) (West).

Here, the Hospital was not operating at the time of the sale and thus was providing no healthcare services to uninsured low-income families. As a result, the Legislature's objective of preserving charitable health facilities for the benefit of the uninsured is not implicated by the sale of the former Hospital's Assets. In addition, the Assets are fully encumbered by the claims of secured creditors, leaving no remaining equity that could be devoted to charitable purposes. With the charitable assets having been exhausted, nothing remains to be protected by the Attorney General.

The Attorney General's concern that health facilities will deliberately close in order to sell their Assets free of the Attorney General's review is belied by the history of this case. Now that the Hospital has closed, the value the estate will receive on account of the sale has plunged from approximately $19.5 million to approximately $6.6 million. It is true that the present sale allows the Debtor to retain accounts receivable, which was not the case in the previous sale. But even after adjusting for this difference, the loss in value attributable to the closure of the Hospital is in the neighborhood of $8 million. It defies credulity to assume that other non-profit hospitals would voluntarily close to escape the Attorney General's review of a sale, when closure results in such significant value destruction.

Nor is there any indication here that the Debtor closed the Hospital for the purpose of evading the Attorney General's review of a sale. The Debtor initially attempted to sell the Hospital as an operating entity, and applied to the Attorney General for review of the sale. After the Attorney General imposed onerous and unrealistic financial conditions on the transaction, the Debtor, the proposed buyer, and representatives of the Debtor's employee unions met with the Attorney General in a good-faith effort to obtain amendments to the conditions that would allow the sale to close. The Attorney General refused to modify the conditions. Only after it became impossible for the Debtor to sell the Hospital as an operating entity did the Debtor close the Hospital and seek to sell the Assets free of the Attorney General's review.

The Attorney General's assertion that health facilities will strategically close to circumvent oversight also ignores the reality that closing a hospital is time-consuming, costly, and requires fastidious planning. It is not a matter of simply locking the doors and putting up a "Gone Out of Business" sign. The reports prepared by the Patient Care Ombudsman appointed in this case illustrate the extent of the work performed by the Debtor to close the Hospital. The Debtor was required to insure that all patients were either discharged or relocated to suitable alternative facilities. Patient relocation provided particularly difficult, as many hospitals refused to accept certain patients because they lacked sufficient insurance coverage.[4] The Debtor was required to terminate over 100 remaining staff members.[5] The Debtor was required to arrange for medication

---

[4] *See* Second Interim Report of Patient Care Ombudsman Pursuant to 11 U.S.C. § 333(b)(2) [Doc No. 657] at 10–16 (describing the difficulties the Hospital encountered in relocating patients).
[5] *Id.* at 13.

remaining in its pharmacy to be returned to suppliers.[6] Arrangements for suppliers to retrieve expensive and fragile leased medical equipment had to be made.[7] The Debtor was required to comply with health and safety regulations, which were enforced by a daily on-site surveyor from the California Department of Public Health.[8]

Finally, the Attorney General argues that sale of the Assets free of the Attorney General's review and consent is a violation of 28 U.S.C. § 959(b). Section 959(b) requires the Debtor to "manage and operate the property" in its possession "according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." The Attorney General's argument lacks merit. First, § 959(b) applies only when the Debtor continues to operate its business, and does not apply where, as here, the Debtor is liquidating its assets. *See, e.g.*, *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 334 (7th Cir. 2010) ("Modern courts have … concluded that § 959(b) does not apply to liquidations"); *Alabama Surface Min. Comm'n v. N.P. Min. Co. (In re N.P. Min. Co., Inc.)*, 963 F.2d 1449, 1460 (11th Cir. 1992) ("A number of courts have held that section 959(b) does not apply when a business's operations have ceased and its assets are being liquidated"); *Saravia v. 1736 18th St., N.W., Ltd. P'ship*, 844 F.2d 823, 827 (D.C. Cir. 1988) (viewing §959(b) "as applying only to operating businesses, not ones that were in the process of being liquidated"). Second, even if § 959(b) did apply to the Debtor, the sale of the Assets free of the Attorney General's review and consent does not violate applicable state law, as explained above.

### C. The Attorney General's Application for a Stay Pending Appeal of the Order Approving the Sale is Denied

The Attorney General's application for a stay pending appeal of the order approving the sale (the "Sale Order") is denied. Pursuant to Fed. R. Bankr. P. 8007(a)(1), the Court may issue a stay of a judgment, order, or decree pending appeal. In determining whether to grant a stay pending appeal, the Court considers the following four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009).

As the Supreme Court has explained, a stay pending appeal

> "is not a matter of right, even if irreparable injury might otherwise result." *Virginian R. Co.,* 272 U.S., at 672, 47 S.Ct. 222. It is instead "an exercise of judicial discretion," and "[t]he propriety of its issue is dependent upon the circumstances of the particular case." *Id.,* at 672–673, 47 S.Ct. 222; see *Hilton, supra,* at 777, 107 S.Ct. 2113 ("[T]he traditional stay factors contemplate individualized judgments in each case"). The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion….

---

[6] *Id.* at 12.
[7] *Id.* at 15.
[8] *Id.* at 11–13 (describing daily visits by the California Department of Pubic Health to monitor the Hospital's orderly shutdown).

> The first two factors of the traditional standard are the most critical. It is not enough that the chance of success on the merits be "better than negligible." … By the same token, simply showing some "possibility of irreparable injury," *Abbassi v. INS,* 143 F.3d 513, 514 (C.A.9 1998), fails to satisfy the second factor.

*Id.* at 433–35.

To be entitled to a stay pending appeal, the moving party must make a "minimum permissible showing" with respect to each of the four factors. *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011). Provided the moving party meets a minimum threshold as to each factor, the Court may "balance the various stay factors once they are established." *Id.* at 965. Under this balancing approach, a stronger showing of irreparable harm can offset a weaker showing of likelihood of success on the merits, and vice versa—provided that the minimum threshold with respect to each factor has been established. *Id.* at 965–66; *see also id.* at 964 ("Petitioner must show either a probability of success on the merits and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in petitioner's favor. These standards represent the outer extremes of a continuum, with the relative hardships to the parties providing the critical element in determining at what point on the continuum a stay pending review is justified.").

1. Likelihood of Success on the Merits

As the Ninth Circuit has explained:

> The first showing a stay petitioner must make is "a strong showing that he is likely to succeed on the merits." *Id.* at 1761 (quoting *Hilton,* 481 U.S. at 776, 107 S.Ct. 2113) (quotation marks omitted). There is some uncertainty as to the exact degree of likely success that stay petitioners must show, due principally to the fact that courts routinely use different formulations to describe this element of the stay test. What is clear, however, is that to justify a stay, petitioners need not demonstrate that it is more likely than not that they will win on the merits….
>
> There are many ways to articulate the minimum quantum of likely success necessary to justify a stay—be it a "reasonable probability" or "fair prospect," as *Hollingsworth,* 130 S.Ct. at 710, suggests; "a substantial case on the merits," in *Hilton*'s words, 481 U.S. at 778, 107 S.Ct. 2113; or, as articulated in *Abbassi,* 143 F.3d at 514, that "serious legal questions are raised." We think these formulations are essentially interchangeable, and that none of them demand a showing that success is more likely than not. Regardless of how one expresses the requirement, the idea is that in order to justify a stay, a petitioner must show, at a minimum, that she has a substantial case for relief on the merits.

*Leiva-Perez*, 640 F.3d at 967–68.

The Attorney General has failed to demonstrate that he is likely to succeed on the merits. As discussed above, accepting the Attorney General's argument that the closed Hospital qualifies as a "health facility" under Cal. Health & Safety Code § 1250 would require the Court to read into the statute language that is not there. No absurd result flows from applying the statute's plain language, which means that the Court is required to enforce the statute according to its terms.

2. Irreparable Injury

The Attorney General argues that he will be irreparably injured absent a stay because the closing of the sale, in conjunction with the Court's finding that American Specialty is a good-faith purchaser within the meaning of § 363(m), will render an appeal moot. As a result, the Attorney General argues, he will be unable to obtain appellate review of an important issue affecting the welfare of the people of California.

Outside the bankruptcy context, the Ninth Circuit has held that the certainty that an appeal will become moot is enough to constitute irreparable injury. *See Artukovic v. Rison,* 784 F.2d 1354, 1356 (9th Cir.1986). However, within bankruptcy, a majority of courts have concluded that mootness does not demonstrate irreparable injury. *See, e.g., Ohanian v. Irwin (In re Irwin)*, 338 B.R. 839, 853 (E.D. Cal. 2006) ("It is well settled that an appeal being rendered moot does not itself constitute irreparable harm"); *In re Red Mountain Mach. Co.*, 451 B.R. 897, 908-09 (Bankr. D. Ariz. 2011) (internal citations omitted) ("[T]he law is clear in the Ninth Circuit that irreparable injury cannot be shown solely from the possibility that an appeal may be moot"); *In re Convenience USA, Inc.*, 290 B.R. 558, 563 (Bankr. M.D.N.C. 2003) (stating that "a majority of the cases which have considered the issue have found that the risk that an appeal may become moot does not, standing alone, constitute irreparable injury" and citing cases).

The inquiry is complicated in this case by the fact that the Attorney General seeks review of an important issue of state law that will likely recur in future bankruptcy cases. Therefore, although the question is a close one, the Court finds that under the circumstances of this case the likelihood of mootness does amount to irreparable harm. However, a stay pending appeal is not a matter of right "even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 427. Given that the three other factors weigh strongly against a stay, the Court declines to issue a stay notwithstanding the Attorney General's showing of irreparable injury.

3. Balance of the Hardships

The injury to the Debtor resulting from issuance of a stay will be substantially greater than the injury to the Attorney General from denial of a stay. The estate is in a precarious financial position and is desperately in need of the funds from the sale. As discussed above, the collapse of the previous sale has already caused the estate's financial position to deteriorate significantly. Issuance of a stay could cause the present sale to collapse, depriving the estate of much-needed funds. By contrast, denial of a stay will most likely result in the Attorney General being unable to obtain appellate review of the Court's decision. This injury is less severe than the financial injury the Debtor would likely suffer were a stay issued, because the Court has found that the Attorney General's appeal is unlikely to succeed and does not raise serious legal questions.

4. Public Interest

"There is a great public interest in the efficient administration of the bankruptcy system." *Adelson v. Smith (In re Smith)*, 397 B.R. 134, 148 (Bankr. D. Nev. 2008). As noted, a stay could cause the sale to collapse, seriously injuring the estate. Here, the public's interest in the Attorney General's ability to obtain appellate review with respect to an important state law issue is outweighed by the public's interest in efficient administration of the bankruptcy system, particularly in view of the Court's determination that the Attorney General's appeal is unlikely to succeed.

**D. American Specialty is a Good-Faith Purchaser Pursuant to Bankruptcy Code § 363(m)**

Section 363(m) provides that the "reversal or modification on appeal of an authorization … of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." Based on the testimony of Dr. Gurpreet Singh, American Specialty's principal, the Court finds that American Specialty is a good-faith purchaser within the meaning of § 363(m).

In one of the more bizarre objections to a § 363(m) determination that this Court has encountered, Promise Hospital of East Los Angeles, L.P. ("Promise"), the disgruntled stalking-horse bidder who lost to American Specialty, maintains that American Specialty is not a good-faith purchaser, on the grounds that Dr. Singh failed to disclose to the Court the extent of his due diligence discussions with the Debtor prior to the auction. Before American Specialty's overbid, the Debtor intended to sell the Assets to Promise for $4.5 million. American Specialty's bidding increased the sale price to $6.7 million. The purpose of § 363(m) is to discourage bidders from colluding for the purpose of driving down the sales prices at bankruptcy auctions. *See Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 281 (9th Cir. 1992) ("Typically, lack of good faith is shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"). Here, American Specialty's bidding increased the value received by the estate on account of the sale by $2.1 million. Promise's objections are nothing more than a last-ditch attempt to scuttle the sale to American Specialty so that it may buy the Assets on the cheap.

**E. Promise's Other Objections to American Specialty's Bid are Overruled**

Promise argues that the Court's determination to allow American Specialty to bid at the sale hearing violated its due process rights, since the Debtor noticed the hearing as a private sale not subject to overbids. Promise cites *In re Northern Star Indus., Inc.*, 38 B.R. 1019 (E.D.N.Y. 1984) in support of its position. In *Northern Star*, the Trustee sought approval of a sale of real property to Wardam Steel Corporation ("Wardam Steel"). *Id.* at 1020. Because no objections were filed to the sale motion, Wardam did not attend the sale hearing. *Id.* At the sale hearing, Sydney Bletter appeared and presented a purchaser offer superior to Wardam Steel's. *Id.* The bankruptcy court approved the sale to Mr. Bletter. *Id.* Wardam objected to the bankruptcy court's ruling, stating that it had already made substantial improvements to the property in reliance upon the fact that no objections had been filed to the original proposed sale. *Id.* at 1021. The district court overturned the bankruptcy court's ruling, finding that the bankruptcy court's decision to accept Mr. Bletter's increased offer, without notice to Wardam Steel, violated Wardam Steel's due process rights. *Id.*

Unlike the losing bidder in *Northern Star*, Promise both participated in the sale hearing and had advance notice that the Court was likely to consider overbids at the sale hearing. The day prior to the sale hearing, the Court made available to the parties its tentative ruling, which stated that the Court was inclined to approve American Specialty's bid over Promise's. Likely because of the distinct possibility of an auction, Promise appeared at the hearing via counsel and with its CEO, Peter Baranoff, and CFO, James Hopwood. As bidding progressed, the Court granted Promise a one-hour recess to allow it to further consider its bidding position. Thus, Promise had a full opportunity to participate in the auction, and there was no violation of its due process rights. In addition, contrary to the situation in *Northern Star*, Promise has not made capital

improvements to the Assets. *Northern Star* is inapposite, and Promise's objections to the Court's decision to allow American Specialty to bid are overruled.

### III. Conclusion

For the foregoing reasons, the Assets of the closed Hospital are not a "health facility" within the meaning of Cal. Corp. Code § 5914(a). Consequently, the Debtor is not required to obtain the consent of the Attorney General prior to selling those Assets. The Attorney General's contention that he has the authority to review the sale is an "interest in … property" within the meaning of Bankruptcy Code § 363(f). The Assets may be sold free and clear of that interest pursuant to Bankruptcy Code § 363(f)(1).

###

Date: May 15, 2017

Ernest M. Robles
United States Bankruptcy Judge