

FILED & ENTERED

JUL 06 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | | | |
|---|---|---|---|
| In re: | Gardens Regional Hospital and Medical Center, Inc., Debtor. | Case No.: | 2:16-bk-17463-ER |
| | | Chapter: | 11 |
| | | **MEMORANDUM OF DECISION GRANTING DEBTOR'S MOTION TO STRIKE** | |
| | | Date:<br>Time:<br>Location: | July 5, 2017<br>10:00 a.m.<br>Courtroom 1568<br>Roybal Federal Building<br>255 East Temple Street<br>Los Angeles, CA 90012 |

    At the above-captioned date and time, the Court conducted an evidentiary hearing on the Debtor's "Motion to Strike and/or Objections to Portions of the Declaration of Jeffrey Ahlholm Filed by RNG in Support of RNG's Objections to Joint Motion of Debtor and Committee to Approve Settlement with Harbor-Gardens and Paladin" (the "Motion to Strike") [Doc. No. 803].[1]

---

[1] In addition to the testimony taken at the evidentiary hearing conducted on July 5, the Court considered the following papers in adjudicating the Motion to Strike:
1) Motion to Strike and/or Objections to Portions of the Declaration of Jeffrey Ahlholm Filed by RNG in Support of RNG's Objections to Joint Motion of Debtor and Committee to Approve Settlement with Harbor-Gardens and Paladin (the "Motion to Strike") [Doc. No. 803];
    a) Declaration of Jeffrey Ahlholm in Support of RNG's Objections to Joint Motion of Debtor and Committee to Approve Settlement with Harbor-Gardens and Paladin [Doc. No. 780];
2) Objections to Debtor's Motion to Strike Prior Ahlholm Declaration (the "Opposition") [Doc. No. 832];
    a) Declaration of Jeffrey Ahlholm in Support of RNG's Objections to Debtor's Motion to Strike Prior Ahlholm Declaration [Doc. No. 833];
    b) Declaration of Gary F. Torrell in Support of RNG's Objections to Debtor's Motion to Strike Prior Ahlholm Declaration [Doc. No. 834];

Brian Walton, the chairman of the Debtor's Board of Directors, and Jeffrey Ahlholm, the principal financial advisor to RNG, both testified and were subject to cross examination. The purpose of the evidentiary hearing was to enable the Court to determine whether conversations between Mr. Walton and Mr. Ahlholm on May 5, 6, and 8, 2017 constituted "compromise negotiations" within the meaning of Federal Rule of Evidence ("FRE") 408, and therefore whether the description of those conversations set forth in a declaration submitted by Mr. Ahlholm is admissible. The Debtor and Mr. Walton assert that the conversations were compromise negotiations; RNG and Mr. Ahlholm take the position that the conversations were not compromise negotiations.

For the reasons set forth below, the Court finds that the conversations were "compromise negotiations" that are inadmissible under FRE 408. The Court will strike the portions of Mr. Ahlholm's declaration that describe the contents of the conversations.

## I. Background

A hearing on the Debtor's motion seeking approval of a compromise (the "Compromise Motion") [Doc. No. 709] with Harbor-Gardens Capital I, LLC ("Harbor Gardens") and Paladin Gardens Management LLC ("Paladin") is scheduled to take place on August 9, 2017. A hearing on Rollins Nelson Group, LLC's ("RNG") motion to determine the value of its claim (the "RNG Claim Motion") [Doc. No. 710] is set for that same date.

The Compromise Motion seeks an order fixing the amount of Harbor Gardens' secured claim at $3 million, plus interest and attorneys' fees and costs. RNG objects to the Compromise Motion on numerous grounds, including that the contemplated settlement with Harbor Gardens amounts to an impermissible *sub rosa* plan of reorganization, that the settlement would alter the priority of RNG's lien, and that the settlement would not leave the estate with sufficient funds to pay RNG's secured claim.

In support of its objection to the Compromise Motion, RNG filed a declaration of Jeffrey Ahlholm (the "Ahlholm Declaration") [Doc. No. 780]. The Ahlholm Declaration sets forth Mr. Ahlholm's characterization of conversations that occurred between Mr. Ahlholm and Mr. Walton on May 5, 6, and 8, 2017. According to the Ahlholm Declaration, during the May conversations Mr. Walton:

- Stated that he did not approve of the proposed settlement agreement that is the subject of the Compromise Motion; and
- Stated that he believed that Debtor's counsel was pursuing the Compromise Motion primarily because the proposed settlement provided a mechanism through which Debtor's counsel could recover its unpaid attorneys' fees.

The Debtor moves to strike the portions of the Ahlholm Declaration that describe the May conversations, on the ground that those conversations were "compromise negotiations" that are inadmissible pursuant to Rule 408. The Court set the hearing on the Motion to Strike prior to the hearings on the related Compromise Motion and RNG Claim Motion with the expectation that earlier adjudication of the Motion to Strike would facilitate a settlement with RNG.[2]

---

  3) Debtor's Reply to Rollins Nelson Group, LLC's Objections to Debtor's Motion to Strike Prior Ahlholm Declaration (the "Reply") [Doc. No. 868]; and
  4) Order Setting Hearing on Motion to Strike for July 5, 2017, at 10:00 a.m. [Doc. No. 857].

[2] In its Opposition [Doc. No. 832], RNG states that the Court's ruling upon the Motion to Strike "should facilitate settlement negotiations prior to the continued hearings on the Compromise Motion and RNG [Claim] Motion …." Opposition at 2.

## II. Findings of Fact
*A. Undisputed Facts*

The following facts are not in dispute. Mr. Walton has been a member of the Debtor's Board of Directors since December 2008. He has served as chairman of the Board since January 2011, and has been a member of the Board's Legal Committee for several years. Mr. Walton was admitted and has been a current active member of the California State Bar since December 1974. For thirteen years, he worked as the Executive Director of the Writers Guild of America. As Executive Director, Mr. Walton was the chief negotiator on behalf of the Writers Guild. Prior to his position as Executive Director of the Writers Guild, Mr. Walton worked at two law firms as a business litigator.

Mr. Walton has engaged in numerous settlement negotiations throughout his legal career. His pattern and practice in conducting settlement negotiations it to make sure that all parties understand at the outset that the discussions are for the purpose of settlement.

Since approximately 2011, Mr. Ahlholm has served as the principal financial advisor to RNG, and has provided financial services on a near full-time basis to RNG and/or to related companies owned and operated by RNG's principals, Vicki Rollins and William Nelson. Doc. No. 780 at ¶3. Mr. Ahlholm became a member of the Debtor's Board in 2014. Mr. Walton knows Mr. Ahlholm from his involvement as a Board member.

Prior to the May 2017 conversations, Mr. Walton and Mr. Ahlholm last met in person in June 2015. Before the Debtor filed for bankruptcy, Mr. Walton and Mr. Ahlholm conversed by telephone in March and April of 2016 to discuss the settlement of claims between RNG and the Debtor. On April 14, 2016, the Debtor, RNG, and other parties entered into a settlement agreement (the "Prepetition Settlement Agreement").

On Friday, May 5, 2017, Mr. Walton contacted Mr. Ahlholm by telephone to discuss issues related to the case. The May 5 telephone call was the first contact between Mr. Walton and Mr. Ahlholm since the March and April 2016 discussions that occurred in connection with the Prepetition Settlement Agreement.

In February 2017, the Debtor, the Official Committee of Unsecured Creditors (the "Committee"), and RNG met to discuss the settlement of the Committee's claims against RNG. The Committee extended a settlement offer to RNG, which RNG declined to accept.

*B. Findings as to Disputed Issues of Fact*

The parties dispute whether the conversations between Mr. Walton and Mr. Ahlholm that occurred on May 5, 6, and 8, 2017, were "compromise negotiations" within the meaning of FRE 408. The Court finds that the conversations were "compromise negotiations" that are inadmissible pursuant to FRE 408.

Mr. Ahlholm testified that after Mr. Walton telephoned him on the evening of Friday, May 5, he sent Mr. Walton a text message to confirm that the parties would hold an in-person discussion on Saturday, May 6. Mr. Ahlholm retrieved the contents of that text message from his phone and testified that the message read as follows:

> Hi Bryan just spoke with wife on schedule and RNG on clearance. And yes, let's have lunch between the two of us to figure out best course of action. Andrew is out of control and there are viable options to stop the nonsense. Any thoughts on a place to meet. Late morning is better for me.

The "Andrew" referred to in the text message is Andrew Sherman, one of the attorneys for the Committee.

    Mr. Walton testified that during his telephone conversation with Mr. Ahlholm on Friday, May 5, he made clear that the purpose of the call was to discuss the possibility of settlement. Mr. Walton testified that when he met with Mr. Ahlholm for further discussions at a restaurant on Saturday, May 6, he explained that the discussions were for the purpose of settlement, and that Mr. Ahlholm responded with words to the effect of "of course." Mr. Walton further testified that during the conversations, he conveyed to Mr. Ahlholm the terms upon which the Committee was willing to settle its disputes with RNG. Mr. Walton testified that Mr. Ahlholm responded by setting forth a counter-proposal that he thought that RNG might accept; Mr. Ahlholm explained that he did not have authority to bind RNG to the counter-proposal and would need to check with RNG to confirm the acceptability of the counter-proposal.

    The Court finds Mr. Walton's testimony to be credible. Mr. Walton described the events of May 5, 6, and 8 with specificity. On cross examination, Mr. Walton did not alter his testimony or make any statements that contradicted or were inconsistent with the testimony that he provided on direct examination.

    There is no dispute that Mr. Walton and Mr. Ahlholm met for approximately two hours on Saturday, May 6 to discuss issues related to the case. Mr. Walton and Mr. Ahlholm are not close friends; prior to the May 5 telephone conversation, they had not spoken with each other for more than one year. Mr. Walton and Mr. Ahlholm became acquainted with each other in their capacity as members of the Debtor's Board. The conversations that Mr. Walton and Mr. Ahlholm held in March and April 2016 were in that capacity, and those conversations also related to a settlement of claims between the Debtor and RNG. It is simply not plausible that Mr. Walton and Mr. Ahlholm would meet for an extended period of time for some purpose other than discussing a settlement.

    The text message that Mr. Ahlholm testified that he sent to Mr. Walton on May 5 further corroborates that the conversations were intended to discuss settlement. In that message, Mr. Ahlholm stated that Andrew Sherman, the Committee's counsel, "is out of control" and that "there are viable options to stop the nonsense." The "nonsense" refers to the Committee's threats to pursue various remedies against RNG. Thus, Mr. Ahlholm's statement that there were "viable options" to "stop the nonsense" indicates that Mr. Ahlholm contemplated some type of settlement.

    Mr. Walton's extensive experience as an attorney further bolsters the Court's finding. Mr. Walton has been a member of the California State Bar since 1974, and has actively practiced law during much of the time subsequent to his admission. He has engaged in compromise negotiations on many occasions throughout his legal career, and he always commences those negotiations by stating to all parties concerned that the negotiations are for settlement purposes. For thirteen years, Mr. Walton worked as the chief negotiator for the Writers Guild of America. It is not believable that an attorney of Mr. Walton's experience would divulge information damaging to the Debtor unless it were clearly understood and agreed upon that the disclosures were solely for the purpose of settlement.

    Mr. Ahlholm testified that he had no authority to present to Mr. Walton any final settlement terms on behalf of RNG. Even if that is true, it does not alter the Court's conclusion that the conversations were compromise negotiations. Preliminary discussions aimed at the possibility of facilitating a settlement at some point in the future are still "compromise negotiations" within the meaning of FRE 408, as explained in greater detailed below.

## III. Conclusions of Law

Based on the findings of fact set forth above, the Court concludes that the conversations between Mr. Walton and Mr. Ahlholm on May 5, 6, and 8, 2017 were "compromise negotiations" that are not admissible pursuant to FRE 408. FRE 408 provides:

> (a) **Prohibited Uses.** Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
> 1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
> 2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
>
> (b) **Exceptions.** The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The Advisory Committee Notes explain that FRE 408 expanded the common law rule on the admissibility of settlement discussions for the purpose of encouraging settlement:

> The practical value of the common law rule has been greatly diminished by its inapplicability to admissions of fact, even though made in the course of compromise negotiations, unless hypothetical, stated to be "without prejudice," or so connected with the offer as to be inseparable from it. An inevitable effect is to inhibit freedom of communication with respect to compromise, even among lawyers. Another effect is the generation of controversy over whether a given statement falls within or without the protected area. These considerations account for the expansion of the rule herewith to include evidence of conduct or statements made in compromise negotiations, as well as the offer or completed compromise itself…. The purpose of this rule is to encourage settlements which would be discouraged if such evidence were admissible.

As the court in *Dimino v. N.Y. City Transit Auth.*, 64 F. Supp. 2d 136, 161 (E.D.N.Y. 1999) explained, FRE 408 is necessary to permit parties to openly and candidly discuss the terms upon which a matter could be settled:

> The primary purpose of this rule is to further the policy of promoting settlements and honesty in settlement negotiations…. If an offer to settle a dispute could be used as evidence of the weakness of the offeror's claim or defense, parties would seldom come to the negotiating table. Therefore, the rule provides wide protection to both the fact of the settlement or offer to settle and to negotiations and conduct associated with settlement or offer to settle. The rule also protects admissions of facts made by parties during settlement negotiations, in order to allow parties a greater degree of honesty and, therefore, a greater ability to reach a compromise.

*Id.* at 161.

RNG cites *Dimino* for the proposition that the May conversations do not fall within the scope of FRE 408 because no settlement offer was tendered. In *Dimino*, the court found that negotiations did not fall within the ambit of Rule 408 because there was insufficient evidence that any settlement had been proposed:

>Thus, despite the fact that, in his declaration to the court, Dreyfus continually refers to his discussions with plaintiff's counsel as an attempt to "settle" or to "negotiate," evidence that a settlement was actually proposed or terms negotiated is equivocal. It is not at all clear that SIRTOA offered to trade any valuable consideration for any compromise of a claim. Accordingly, evidence of the discussions would not seem to fall under the scope of Rule 408's exclusion.

*Id.* at 163.

As set forth above, the Court finds that the May conversations did include specific settlement offers. However, even if the May conversations did not include specific settlement offers, the Court finds that the conversations would still qualify as "compromise negotiations" within the meaning of FRE 408. *Dimino* is inconsistent with the plain language of FRE 408, and the Court declines to follow it. FRE 408(a)(1) defines "compromise negotiations" in a way that would exclude any negotiation that did not include an offer of settlement. *See* Rule 408(a)(1) (stating that evidence of "furnishing, promising, or offering … a valuable consideration in compromising or attempting to compromise the claim" is not admissible). But FRE 408(a)(2) includes a broader exclusion that encompasses any "conduct or statement made during compromise negotiations about the claim." *Dimino*'s narrow construction of Rule 408 disregards the broader scope of FRE 408(a)(2), and undercuts FRE 408's purpose of facilitating settlement negotiations. The narrower construction adopted by *Dimino* would make admissible preliminary settlement discussions simply because those discussions had not yet progressed to the point of including a formal settlement offer. *Dimino*'s construction would therefore discourage settlement negotiations, particularly in complex cases, because it is often necessary for parties to participate in multiple negotiating sessions before the parties are ready to begin exchanging formal settlement offers.

Other courts have given effect to FRE 408(a)(2)'s broad exclusion of any conduct or statement made during compromise negotiations. For example, in *United States v. Skeddle*, 176 F.R.D. 254, 256 (N.D. Ohio 1997), the court held that statements made by former executives of a corporation to a firm that the corporation had hired to investigate the former executive's alleged wrongdoing were inadmissible as compromise negotiations. The *Skeddle* court based its conclusion on the fact that the statements "were made in an effort to facilitate settlement among the parties." *Id.* at 256. The court did not require a showing that the negotiations satisfied the elements of FRE 408(a)(1)—that is, that the negotiations included the furnishing of an offer of valuable consideration in compromising the claim. It was sufficient that the statements were made during "compromise negotiations" pursuant to FRE 408(a)(2):

>The clear language of Rule 408 renders "statements made in compromise negotiations" inadmissible. The government does not dispute that the statements by Skeddle, Costin, and Bryant to the LOF and Fairfax investigators were made during "compromise negotiations." A straightforward application of the Federal Rules of Evidence generally, and Rule 408 specifically, leads me to the conclusion that any statements, memoranda or summary of such statements shall be excluded.

*Id.* at 256.

Similarly, in *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1107 (5th Cir. 1981), the court declined to admit a report that had been used as a tool during unsuccessful compromise negotiations. The report at issue had been prepared by an architect and contained information on construction defects present in a recently built Ramada Inn. The purpose of the report was to identify arguable defects that could then be discussed in monetary terms during the settlement

negotiations. The court found that the report was comprised of "a collection of statements made in the course of an effort to compromise" and was therefore inadmissible, even though the report was intended only as a tool to facilitate negotiations and did not include any settlement offers. *Id.* The court explained:

> [FRE 408] is designed to encourage settlements by fostering free and full discussion of the issues. The previous common law rule held that admissions of fact made in negotiations were admissible "unless hypothetical, stated to be 'without prejudice,' or so connected with the offer as to be inseparable from it." After the House Committee rejected a proposed deviation from the common law rule, the Senate Committee amended the proposed rule, by inclusion of the language emphasized in the above quote, because
>> The real impact of this (House) amendment however, is to deprive the rule of much of its salutory effect. The exception for factual admissions was believed by the Advisory Committee to hamper free communication between parties and thus to constitute an unjustifiable restraint upon efforts to negotiate settlements the encouragement of which is the purpose of the rule. Further, by protecting hypothetically phrased statements, it constituted a preference for the sophisticated, and a trap for the unwary.
> The present rule fosters free discussion in connection with such negotiations and eliminates the need to determine whether the statement if not expressly qualified "falls within or without the protected area of compromise;" the question under the rule is "whether the statements or conduct were intended to be part of the negotiations toward compromise."

*Id.* at 1106–7 (internal citations omitted).

As set forth in Section III, "Findings of Fact," the Court finds that Mr. Walton conveyed the terms upon which he believed that the Committee was willing to settle, and Mr. Ahlholm conveyed the terms upon which he believed RNG was willing to settle. The character of the conversations as compromise negotiations is not altered by the fact that Mr. Ahlholm did not have authority to convey a final settlement offer on behalf of RNG, but instead was conveying only the terms upon which he believed RNG was willing to settle. *Skeddle* and *Ramada* make clear that any statements made in an effort to compromise are inadmissible under FRE 408. Exploratory compromise negotiations that have not yet progressed to the point at which the parties are willing to exchange formal compromise offers still fall within the purview of FRE 408.

## IV. Conclusion

Based upon the foregoing, the Court finds that the conversations between Mr. Ahlholm and Mr. Walton on May 5, 6, and 8, 2017 were "compromise negotiations" within the meaning of FRE 408. The portions of the Ahlholm Declaration that describe the contents of those conversations are stricken from the record. The Court will enter an order consistent with this Memorandum of Decision.

###

Date: July 6, 2017

Ernest M. Robles
United States Bankruptcy Judge