# FOR PUBLICATION



**FILED & ENTERED**

**SEP 25 2017**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY gonzalez  DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:    Gardens Regional Hospital and Medical Center, Inc., Debtor. | Case No.:   2:16-bk-17463-ER<br><br>Chapter:    11<br><br>**MEMORANDUM OF DECISION DENYING THE DEPARTMENT OF HEALTHCARE SERVICES' MOTION FOR ALLOWANCE OF AN ADMINISTRATIVE PRIORITY CLAIM**<br><br>Date:       August 15, 2017<br>Time:       10:00 a.m.<br>Location:   Courtroom 1568<br>            Roybal Federal Building<br>            255 East Temple Street<br>            Los Angeles, CA 90012 |

At issue is whether an exaction assessed against the estate by the California Department of Health Care Services ("DHCS"), pursuant to the hospital quality assurance fee program, is properly characterized as a tax entitled to payment as an administrative priority claim pursuant to §503(b)(1)(B)(i), or whether instead the exaction is a fee not entitled to administrative priority status.[1] The Court finds that the exaction is a fee, not a tax. Further, the Court finds that even if the exaction did qualify as a tax, DHCS' claim on account of the exaction would not be entitled to administrative priority, because the claim arose prepetition.

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and General Order No. 13-05 of the U.S. District Court for the Central District of California.

## I. Facts

Gardens Regional Hospital and Medical Center (the "Debtor") commenced a voluntary Chapter 11 petition on June 6, 2016. As of the filing of the petition, the Debtor operated a 137-bed general acute care hospital located in Hawaiian Gardens, California (the "Hospital"). The Hospital served a high number of indigent patients and was operated as a non-profit entity.

On January 20, 2017, the Court granted the Debtor's emergency motion to close the Hospital.[2] As of February 2, 2017, all patients in the Hospital had been discharged or relocated, and the Hospital was completely closed.[3] On May 15, 2017, the Court granted the Debtor's motion to sell certain assets of the closed Hospital (the "Assets") to American Specialty Management Group, Inc. ("ASMG") for $6.7 million.[4] The Court rejected the California Attorney General's contention that he was entitled to impose conditions upon the terms of the sale and/or the use of the Assets subsequent to the sale, and denied the Attorney General's motion for a stay pending appeal of the order approving the sale. *See In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 567 B.R. 820, 825–833 (Bankr. C.D. Cal. 2017) ("*Gardens I*"). On May 18, 2017, the Debtor filed a notice[5] stating that the sale of the Assets to ASMG had closed.[6]

Prior to the closure of the Hospital, the Debtor provided services to patients under the California Medical Assistance Program, more commonly known as Medi-Cal. In exchange for providing these services, the Debtor received reimbursements from DHCS, the state agency charged with administering Medi-Cal.

The costs of the Medi-Cal program are shared between the state and federal governments. California is generally entitled to be reimbursed by the federal government for 50% of Medi-Cal costs. 42 U.S.C.A. §1396b(a) (West 2016). To help cover its share of Medi-Cal costs, California enacted the Medi-Cal Hospital Reimbursement Improvement Act of 2013 (the "Reimbursement Improvement Act" or "Act"), codified at Cal. Welf. & Inst. Code §§ 14169.50–14169.76 (West 2017). The Act requires most general acute care hospitals to pay a quarterly Hospital Quality Assurance Fee (an "HQA Fee"),[7] which is assessed regardless of whether the hospital participates in the Medi-Cal program. Cal. Welf. & Inst. Code § 14169.52(a) (imposing the HQA Fee upon "each general acute care hospital that is not an exempt facility"). The HQA Fee allows

---

[2] *See* Order on Debtor's Emergency Motion to Authorize Closure of Hospital [Doc. No. 633].
[3] *See* Second Interim Report of Patient Care Ombudsman Pursuant to 11 U.S.C. § 333(b)(2) [Doc. No. 657] (describing the orderly shutdown of the Hospital).
[4] *See* Order (A) Authorizing the Sale of Certain of the Debtor's Assets to Winning Bidder American Specialty Management Group, Inc. [or Backup Bidder Promise Hospital of East Los Angeles, L.P. in the Event that the Sale to the Winning Bidder is Not Consummated], Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of An Unexpired Lease Related Thereto; and (C) Granting Related Relief (the "Sale Order") [Doc. No. 813].
[5] *See* Notice of Closing of Sale of Assets of Gardens Regional Hospital and Medical Center, Inc., to American Specialty Management Group, Inc. [Doc. No. 831].
[6] In connection with his appeal of the Sale Order, the Attorney General disputes whether the sale to ASMG has actually closed. The Court makes no findings as to whether the sale has closed.
[7] The following types of hospitals are exempt from the HQA Fee: (1) hospitals owned by a local health care district, (2) hospitals designated as a specialty hospital, (3) hospitals satisfying the Medicare criteria to be a long-term care hospital, and (4) small and rural hospitals, as defined by Cal. Health & Safety Code § 124840. Cal. Welf. & Inst. Code § 14169.51(l).

California to obtain more healthcare funds from the federal government, which generally matches state Medi-Cal contributions dollar-for-dollar. The HQA Fee is collected by DHCS and is assessed quarterly.

On March 2, 2015, the Debtor stopped paying its quarterly HQA Fees. As of June 6, 2016, the date of the filing of the petition, the Debtor's unpaid HQA Fees equaled $699,173.15. To recover the unpaid prepetition HQA Fees, DHCS began withholding, subsequent to the petition, approximately 20% of the payments owed to the Debtor for providing healthcare services to Medi-Cal beneficiaries (such payments, the "Medi-Cal Payments").[8]

On June 21, 2017, the Court denied the Debtor's motion seeking to hold DHCS and the State of California in civil contempt for withholding a percentage of the Medi-Cal Payments. The Debtor argued that the withholding was an improper setoff in violation of the automatic stay. The Court found that under principles of equitable recoupment, the State was authorized to withhold a percentage of Medi-Cal Payments owed the Debtor, for the purpose of recovering unpaid hospital quality assurance fees that the Debtor was required to pay to the State under the Reimbursement Improvement Act. *See In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 569 B.R. 788 (Bankr. C.D. Cal. 2017) ("*Gardens II*"). The Debtor's appeal of *Gardens II* is currently pending before the Bankruptcy Appellate Panel.

Throughout the course of this case, DHCS has withheld a total of $4,306,426.18 from the Medi-Cal Payments owed the Debtor, for the purpose of recovering the unpaid HQA Fees. DHCS contends that, even after the withholding, the Debtor's HQA Fee delinquency is $2,537,513.19.

DHCS argues that it is entitled to an administrative priority expense claim, pursuant to §503(b)(1)(B)(i), on account of the unpaid HQA Fees. According to DHCS, the HQA Fees qualify as a tax within the meaning of §503(b)(1)(B)(i). The Debtor asserts that its HQA Fee obligation is a fee, not a tax, and therefore does not qualify for administrative priority status. In the alternative, the Debtor argues that even if the HQA Fees are a tax, the obligation arose prepetition and consequently is not entitled to priority status.

//
//
//
//
//
//
//
//
//

---

[8] The Debtor was entitled to receive reimbursements for providing treatment to patients on a fee-for-service basis (the "Medi-Cal Fee-for-Service Payments"), but was also entitled to receive supplemental quality assurance payments (the "Supplemental HQA Payments") computed according to formulas set forth in the Reimbursement Improvement Act. As used herein, the term "Medi-Cal Payments" refers to the sum of the Medi-Cal Fee-for-Service Payments and the Supplemental HQA Payments owed the Debtor. The record reflects that DHCS withheld 20% of the Medi-Cal Payments owed the Debtor but does not reflect the percentage of Supplemental HQA Payments that DHCS withheld.

The unpaid HQA Fee debt pertains to two postpetition billing periods, which DHCS denominates as "Cycle 11" and Cycle 12." The following table sets forth the Debtor's HQA Fee delinquency by cycle:

| Billing Period | Amount of Delinquent HQA Fees | Deadline to Pay HQA Fees |
|---|---|---|
| Cycle 11—July 1, 2016 to September 30, 2016 | $954,418.23[9] | October 5, 2016 |
| Cycle 12—October 1, 2016 to December 31, 2016 | $1,595,092.00 | January 4, 2017 |

## II. Discussion
### A. For Bankruptcy Purposes, The Debtor's HQA Liability is a Fee, Not a Tax

Section 503(b)(1)(B)(i) provides in relevant part: "After notice and a hearing, there shall be allowed administrative expenses, … including any tax incurred by the estate, whether secured or unsecured …."

The Ninth Circuit has held that for bankruptcy purposes, an exaction qualifies as a tax, rather than a fee, if it is:
  a) an involuntary pecuniary burden, regardless of name, laid upon individuals or property;
  b) imposed by or under the authority of the legislature;
  c) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; and
  d) under the police or taxing power of the state.

*California Self-Insurers' Security Fund v. Lorber Indus. of California (In re Lorber Indus. of California)*, 564 F.3d 1098, 1101 (9th Cir. 2009) ("*Lorber II*").

An "involuntary pecuniary burden" is "a non-contractual obligation imposed by state statute upon taxpayers who had not consented to its imposition." *County Sanitation Dist. No. 2 of Los Angeles County v. Lorber Indus. of California, Inc. (In re Lorber Indus. of California, Inc.*, 675 F.2d 1062, 1066 (9th Cir. 1982) ("*Lorber I*").

The Supreme Court has distinguished taxes from fees as follows:
> Taxation is a legislative function, and Congress, which is the sole organ for levying taxes, may act arbitrarily and disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income. A fee, however, is incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society.

*Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340–41 (1974).

The nomenclature used to describe the exaction does not control whether the exaction is a tax or a fee for bankruptcy purposes. In *United States v. Reorganized CF & I Fabricators of Utah,*

---

[9] For Cycle 11, the Debtor's HQA Fee obligation was $1,595,092.00. Because DHCS withheld $640,673.77 from Medi-Cal Payments owed the Debtor, the Debtor's outstanding obligation for Cycle 11 has been reduced to $954,418.23.

Case 2:16-bk-17463-ER    Doc 954    Filed 09/25/17    Entered 09/25/17 10:43:10    Desc
                         Main Document      Page 5 of 9

*Inc.*, 518 U.S. 213 (1996), the Supreme Court held that an exaction denominated as a tax under the Internal Revenue Code did not qualify as an "excise tax" within the meaning of the Bankruptcy Code. *Id.* at 224; *see also George v. Uninsured Employers Fund (In re George)*, 361 F.3d 1157, 1160 (9th Cir. 2004) ("Federal courts apply a 'functional examination' to the exaction, regardless of how it is labeled, to determine whether it is a tax, a penalty, a debt, or something else.").

*The HQA Exactions Are Not Imposed for a Public Purpose*

The primary issue in dispute is whether the HQA exactions are imposed for a public purpose. The Debtor argues that the Reimbursement Improvement Act, under which the HQA exactions are imposed, was enacted primarily to increase the federal funds available to hospitals within California. Under the Debtor's theory, it is the hospitals themselves—not the patients that are the end users of the hospitals' services—that principally benefit from the Act, because the Act makes additional funds available that shore up the hospitals' balance sheets. In contrast, DHCS argues that the Act's principal beneficiaries are the Medi-Cal patients who receive treatment from the hospitals that receive reimbursements under the Act. DHCS asserts that the exactions are imposed for the public purpose of expanding access to healthcare.

The hybrid healthcare system used in the United States—which combines elements of private enterprise and government support—makes application of the "public purpose" test difficult. Much of the healthcare delivered in the United States is provided by way of an extensive social safety net, supported by tax revenues, which exists to provide healthcare to those who could not otherwise afford it. For example, government funds are channeled through hospitals who participate in the Medi-Cal program. Yet the hospitals who form a vital link in this social safety net are also permitted to operate as for-profit entities, and these hospitals benefit from the government's support of healthcare.[10] As one scholar has noted:

> A huge swath of the American economy—over one-sixth—is related to health care and therefore benefits from an injection of revenues through government health care programs. Within this economic sector are hospitals, outpatient clinics, physicians, allied health professionals, insurance companies, and pharmaceutical firms—to name only the larger participants….
>
> Each of these players owes a significant portion of its income to government programs. For some, that portion is well over half. What appears on the surface to be a market-based system is actually a huge public-private partnership in which the two sides form a symbiotic pair. Private health care organizations and professionals could not function as they do without government-imposed structure and funding. In the absence of government involvement, the industry would be significantly smaller overall, and the range of medical services available to Americans would be much more limited.

Robert I. Field, *Government As the Crucible for Free Market Health Care: Regulation, Reimbursement, and Reform*, 159 U. Pa. L. Rev. 1669, 1673–74 (2011) [hereinafter *Government as the Crucible*].

As a result of this hybrid system, healthcare legislation that benefits the public often benefits private entities as well. The Patient Protection and Affordable Care Act of 2010 (the "ACA") is a good example. By prohibiting insurers from denying coverage to those with pre-existing

---

[10] In this case, the Debtor operated the Hospital as a non-profit entity. However, the effect of the Act upon for-profit hospitals sheds light on the "public purpose" test.

conditions or other health issues, 42 U.S.C. §§ 300gg *et seq.*, the ACA benefits the public at large. But by requiring most Americans to maintain "minimum essential" health insurance coverage, 26 U.S.C. §5000A, the ACA also benefits private insurance companies by increasing their customer base. *See Government as the Crucible*, 159 U. Pa. L. Rev at 1723 ("With [the ACA] mandating that everyone have health insurance, [insurance] companies stand to enjoy substantial new business. Moreover, many of the new customers will receive government subsidies to help defray the cost.").

This duality of benefits is present in the Reimbursement Improvement Act as well. The Act benefits hospitals by injecting additional cash onto their balance sheets. The public, however, benefits as well, because if hospitals did not receive the additional funds under the Act, they would not be able to provide treatment to as many Medi-Cal patients. In determining whether the HQA exactions serve a public purpose, the Court must assess whether it is hospitals or the public at large that receives the preponderance of the benefits under the Act.

Though the question is a close one, in the Court's view, the HQA exactions are best seen as operating to strengthen hospitals' balance sheets. This means that for the purpose of determining whether the exactions are best characterized as a fee or tax, the exactions are imposed to benefit hospitals, not the public at large. Several features of the Act drive this conclusion. First, the Act's purpose is to increase the total amount of funding available to California hospitals by ensuring that California receives the maximum amount of matching federal dollars under the Medicare program. Roughly every dollar collected by way of the HQA exaction yields an additional dollar in matching funds from the federal government. From the perspective of the hospitals, the exaction therefore more closely resembles an investment than a tax. The hospitals receive back the funds they pay in HQA exactions, plus additional matching funds from the federal government.

It was for this reason that the Act was sponsored by an industry group, the California Hospital Association. The legislative history reflects the Act's benefits to the hospital industry:

> <u>Benefit to hospital industry from hospital fee</u>. As part of the establishment of the fee and related payment provisions, the California Hospital Association (CHA, the bill's sponsor) developed a model that estimates the revenue generated by the fee, payments made to hospitals, payments made to the state for program administration and children's health coverage, and the net benefit to the hospital industry. CHA's model uses 2010 data to determine the payment amounts each hospital will receive under the bill. CHA estimates that over the three year period the bill is in effect (January 1, 2014 through December 31, 2016), $13.1 billion dollars in revenue would be raised from the fee, which would provide total payments to hospitals (after federal matching funds are drawn down) of $23.1 billion. The state would receive nearly $2.4 billion for children's coverage and administration, and the fee would provide a net benefit to the hospital industry of $9.9 billion (total payments to hospitals minus fees paid).
>
> The primary beneficiaries of the fee program are private hospitals (which pay the fee to draw down federal funds) as they receive $22.6 billion from the fee (this is a gross amount and does not deduct the amounts paid in fees by these facilities).

Senate Floor Analysis, Senate Bill 239, at 10 (available at <http://leginfo.ca.gov/pub/13-14/bill/sen/sb_0201-0250/sb_239_cfa_20130912_183324_sen_floor.html>).

Other provisions of the Act reinforce its purpose of supporting the hospital industry. DHCS is required to "work in consultation with the hospital community to implement" the Act's provisions. Cal. Welf. & Inst. Code § 14169.52(j). If a hospital fail to timely pay its HQA

obligations, DHCS has discretion to waive the interest and penalties assessed as a result of the late payments, provided the hospital makes a showing of financial hardship. *Id.* at § 14169.52(l)(1). Any excess HQA Fees collected must be refunded to hospitals. *Id.* at § 14169.53(c). A certain amount of the funds distributed under the Act must be used "to *minimize uncompensated care* provided by hospitals to uninsured patients …." *Id.* at § 14169.53(b)(1) (emphasis added).

As noted, the hybrid public/private nature of the healthcare system means that the public also benefits from the HQA Fees—the additional funds that hospitals receive as a result of the Act allow them to treat more Medi-Cal patients. In determining that the preponderance of the benefit is to the hospitals, the Court finds it significant that hospitals are reimbursed directly for healthcare services they provide. A hospital that devises a more efficient way of providing healthcare services can use the funds it saves for other purposes; it is not required to use that money to treat additional Medi-Cal patients. Further, hospitals with an emergency department are required to provide care to any person who comes to the emergency department seeking treatment, regardless of that person's ability to pay. 42 U.S.C. § 1395dd. The fact that emergency department patients would receive treatment even if the Act did not exist supports the Court's finding that it is hospitals who receive the preponderance of benefits under the Act.

*California Law Does Not Dictate the Determination of Whether the Exaction is a Fee or a Tax*

DHCS' other arguments are disposed of more easily. DHCS cites various California cases holding that the HQA Fees are a tax. However, those cases are not controlling because they address whether the HQA Fees constitute a tax for purposes of California law, not whether the obligation is a tax for bankruptcy purposes. Federal law controls for purposes of determining whether the HQA Fees qualify as a tax within the meaning of §503(b)(1)(B)(i). DHCS also asserts that the HQA Fees qualify as a tax pursuant to the definition of "tax" added to the California Constitution pursuant to Proposition 26. Once again, whether an exaction qualifies as a tax for bankruptcy purpose is an issue of federal law that is not controlled by the California Constitution.

**B. Even if the Debtor's HQA Liability is a Tax, DHCS' Claim is Not Entitled to Administrative Priority Because it Arose Prepetition**

Section 503(b)(1)(B)(i) accords administrative priority to a claim arising on account of "any tax incurred by the estate …." The estate does not spring into existence until the filing of the petition, §541(a), so a tax claim arising prepetition cannot be entitled to administrative priority. Because DHCS' claim arose prepetition, the claim is not entitled to administrative priority even if the Debtor's HQA obligation is a tax.

Section 101(5)(A) defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured …." "This 'broadest possible definition' of 'claim' is designed to ensure that 'all legal obligations of the debtor, *no matter how remote or contingent,* will be able to be dealt with in the bankruptcy case.'" *Cal. Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 929 (9th Cir. 1994) (emphasis in original) (citing H.R.Rep. No. 595, 95th Cong., 2d Sess. 1, 309 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266; S.Rep. No. 598, 95th Cong., 2d Sess. 1, 22, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5808).

"[F]ederal law determines when a claim arises under the Bankruptcy Code." *SNTL Corp. v. Centre Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826, 839 (9th Cir. 2009). The Ninth Circuit uses

the "fair contemplation" test to determine whether a claim arose prepetition. *Picerne Construction Corp. v. Castellino Villas, A. K.F. LLC (In re Castellino Villas, A. K. F. LLC)*, 836 F.3d 1028, 1034 (9th Cir. 2016) (internal citations omitted). Under the fair contemplation test,
> "a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law." For instance, in *Jensen* we held that when a state environmental regulatory agency was aware that the groundwater at the debtors' site was seriously contaminated before the debtors filed a bankruptcy petition, a contingent claim for cleanup costs was in the "fair contemplation" of the state at the time the debtors filed their Chapter 7 petition. The state's claim for cleanup costs was therefore discharged in bankruptcy, even though the state incurred nearly a million dollars in cleanup costs after the discharge.

*Id.* (internal citations omitted).

DHCS argues that it could not have reasonably contemplated its HQA Fee claim against the Debtor prior to the petition, because DHCS did not know the exact amount of the Debtor's HQA Fee liability until August 2016, after the petition was filed. DHCS' argument is not persuasive. A claim remains within the fair contemplation of the claimant even if the claimant cannot specify the exact amount of the claim. In *Jensen*, for example, a claim for environmental cleanup costs was within the fair contemplation of the relevant state regulatory agency prior to the petition, even though it was not until after the date of the petition that the full extent of the environmental contamination was discovered and the cleanup work performed. *Jensen*, 995 F.2d at

Here, DHCS had a far better estimate of its claim prepetition than the claimant in *Jensen*. Pursuant to the Reimbursement Improvement Act, quality assurance fees are assessed based on a DHCS-developed fee model that must be approved by a federal agency, the Centers for Medicare and Medicaid Services (the "CMS"). Cal. Welf. & Inst. Code §§ 14169.51(m), 14169.52(c), 14169.52(e), and 14169.53(f); Beshara Decl. [Doc. No. 829] at ¶¶12–14. The relevant fee model (the "Fee Model") was approved by CMS prepetition, in January 2015. Beshara Decl. at ¶15. After DHCS obtains CMS approval of the Fee Model, it then calculates the HQA Fees that are owed by each hospital, using data that the hospitals are required to supply. Beshara Decl. at ¶15; *see also Gardens II*, 569 B.R. at 791 (describing how a hospital's HQA Fee obligation is calculated). The Debtor's HQA Fee obligation could change if the number of hospitals subject to HQA Fee liabilities changed—for example, an increase in the total number of hospitals subject to the fee would result in a corresponding decrease in the amount of fees assessed against each individual hospital. Nonetheless, prior to the petition, DHCS still had a far better idea of the amount of its claim against the Debtor than the claimant in *Jensen*. The *Jensen* claimant did not even know the full extent of the environmental contamination giving rise to its claim until after the petition. Further, even if DHCS could not have accurately estimated the amount of its claim prepetition, what matters for purposes of the fair contemplation test is not whether the claimant knows the *amount* of its claim, but rather whether the claimant can fairly contemplate the *existence* of its claim. In sum, DHCS could fairly contemplate its claim against the Debtor prepetition even though it did not know the exact amount of the claim.[11]

---

[11] Nothing in this opinion constitutes a determination as to whether DHCS holds an allowable prepetition claim on account of the Debtor's unpaid HQA Fee obligation.

## III. Conclusion

Because the HQA Fees do not qualify as a tax for bankruptcy purposes, DHCS is not entitled to an administrative claim pursuant to §503(b)(1)(B)(i). Even if the HQA Fees did qualify as a tax, DHCS would still not be entitled to an administrative claim, since any claim DHCS may have on account of the Debtor's unpaid HQA Fee obligation arose prepetition.

###

Date: September 25, 2017

Ernest M. Robles
United States Bankruptcy Judge